Robert F. Aucone, CPA, ABV
1072 Riddlewood Road
Highlands Ranch, CO 80129
720-331-6300
baucone@comcast.net

June 17, 2016

Mark A. Fahleson, Esq.
Rembolt Ludtke, LLP
3 Landmark Center
1128 Lincoln Mall, Suite 300
Lincoln, NE 68508

Re: Deborah Rasby and Douglas Rasby, v. James D. Pillen
Double D, LLC Calculation Report

Mr. Fahleson:

I was asked to review and comment, if applicable, on a "calculation report of ownership interest of Deborah Rasby in Double D, LLC," (hereinafter "the Report"). The calculation report was prepared by William A. Startzer and the "calculation date is December 31, 2011."

There are numerous concerns with the Report. These include the approach taken (and other potential approaches not considered), adjustments to the capitalization of earnings benefit stream, including federal and state income taxes, the adjustment for depreciation, the adjustment for capital expenditures, the adjustment for working capital, calculation of the pass-through premium, and the calculation of the capitalization rate.

The remainder of this report will provide a discussion regarding the approach taken (and other potential approaches not considered) as well as detailed information as to the adjustments made to the Report Exhibits. The Attachments to this report, as discussed below, essentially duplicate the Report Exhibits after reflecting the adjustments and corrections needed. Finally, there is a summary and conclusions section.

Based upon the test work performed and the documents reviewed, it is my opinion that the Report cannot be relied upon in determining the value of Double D, LLC (hereinafter "Double D") as of December 31, 2011.

## Valuation Approach

***Professional Standards***

The Report states that it is a "calculation report" which is "prepared in accordance with the Statement on Standards for Valuation Services of the American Institute of Certified Public Accountants (hereinafter "SSVS" or "the Statement"). " It goes on to state that the Report provides the reader with an "indication of value," and "is not a complete valuation analysis." Finally, it states that a calculation engagement does not



include all the procedures required for evaluation and "had a valuation engagement been performed, the results may have been different."

SSVS does provide for a "calculation engagement," and the Representation and Engagement Letter (hereinafter the "EL") with Deb Rasby dated January 13, 2016, does state that they would perform a calculation engagement. In that regard, the Statement "refers to an engagement or any part of an engagement (for example, a tax, litigation, or acquisition – related engagement) that involves estimating the value of a subject interest. An engagement to estimate the value culminates in the expression of either a ***conclusion of value*** or a ***calculated value***." It also states that "A valuation analysts performs a calculation engagement when (1) the valuation analyst and the client agree on the valuation approaches and methods the valuation analysts will use and the extent of procedures the valuation analysts will perform in the process of calculating the value of a subject interest (these procedures will be more limited than those of a valuation engagement) and (2) the valuation analyst calculates the value in compliance with the agreement. The valuation analyst expresses the results of these procedures as a calculated value."

The Report does not follow these guidelines. In spite of the representations in the EL, the Report does not use the term "calculated value." Instead, it states that it is a "calculation report" which provides the reader with an "indication of value" based upon the procedures performed. It does not provide a conclusion as to the "calculated value." Hence, it does not follow the guidelines provided in the Statement or the terms of the EL.

***Representation and Engagement Letter***

While the valuation analyst, in this case Mr. Startzer, and his client, Deborah Rasby, may have agreed on the approach, it is not appropriate in the context of this litigation. The EL specifically states "We assume you will be able to use the calculation reports for negotiation of a settlement through mediation. If litigation requires a court trial and you require us to form a conclusion of value, we can expand our work to a valuation engagement." In my experience, I have seen situations where the "calculated value" has been used in litigation matters, however this approach only occurred when both parties to the litigation agreed to the use of one valuation analyst and one or more valuation approaches and/or methods to determining the value. In addition, they both "agree on the extent of procedures the valuation analysts will perform." That was not the case in this situation. In my opinion, a "valuation engagement," requiring a full business valuation, resulting in a conclusion of value, should have been performed.

***December 14, 2015, E-mail from Bill Startzer to Deb Rasby***

The e-mail referred to above states in part "The valuation engagement requires significantly more information than a calculation of value. Assuming we have access to the information we need, then based on the work we performed, we can provide a conclusion of value, or an opinion of value. I have testified in divorce cases using a






PILLEN02488

calculation of value, but your attorney will need to determine if an valuation engagement is necessary for this litigation."

The e-mail further states "We can start by preparing a calculation of value to get an indication of where the value will fall and then step it up to a valuation engagement if that is needed for testimony. But keep in mind, there is a lot more information needed to get the valuation engagement done, so adequate time must be allowed to complete that process."

The e-mail further states "What standard of value do you want to use? On our prior work, we used a fair value, which is fair market value without the application of any discounts. Such value is to your benefit, but your attorney will need to consider whether such standard of value can be used in this litigation. Some litigation requires the application of fair market value, which includes the application of discounts for either lack of control, lack of marketability, or both."

Finally, the email states "If we do a valuation engagement, we want an opportunity to make a site visit and interview company management."

***Valuation Engagement***

The Statement defines a valuation engagement as when "Evaluation analysts perform a valuation engagement when (1) the engagement calls for the valuation analyst to estimate the value of a subject interest and (2) the valuation analysts estimates the value and is free to apply the valuation approaches and methods he or she deems appropriate in the circumstances. The valuation analyst expresses the results of the valuation as a conclusion of value; the conclusion may be either a single amount or a range." The Statement further states that "In developing the valuation, the valuation analysts should consider the 3 most common valuation approaches," and lists the income approach, asset approach and market approach. It further cites the "capitalization of benefits method (earnings or cash flows)" and the "discounted future benefits method (earnings or cash flows)" as 2 examples of the income approach. It also cites the "guideline public company method" and the "guideline company transactions method" as examples of the market approach.

In this instance, using one of the other methods may have provided a better indication of value.

Also in this regard, the Institute of Business Appraisers state that their standards "do allow for calculation engagements or consulting engagements where estimates or approximations of value are provided so long as the nature and scope of the service provided is clearly stated. A calculation or approximations does not constitute an opinion of value and will constitute a level of service less than a letter or formal report."



EXHIBIT D

***Sources of Information***

The Report states "The analysts have relied primarily on financial data provided to them by Deborah Rasby," that the "financial information included the internally prepared financial statements for the fiscal years ending December 2007 through December 2011," and that they "relied on other oral and written information provided by Deborah Rasby to gain an understanding of the business operations of the Company."

The Report does not specify the "other oral and written information provided." As result, the reliability and/or accuracy of that information cannot be tested. Further, it is my understanding that Deborah Rasby was primarily in charge of the accounting functions related to the business. In my experience, a valuation analysts always attempts to arrange a meeting with the majority owners of the business as well as individuals who are key to the operations of the business in order to obtain a full understanding of the nature, history, and future operations of the business. The Report does not indicate that Mr. Startzer attempted to arrange such meetings and, had he done so, some of his decisions, as will be discussed below, may have been different.

In fact, as noted above, the e-mail from Mr. Startzer to Deb Rasby specifically notes that they would want an opportunity to make a site visit and interview company management if they were to perform a valuation engagement.

***Report Assumptions***

The Report states that "we will use normalized cash flow" to determine the economic benefit, however, the Report does not reflect any "normalizing" adjustments, nor does it indicate that such adjustments were even considered.

The Report lists 5 assumptions included in the determination of value. The first states that "A weighted average of earnings before interest, taxes, depreciation and amortization (EBITDA) for the last five years was calculated to create a starting point to calculate normalized cash flow. With one exception, such weighted EBITDA would be representative of the Company's ongoing EBITDA. The one exception is for potential lost revenue for sales to a related party. Substantially all revenue is from sales to a related party. Deborah Rasby has determined the sale of pigs in 2010 to this related party were at a price substantially less than market prices. She determined such lost revenue for 2010 was $5.6 million. We assume the same lost revenue occurred in 2011. Due to the uncertainty of transactions in years prior to 2010, those preceding years were not included in the weighting factor, as shown on Exhibit 2."

It is almost inconceivable that Mr. Startzer would reflect an adjustment of $5.6 million to the 2010 income statement solely based upon the representations of Deborah Rasby. It is even more inconceivable that he would reflect an additional adjustment of $5.6 million to the 2011 income statement with absolutely no substantiation.

Further, he apparently did not consider that an increase in revenue would likely result in corresponding increases in expenses. For example, total revenue for the year ended December 31, 2009, was $7,649,456. Total revenue for the year ended December 31, 2010, was $1,289,983. The addition of $5.6 million of revenue in 2010 indicates he believes total revenue in 2010 would have been $6,889,983, or $759,473 less than in 2009. Total expenses for the year ended December 31, 2009, were $8,347,106, as compared to $1,389,546 for the year ended December 31, 2010. The lack of foundation aside, it is clearly inconsistent to project such an increase in revenue without a corresponding increase in expense.

Finally, the Report does not explain why this approach would be "representative," nor why the particular weighting, as shown on Exhibit 2, was used.

The second assumption is that "Anticipated depreciation/amortization is an estimate based on historical financial data and discussions with Deborah Rasby." First, as will be discussed below, while a "weighted average of earnings" for the past 2 years was used to determine the ongoing EBITDA, a simple average of depreciation expense for the past 2 years was used as a prediction for ongoing depreciation. This is clearly inconsistent. In addition, there is no provision for growth, as there was for the calculation of weighted average of earnings before interest, taxes, depreciation and amortization on Exhibit 2.

The third assumption relates to the differences in income taxes when comparing a pass-through entity such as Double D as compared to those of a C Corporation. While I concur with the overall approach, as will be discussed in detail below, I disagree with the use of a 20% federal tax rate being applied to the hypothetical dividends of a C Corporation.

The fourth assumption is "An adjustment to working capital requirements, to determine normalized cash flow, was calculated by applying the growth rate to net working capital at the valuation date." In this case, the calculations do consider the significantly negative working capital position, nor do they include a provision for growth, as there was for the calculation of weighted average of earnings before interest, taxes, depreciation and amortization on Exhibit 2.

The fifth assumption states "All related party transactions are completed at amounts that reflect arms-length transactions between unrelated parties at prices that reflect current market values." There does not appear to be any discussion in the Report as to related party and/or unrelated party transactions, nor any adjustments as a result of such transactions.

***Capitalization Rate***

Finally, the report addresses the "buildup" method used to determine the "discount rate and the capitalization rate." While I agree with this approach, as will be discussed below, I have several concerns with regard to the actual application of the approach.

***Discounts for Control and Lack of Marketability***

The Report states "Discounts for lack of control and discounts for lack of marketability are often considered and/or applied when computing the value of less than a controlling interest or where the business or ownership interests in the business cannot be readily sold in the marketplace." That is certainly the case with regard to Deborah Rasby's interest in Double D. The report further states "For purposes of this calculation, a discount for lack of control would not be separately stated as the analysts relied on historical financial data with no adjustments for control, and the capitalization rate is derived from public returns for minority owners. For purposes of this calculation, no discount for lack of marketability was applied."

This statement implies that a discount for lack of control was not taken because there was "no adjustment for control." The two adjustments, control and lack of control, are independent of one another and, in my opinion, a discount for lack of control should have been determined.

The statement that "the capitalization rate is derived from public company returns for minority owners," does not alleviate the need for a marketability discount. The significant difference between minority ownership in public companies as compared to privately held companies is that the owner of an interest in a public company can liquidate their ownership interest usually within 2 to 3 business days. That is not the case with an ownership interest in a closely held business. There is not a ready market of investors ready and willing to purchase minority interests in closely held businesses and, as a result, the process can often take six months or longer, subjecting the owner to market fluctuations during the interim.

Finally, as noted above, the e-mail from Mr. Startzer to Deb Rasby specifically notes that the approach taken is to Deborah Rasby's benefit, but her attorney will need to consider whether such standard of value can be used in this litigation and that some litigation requires the application of fair market value, which includes the application of discounts for either lack of control, lack of marketability, or both.

***Conclusion***

Based upon the above, the Report should not be relied upon when determining the value of Double D as of December 31, 2011.

This statement notwithstanding, I have re-created the Exhibits to the Report in order to show the detail and magnitude of the concerns with the Report calculations. The





Attachments are not intended to replace the Report Exhibits and do not express an opinion of value of Double D. Attachment I to this report corresponds to Exhibit 1 of the Report, Attachment II corresponds to Exhibit 2, Attachment III corresponds to Exhibit 3, and Attachment IV corresponds to Exhibit 6. In addition, Attachment V is the calculation of depreciation expense, Attachment VI is a determination of the appropriate capital expenditure adjustment and Attachment VII is a determination of the appropriate working capital adjustment.

## Adjustments to Report Exhibits

***Depreciation Expense***

As mentioned above, the Report simply took an average of the annual depreciation as a proxy for future depreciation expense. However, Exhibit 2 to the Report uses a weighted average of income as a proxy for future income and, in my opinion, this is inconsistent with a simple average of depreciation expense. Accordingly, Attachment V calculates the weighted average depreciation using the same approach as used in Exhibit 2 to the Report.

In addition, Exhibit 2 to the Report provides for a 3% growth in revenue, but does not provide for the same growth in depreciation. Once again, I believe this is inconsistent and, have provided for a 3% growth of depreciation expense, resulting in projected future depreciation, as shown on Attachment V, of $1,369,044.

Finally, the amounts calculated represent the actual depreciation deduction from year to year. It is likely that as assets are replaced, likely at higher prices, and additional assets are purchased, an indication that actual depreciation expense will increase by more than 3% per year. As can be seen from Exhibit 2 to the Report, depreciation expense increased from $908,880 for the year ending December 31, 2007, to $1,529,772 for the year ending December 31, 2011, an increase of 68%. This represents a compounded increase of 13.9% per year.

***Capital Expenditure Adjustment***

Exhibit 2 to the Report provides for future capital expenditures of $460,000 per year. Footnote 2 to Exhibit 2 states that the "Estimate based on average of preceding two years." However, it appears that the estimate is based upon capital expenditures in 2010 of $928,512 divided by 2 ($928,512 / 2 = $464,256). Once again, a weighted average approach should have been used to calculate average capital expenditures, and the weighted average capital expenditures should have been increased by the 3% growth rate.

Attachment VI to this report calculates the net increase in property and equipment from year to year for the four years ended December 31, 2011. It then calculates the weighted average net increase using the same approach as used on Exhibit 2 of the Report when determining future income, resulting in weighted average net capital





expenditures of $695,367. That amount is increased by the 3% growth rate, resulting in projected weighted average net capital expenditures of $716,228.

As noted in the previous paragraph, the amounts calculated represent the "net" increase in property and equipment from year to year. It is likely that assets were retired from service during those years, thereby understating the actual "additions" during those years.

***Working Capital Adjustment***

Working capital is the difference between current assets and current liabilities. Working capital is a measure of a company's efficiency and its short-term financial health. A working capital ratio is calculated by dividing current assets by current liabilities. Negative working capital, or a ratio below one, may indicate that the company could run into trouble paying back creditors in the short-term. A declining or consistently negative working capital ratio over a longer period of time is a situation that warrants further analysis and attention.

As can be seen from Attachment VII, Double D's working capital ratio has been negative, that is, below one, for the five years ended December 31, 2011. In fact, the only time at which the ratio has been above .50 was December 31, 2007.

Exhibit 2 to the Report includes an "Adjustment for Working Capital Requirements" of $50,000. Footnote 4 indicates that this is an "Estimate." No further explanation is provided as to how the $50,000 was determined. In my opinion, $50,000 is inadequate given the fact that Doubled D reported negative working capital of $5,114,066 at December 31, 2011. Double D should strive to eliminate the working capital deficit as soon as possible. Given the magnitude of the deficit, eliminating the deficit in ten years would be a reasonable goal. That would require additions to working capital of $511,407 per year. For purposes of these calculations, I have included an adjustment for working capital of $500,000 per year on Attachment II.

***Capitalization Rate***

The Capitalization Rate used is calculated on Exhibit 3 to the Report. As noted above, I concur with the approach, however do not agree with all of the factors used in the Report. Attachment III to this report is a side-by-side comparison of the components of the capitalization rate as shown in the Report and as corrected in this report.

The analysis begins with the "Rate to Equity," which is calculated beginning on the middle of the page. The first component of the rate to equity is the risk-free rate of return. I agree with the rate used.

The second and third components are the equity risk premium and small stock risk premium. I routinely use the same source when determining the equity risk premium





and small stock risk premium and, as a result, agree with his equity risk premium. However, I disagree with the small stock risk premium used in the Report. As noted in footnote 1 to Attachment III, Mr. Startzer used a small stock risk premium associated with publicly traded stocks with a market capitalization of $128,714,000, or greater. The Report concluded that the calculated value of Double D was $39,148,193. As a result, and based upon the recalculated value as shown on Attachment I to this report, it is my opinion that the small stock risk premium associated with companies with a market capitalization of $1,028,000 or more should have been used. The small stock risk premium for that category was 11.77%, which is being used in this report to determine the capitalization rate.

Mr. Startzer added a company specific premium of 4% when determining the capitalization rate. In my experience, this rate is very low for a small, privately owned company. In my experience, the range is generally between 6% to 8%, or even higher. Therefore, in my opinion a rate of at least 7% is appropriate.

Based upon these changes, in my opinion the "Rate to Equity" of 17.46% as shown in the Report significantly understates the rate of return an investor would require for business of this size. In my opinion, a rate of 27.48%, as shown on Attachment III, is more appropriate.

After computing the Rate to Equity, the Report applies a "Weight" of 93% to the Rate to Equity, to arrive at a Weighted Rate of Equity of 16.24%. There is no explanation as to how the 93% "Weight" was determined. For comparison purposes, I have also used the 93% "Weight," however that is not an indication that I agree with the percentage used.

The Report then states a "Rate to Debt – Estimated interest rate on debt" of 6%. The Report does not indicate how the 6% was determined. I have calculated the effective interest rate for the years ended December 31, 2010 and 2011, at the bottom of the first page of Attachment III. As can be seen, the effective interest rate for the year ended December 31, 2010 was 4.96%, effective interest rate for the year ended December 31, 2011, was 4.18%, and the average interest rate for the two years was 4.57%. Accordingly, I use this rate, as opposed to the 6% used in the Report.

The report then reduces the Rate to Debt for an "Income tax benefit" equal to 40% of the Rate to Debt. Essentially, the report is estimating income taxes at 40% which, in my opinion, is too high. Attachment II to this report shows state income taxes of $32,992 and federal income tax of $137,420, a total of $170,342, on a tax base of $471,307. This represents an effective tax rate of 36.1%, which, when applied to the 4.57% Rate to Debt results in an income tax benefit of 1.65%.



EXHIBIT D
PILLEN02495

The "After-tax rate to debt" in the Report is 3.6%. As shown on Attachment III to this report, the after-tax rate to debt is 2.97%. The Report then applies another "Weight" of 7% to the After-tax rate to debt. Once again, there is no explanation as to how the 7% "Weight" was determined. For comparison purposes, I have also use the 7% "Weight," however that is not an indication that I agree with the percentage used.

Finally, Mr. Startzer applies a "Mid Year Convention" to the capitalization rate, thereby reducing the capitalization rate and increasing the value of the business. In my opinion, the midyear calculation is inappropriate. First, the risk-free rate of return is as of December 31, the date of the valuation. Second, the equity risk premium and small stock risk premiums are based upon averages of stocks in each category from the preceding year. Lastly, the company specific premium is based upon the valuation analysts' assessment of risk at the valuation date, once again December 31, 2011.

***Income Tax Pass-Through Analysis***

Exhibit 6 to the Report is the calculation of the pass-through premium as a result of Double D being an LLC, exempt from corporate income taxes, as compared to a C Corporation. Attachment IV to this report is the same as Exhibit 6 except that the corrected taxable base is the starting point and the individual federal income taxes under the column headed "Entity Level Tax" is calculated at 15%, the tax rate for dividends, as opposed to the 20% rate used in the Report. In addition, given the relatively low tax base of $471,312, state income taxes of $32,992 under the "No Entity Level Tax" column were deducted from the net income after income taxes of $471,307 before calculating the federal income tax expense of $175,326.

***Capitalization of Earnings Benefit Stream***

The Capitalization of Earnings Benefit Stream is shown on Exhibit 2 to the Report. The calculations on Exhibit 2 result in an After Tax Cash Flow of $4,502,931. Attachment II to this report uses the same format as Exhibit 2, with changes and adjustments discussed in the previous paragraphs.

Attachment II begins with net income as reported on the internal financial statements. In some cases these amounts are different from those used in the Report. Actual depreciation expense and interest expense, as reported on the income statement, are added back to the income reported on the internal financial statements. The totals are annualized in the same format as Exhibit 2, resulting in weighted average earning power of $1,786,749. As noted above, there are two reasons for the significant difference. First, Attachment II excludes the hypothetical $5,600,000 "Lost Revenue" included on Exhibit 2 to the Report. Second, Attachment II uses a five-year weighted average approach to calculate Ongoing EBITDA. The ongoing EBITDA is then increased by the 3% growth rate, as was done on Exhibit 2. The adjusted ongoing depreciation, however, was taken from Attachment V, as discussed above. State and federal income taxes were then calculated on the taxable base resulting in a subtotal of $300,896, as compared to the



EXHIBIT D
PILLEN02496

$3,512,931 shown on Exhibit 2. Ongoing depreciation, once again taken from Attachment V, is added to the subtotal, as are the adjustments for capital expenditures and working capital (from Attachments VI and VII), discussed above. The result is adjusted Ongoing Net of Debt After Tax Cash Flow of $775,066.

***Calculation of Indicated Value***

Attachment I to this report is the calculation of indicated value which corresponds to Exhibit 1 to the Report. It begins with the after-tax cash flow of $775,066 from Attachment II. The capitalization factor of 4.4 was calculated on Attachment III as discussed above. The premium for a pass-through entity of 12.05% was calculated on Attachment IV, as discussed above. The result of these calculations is a calculated value of the company to the owners of $3,815,756. Five percent of this is $190,788, rounded to $190, 800.

## Summary and Conclusions

Based upon the documents reviewed and the calculations performed, in my opinion the Report should not be relied upon when determining the value of Double D. In addition, the above is not intended to, and does not, constitute an alternate opinion of value of Double D. In my opinion, a full valuation engagement, resulting in a conclusion of value, after applying several valuation approaches, is required in the context of this litigation.

I am being compensated at the rate of $325 per hour and $350 per hour for deposition and trial testimony. A copy of my curriculum vitae, list of testimony, list of publications and list of documents reviewed is also attached.

Sincerely,

Robert F. Aucone
Attachments



EXHIBIT D
PILLEN02497