1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF NEBRASKA

3

**EXHIBIT 2**

4

5   DEBORAH RASBY and          )
    DOUGLAS RASBY, husband      )
    and wife,                   )   CASE NO. 8:15-cv226

6                               )

7            Plaintiffs,        )   DEPOSITION TAKEN IN
                                )
         vs.                    )   BEHALF OF DEFENDANT
8                               )
    JAMES D. PILLEN, an         )
9   individual,                 )
                                )
10           Defendant.         )

11

12

13   DEPOSITION OF:  ROGER W. WELLS

14   DATE:  March 21, 2017

15   TIME:  9:09 a.m.

16   PLACE:  1601 Dodge Street, Suite 3700, Omaha,

17   Nebraska

18

19

20

21

22   ORIGINAL

23

24

25

2

1                    A P P E A R A N C E S :

2       APPEARING FOR THE PLAINTIFFS:

3               Ms. Diana J. Vogt
                Attorney at Law
4               260 Regency Parkway Drive
                Suite 200
5               Omaha, NE 68114
                dvogt@sherrets.com
6
        APPEARING FOR THE WITNESS:
7
                Mr. William F. Hargens
8               Attorney at Law
                1601 Dodge Street
9               Suite 3700
                Omaha, NE 68102
10              whargens@mcgrathnorth.com

11      APPEARING FOR THE DEFENDANT:

12              Mr. Timothy R. Engler
                Ms. Sheila A. Bentzen
13              Attorneys at Law
                3 Landmark Centre
14              1128 Lincoln Mall, Ste. 300
                Lincoln, NE 68508
15              tengler@remboltlawfirm.com
                sbentzen@remboltlawfirm.com
16
        ALSO PRESENT:
17
                Kara Barnett, Douglas Rasby and Deborah
18              Rasby

19

20

21

22

23

24

25



3

1                         I-N-D-E-X

2
      WITNESS      Direct  Cross   Redirect  Recross
3
      ROGER WELLS   8   207-Vogt    215       --
4

5

6     EXHIBITS                          Marked Offered

7     1. Unit Purchase Agreement          17    --

8     2. Unit Purchase Agreement with
      Handwriting                         41    --
9
      3. E-Mail 5/22/11 with Attachment,
10    Retirement Information              53    --

11    4. E-Mail String, RE: Deb Rasby    53    --

12    5. E-Mail String, RE: Hog
      Operations                          53    --
13
      6. E-Mail 7/18/11, RE: Possible
14    Letter from Rasby to Pillen         53    --

15    7. Chart of Entities                76    --

16    8. E-Mail 8/11/11, RE: FYI's and
      Questions: Rasby Potential Sale
17    to Jim Pillen                       86    --

18    9. E-Mail String, RE: Strategic
      Planning Needed?                    86    --
19
      10. E-Mail String, RE: Past Email
20    Communications with Jim Pillen RE:
      Expense Allocations (Reference my
21    Other Email Today for Details)      86    --

22    11. E-Mail 8/18/11, RE: Notes for
      Rasby August 19 2011 Meeting
23    with Attachment                     98    --

24    12. E-Mail String, RE: Update      103    --

25    13. E-Mail String, RE: Follow up
      on Wednesday's Meeting             105    --



4

| EXHIBITS | Marked | Offered |
|---|---|---|
| 14. E-Mail String, RE: Update | 109 | -- |
| 15. E-Mail, RE: Update and Questions, with "Legal Brief" Attachment | 110 | -- |
| 16. E-Mail String, RE: Meting with Investment Banker and also with You and Your Colleague? | 115 | -- |
| 17. E-Mail String, RE: Meeting with Investment Banker and also with You and Your Colleague? | 117 | -- |
| 18. E-Mail String, RE: An Update and a Question | 125 | -- |
| 19. E-Mail String, RE: Update Information and Question | 127 | -- |
| 20. E-Mail String, RE: Pillen's Strategy | 129 | -- |
| 21. E-Mail String, RE: Communication to Jim Pillen | 130 | -- |
| 22. E-Mail String, RE: Update and a Request for You Opinion | 132 | -- |
| 23. E-Mail String, RE: P.S. RE: Call | 136 | -- |
| 24. E-Mail String, RE: Offer of Sale from Jim Pillen & Notes to 1020 Balance Sheet Showing Note Receivable, with Attached Letter, Balance Sheet Analysis | 138 | -- |
| 25. E-Mail, RE: Offer of Sale from Jim Pillen & Notes to 2010 Balance Sheet Showing Not Receivable | 144 | -- |
| 26. E-Mail, RE: Pillen Offer | 145 | -- |
| 27. E-Mail String, RE: Further Thoughts on Pillen Offer | 147 | -- |
| 28. E-Mail, RE: More Questions on Pillen Offer | 150 | -- |



5

| EXHIBITS | Marked | Offered |
|---|---|---|
| 29. E-Mail String, RE: Counter Offer Possibility? | 151 | -- |
| 30. E-Mail String, RE: More Questions on Pillen Offer | 153 | -- |
| 31. E-Mail, RE: Rasby/Corp Opportunity | 154 | -- |
| 32. E-Mail, RE: Letter to Jim Pillen and a Question, with Attachment | 156 | -- |
| 33. E-Mail, RE: Revised Letter to Jim, with Attachment | 157 | -- |
| 34. E-Mail, RE: Deb Rasby, with Attached Letter | 158 | -- |
| 35. E-Mail String, RE: Pillen | 162 | -- |
| 36. E-Mail, RE: Pillen/Rasby | 163 | -- |
| 37. E-Mail String, RE: Valuation | 165 | -- |
| 38. E-Mail String, RE: Steve Weiss | 166 | -- |
| 39. E-Mail, RE: Questions | 168 | -- |
| 40. E-Mail, RE: The Situation as I see it | 169 | -- |
| 41. E-Mail String, RE: Questions for Our Meeting | 171 | -- |
| 42. E-Mail, RE: Draft Response, with Attachment | 172 | -- |
| 43. E-Mail, RE: Moll Message | 172 | -- |
| 44. E-Mail String, RE: Moll Message | 174 | -- |
| 45. E-Mail String, RE: Rasby/Pillen | 175 | -- |
| 46. E-Mail String, RE: Rasby/Pillen | 176 | -- |




6

| | EXHIBITS | Marked | Offered |
|---|---|---|---|
| 1 | | | |
| 2 | 47. E-Mail String, RE: The Written Offer-Rasby/Pillen | 176 | -- |
| 3 | | | |
| 4 | 48. E-Mail String, RE: Feeling that my Direction was Wrong and a New Letter-Rasby/Pillen, | | |
| 5 | with Attachment | 179 | -- |
| 6 | 49. E-Mail String, RE: LLCs, with Attachment | 183 | -- |
| 7 | | | |
| 8 | 50. E-Mail, RE: Draft Email to Moll, with Attachment | 185 | -- |
| 9 | 51. E-Mail String, RE: Rasby/Pillen | 186 | -- |
| 10 | | | |
| 11 | 52. E-Mail String, RE: Revised Moll Email, with Attachment | 188 | -- |
| 12 | 53. E-Mail String, RE: Pillen/Rasby, with Attachment | 190 | -- |
| 13 | | | |
| 14 | 54. E-Mail, RE: Pillen/Rasby Revised Contract for Closing | | |
| | Tomorrow? | 191 | -- |
| 15 | | | |
| 16 | 55. E-Mail, RE: Unit Purchase Agreement, with Attachment | 192 | -- |
| 17 | 56. E-Mail String, RE: Rasby/Pillen | 194 | -- |
| 18 | | | |
| 19 | 57. E-Mail String, RE: Rasby Closing | 195 | -- |
| 20 | 58. E-Mail String, RE: Rasby/Pillen | 197 | -- |
| 21 | | | |
| 22 | 59. E-Mail String, RE: Thank you! With Attachment | 198 | -- |
| 23 | 60. E-Mail String, RE: Confusion, with Attachment | 199 | -- |
| 24 | | | |
| 25 | 61. E-Mail String, RE: Pillen/Rasby Closing | 200 | -- |




7

| | EXHIBITS | Marked | Offered |
|---|---|---|---|

1   EXHIBITS                               Marked Offered

2   62. E-Mail String, RE:
    Rasby/Pillen                        201      --

3

4   63. E-Mail String, RE: Rasby/Pillen,
    with Attachment                     203      --

5   64.  E-Mail String, RE: P.S. The
    Additional Amount Requested is

6   $1.275MM                            205      --

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8

1      S-T-I-P-U-L-A-T-I-O-N-S

2          It is hereby stipulated and agreed by and

3      between the parties that;

4          Notice of taking said deposition is

5      waived; notice of delivery of said deposition

6      is waived.

7          Presence of the witness during the

8      transcription of the stenotype notes is waived.

9          All objections are reserved until the time

10     of trial except as to form and foundation of

11     the question and privilege.

12         The reading of Rule 6-330(8)(a) and

13     6-330(8)(c) having been waived.

14              ROGER W. WELLS,

15     Of lawful age, being first duly cautioned and

16     solemnly sworn as hereinafter certified, was

17          examined and testified as follows:

18              DIRECT EXAMINATION

19     BY MR. ENGLER:

20     Q.     For the record, would you state your

21     name and spell your last name?

22     A.     Roger Wells, W-E-L-L-S.

23     Q.     Mr. Wells, my name's Tim Engler.  We met

24     just before the deposition.

25         I'm representing Dr. Jim Pillen in a



11

1    undergrad and first year of law school?  Is
2    that how you got done in two years?
3    A.    Yes.  It's Creighton's 3-3 program.
4    Q.    That's what it's called.  I was looking
5    at those dates, trying to get that figured out.
6          I think you did extremely well on both
7    undergrad and law school; correct?
8    A.    I performed, yes.
9    Q.    Okay.  Summa cum laude in both?
10   A.    Yeah.  I was No. 2 in law school.  Could
11   have done better.
12   Q.    Not much.  Congratulations.
13         You're currently with the McGrath North
14   Law Firm?
15   A.    Yes.
16   Q.    Did you join McGrath North right now of
17   law school?
18   A.    I did.
19   Q.    Has your entire career been with McGrath
20   North?
21   A.    My entire law career, yes.
22   Q.    So you've been practicing just under 36
23   years?
24   A.    Yes.
25   Q.    Started as an associate?



12

1    A.      Yes.

2    Q.      And then became a partner after a normal

3    associate track?

4    A.      Three years later, yes.

5    Q.      Okay.  And have been a partner ever

6    since?

7    A.      Yes.

8    Q.      Are you currently the firm manager?

9    A.      I am the firm president, yes.

10   Q.      Okay.  And how long have you been in

11   that position?

12   A.      Oh, six years, roughly, five, six years,

13   seven years.

14   Q.      Okay.  Would you agree with me that

15   McGrath North is considered one of finer law

16   firms in the City of Omaha?

17   A.      I certainly hope that's the case.

18   Q.      One of the finer law firms, really, in

19   the State of Nebraska and Midwest; correct?

20   A.      I hope that's the case.

21   Q.      How large is the firm right now?

22   A.      We're a freckle under 70 lawyers now, if

23   I remember right.

24   Q.      Has it been about that size for some

25   time now?



13

1    A.    We've sort of been on a steady growth

2    pattern here for the last five years or so.

3    Q.    I took a look at your website.  And I

4    think that -- at least when I looked at it the

5    last time, you're co-chair of the McGrath North

6    Business and Corporate Practice Group?

7    A.    Yes.

8    Q.    You head the firm's mergers and

9    acquisition practice?

10   A.    Yes.

11   Q.    That suggests you have been lead counsel

12   on literally hundreds of transactions; is that

13   correct?

14   A.    Yes.

15   Q.    Some of the clients that you've

16   represented include ConAgra Foods?

17   A.    Yes.

18   Q.    Louis Dreyfus Commodities?

19   A.    Yes.

20   Q.    Gavilon Group?

21   A.    Yes.

22   Q.    What is Gavilon Group?  I'm not familiar

23   with them.

24   A.    They are a spin-off of ConAgra Foods.

25   It's their commodity trading operation.



14

1   ConAgra spun them off to a group of three

2   private-equity owners who a few years ago sold

3   it to Marubeni.  So now they're a wholly owned

4   subsidiary of Marubeni.

5   Q.    First Data Corporation?

6   A.    Yes.

7   Q.    Entity you've represented in commercial

8   transactions?

9   A.    Yes.

10  Q.    Blue Cross/Blue Shield Nebraska?

11  A.    Yes.

12  Q.    It also suggests that one of your areas

13  of expertise in terms of industry is the

14  agricultural industry?

15  A.    Yes.

16  Q.    Would that include the swine industry?

17  A.    I've done work in the swine industry,

18  both in the processing side and on the grow-out

19  side.

20  Q.    Having done hundreds of transactions

21  involving commercial acquisitions and mergers,

22  would it be fair to say that you probably have

23  been involved in billions of dollars worth of

24  deals?

25  A.    Yes.



15

1   Q.      And some of the deals you've done have
2   actually been billion dollar deals?
3   A.      Yes.
4   Q.      Do you consider yourself a good
5   negotiator?
6   A.      Yes.
7   Q.      Has your practice always been in the
8   mergers and acquisition area?
9   A.      I do things other than just mergers and
10  acquisitions.
11  Q.      What else do you do?
12  A.      I do some finance work.  I do some
13  corporate governance work.  I do some
14  securities work, just general commercial work.
15  Q.      Here today with you is William Hargens,
16  Bill Hargens.
17  A.      Yes.
18  Q.      And he's one of your senior commercial
19  litigators?
20  A.      Yes.
21  Q.      Also regarded probably as one of the
22  finer lawyers in the state?
23  A.      Yes.
24  Q.      Professional accomplishments include
25  being listed as one of the best lawyers in



16

1    America?

2    A.    Yes.

3    Q.    America's Leading Lawyers For Business,

4    the Chambers Magazine; correct?

5    A.    Yes.

6    Q.    Great Plains Super Lawyer?

7    A.    Yes.

8    Q.    In the area of mergers and acquisitions?

9    A.    Yes.

10   Q.    Other accomplishments that you've had?

11   A.    I've just had a good career practicing

12   law.  And I enjoy it.

13   Q.    Congratulations.

14         How long have you known Deborah or Doug

15   Rasby?

16   A.    I met them in the late spring, early

17   summer 2011.

18   Q.    Do you know how it came about that they

19   contacted you?

20   A.    I believe they got a referral from Gene

21   Arnold, an accountant with Frankel Zacharia.

22   Q.    And can we kind of -- do you know how to

23   spell Frankel Zacharia?  I have it somewhere.

24   A.    F-R-A-N-K-E-L, Z-A-C-H-A-R-A -- I-A.

25              THE WITNESS:  Did I get it



17

1    right?

2                    MR. HARGENS:   Yeah.

3    Q.     (BY MR. ENGLER) And prior to that

4    initial contact, had you had any dealings with

5    either Doug or Deborah Rasby?

6    A.     No.

7    Q.     Have you done any work for Doug or --

8    Doug or Deborah Rasby as a lawyer since that

9    transaction?

10   A.     No.

11   Q.     When I say that transaction, why don't I

12   go ahead and get that identified for the

13   record.

14                    (Exhibit No. 1 marked for

15                    identification.)

16   Q.     (BY MR. ENGLER) Mr. Wells, I'm going to

17   hand you what the court reporter has marked as

18   Exhibit No. 1, which for identification

19   purposes is a June 29th, 2012, Unit Purchase

20   Agreement between Deborah Rasby and James

21   Pillen.

22   A.     Uh-huh.

23   Q.     Is that the transaction in which you

24   represented Ms. Rasby?

25   A.     Yes.



18

1    Q.      And is that the only legal work that you

2    did for the Rasbys?

3    A.      In connection with their dealings with

4    the Dr. Pillen, yes.

5    Q.      Okay.  Thank you.

6            Do you know Dr. Pillen?

7    A.      No.

8    Q.      Have you ever met him?

9    A.      No.

10   Q.      To your knowledge, have you ever talked

11   to him?

12   A.      No.

13   Q.      There were a number of entities involved

14   in this transaction, entities that were --

15   owned or were associated with Mr. Pillen.  Were

16   you familiar with any of those entities prior

17   to the transaction?

18   A.      No.

19   Q.      To your knowledge, have you done any

20   legal work involving any of those entities

21   other than this transaction?

22   A.      No.

23   Q.      Okay.  Let's talk about the background

24   that you have with regard to the agricultural

25   industry, in particular involving pork or



19

1    swine.

2           You mentioned that you had had some

3    involvement in that.  Can you relate to me what

4    your involvement has been prior to this

5    transaction?

6    A.      I represented ConAgra Foods when they

7    did some major acquisitions in the pork

8    processing area.

9    Q.      Okay.

10   A.      Pork slaughtering, processing.

11   Q.      Okay.

12   A.      I also did some work for ConAgra Foods

13   after they acquired those operations as they

14   were negotiating hog contracts with various

15   growers.

16   Q.      ConAgra is a fairly large entity;

17   correct?

18   A.      Yes.

19   Q.      Would you agree with me has some pretty

20   strong leverage in terms of its negotiating

21   position?

22   A.      Yes.

23   Q.      Is -- is the concept of leverage in a

24   negotiating transaction an important concept

25   sometimes?



20

1   A.      Yes.

2   Q.      And if you have a lot of leverage like

3   someone like a ConAgra, you can maybe get

4   people to agree to a transaction that may be a

5   little less than what they want or more than

6   what they want?

7   A.      The possibility exists, yes.

8   Q.      Is there anything wrong with that?

9   A.      No.

10  Q.      Is it frequently done?

11  A.      Absolutely.

12  Q.      Have you as a negotiator used leverage

13  as to your advantage?

14  A.      Yes.

15  Q.      Let's talk about some factors that would

16  affect the pork industry in terms of a

17  transaction.

18          Would you agree with me that the

19  agricultural industry and in particular the

20  pork industry is a volatile industry in terms

21  of its -- the prices?

22  A.      I'm not an economic expert.  But

23  historically that's been true, yes.

24  Q.      Is some of that volatility driven by the

25  futures market, for example, price of pork?



21

1    A.      I'm not sure that the futures market

2    drives the pricing.  But it certainly reflects

3    some of the volatility in the pricing.

4    Q.      Would corn prices also be a factor that

5    would affect the pork industry?

6    A.      Yes.

7    Q.      Pretty significant factor?

8    A.      I believe so.

9    Q.      Would issues such as mortality, health

10   and disease also be an important factor?

11   A.      As far as I know, yes.

12   Q.      Also affecting the volatility of the

13   industry?

14   A.      Can.

15   Q.      If you have a swine flu incident or some

16   type of bacteria, that could really impact the

17   industry?

18   A.      Depending upon the scope of it,

19   certainly.

20   Q.      You mentioned the name Gene Arnold with

21   Frankel Zacharia?

22   A.      Zacharia.

23           MR. HARGENS:  Zachariah.

24   Q.      (BY MR. ENGLER) I'm going to struggle

25   with that name for a long time.



26

1     the documents that you produced, both

2     electronic documents and your file, when you

3     reviewed them, were they redacted in any way?

4     A.     I didn't review the files.  I turned my

5     files over to Bill and his team --

6     Q.     Right.

7     A.     -- for the production.

8     Q.     I'm talking about in terms of when you

9     reviewed the e-mails and other documents here

10    to prepare for your deposition, were those

11    documents, any of those redacted --

12    A.     Yes.

13    Q.     -- in any way?

14           Okay.  All right.  Let's talk about some

15    of the negotiating or bargaining strategies you

16    have used in your career as a transactional

17    lawyer.

18           In negotiating a deal, have you at times

19    essentially told the other side that the deal

20    was a take-it-or-leave-it deal?

21    A.     Yes.

22    Q.     Is that unusual?

23    A.     No.

24    Q.     Is that a recognized strategy when

25    you're negotiating sometimes?



27

1    A.     I'm not sure I know what you mean by

2    recognized.  But people use it, yes.  Sometimes

3    they mean it.  Sometimes they don't.

4    Q.     Okay.  Have you threatened to walk away

5    from a deal as a negotiating strategy?

6    A.     Yes.

7    Q.     Is there anything wrong with that?

8    A.     No.

9    Q.     Is that a common practice or -- let me

10   put it this way, is it -- strike that.

11          It's not an unusual practice to do that,

12   is it?

13   A.     No.

14   Q.     In negotiating deals, have you

15   threatened legal action?

16   A.     Yes.

17   Q.     Is there anything wrong with that?

18   A.     No.

19   Q.     Do you think that -- consider that to be

20   a, you know, recognized bargaining strategy?

21   A.     Again, I'm not sure it's recognized.

22   But it's -- it happens.

23   Q.     Okay.  Have you seen or been involved in

24   negotiating where one party threatens actions

25   such as support for political campaign to gain



28

1    leverage?

2    A.      Not until this transaction.

3    Q.      How about using withdrawal of support

4    for a political campaign as a strategy?

5    A.      Not until this transaction.

6    Q.      Do you consider anything wrong with

7    that?

8    A.      In and of itself, no.

9    Q.      Have you seen or have you used a

10   strategy whereby you threatened one of these

11   take it or leave it, walk away from the deal,

12   threaten legal action and actually follow

13   through with it so the deal's blown up?

14   A.      I can't remember a specific

15   circumstance.  But I'm sure that that's

16   happened.

17   Q.      Okay.  And so there's nothing wrong with

18   someone using that negotiating strategy and

19   then following through with it if it doesn't

20   lead to do a deal?

21   A.      Not that I'm aware of, no.

22   Q.      Have you seen a -- have you used or seen

23   a party use the threat of shutting down an

24   operation as a negotiating strategy?

25   A.      I'm not sure I've seen that until this



29

1    transaction.

2    Q.      Okay.  Is there anything wrong with

3    telling someone you're going to shut down an

4    operation as a negotiating strategy?

5    A.      In and of itself, no.

6    Q.      A party would withdraw financial support

7    of an entity as a negotiating strategy?

8    A.      I'm not sure that I've ever had -- ever

9    have seen that until this transaction.

10   Q.      Do you consider that to be an improper

11   way of negotiating?

12   A.      Again, in and of itself, no.

13   Q.      When you qualify your answer with in and

14   of itself, can you explain that to me?

15   A.      There were some -- in connection with

16   this transaction, we -- it was unique in that

17   you had a major shareholder --

18   Q.      Uh-huh.

19   A.      -- that was threatening to take actions

20   with respect to a minority shareholder.

21          Now, that in and of itself, the threat,

22   I can't criticize that.

23          Now, had the threats been carried

24   forward, given the nature and the facts around

25   this transaction, there could have been



36

1    Ms. Rasby in this transaction, did you attempt

2    to negotiate the purchase price?

3    A.    I certainly advised Mr. and Mrs. Rasby

4    with respect to the transaction.

5    I had no direct conversations with

6    Dr. Pillen on purchase price or terms.

7    Q.    Okay. Was it the objective of your role

8    as the attorney for the Rasbys to try and get

9    them the best purchase price possible?

10    A.    Yes.

11    Q.    And to use whatever strategies available

12    to you as a lawyer based on your experience to

13    get that price?

14    A.    Yes.

15    Q.    Do you feel like you accomplished that?

16    A.    I think given the circumstances, yes.

17    Q.    And given the circumstances, do you

18    think it was a fair price?

19    A.    I don't think that's for a lawyer to

20    judge.

21    Q.    Okay. Fair enough.

22    A.    It certainly wasn't fair to the Rasbys,

23    in their judgment.

24    Q.    Did you make any recommendations to the

25    Rasbys about the purchase price and whether



46

1    come back to that.  But let's move on.

2    Q.    (BY MR. ENGLER) In connection with the

3    negotiation of this transaction, did -- did the

4    concept of threatening to pull support of Jim

5    Pillen as a regent come up?

6    A.    Yes.

7    Q.    And how did that come about?

8    A.    It was something that Mrs. Rasby or

9    Mr. Rasby -- I'm not sure which -- raised to my

10   attention as something they wanted to do.

11   Q.    Okay.  Did you think that was improper

12   in any way?

13   A.    As long as there wasn't anything

14   disparaging or slanderous being said, no.

15   Q.    In connection with negotiation of this

16   transaction, was the concept of a release

17   utilized?

18   A.    The final transaction document included

19   releases.

20   Q.    And were these mutual releases?

21   A.    Yes.

22   Q.    Were they intended to provide both sides

23   with a freedom from lawsuits later?

24   A.    Yes.

25   Q.    Was it a mutually drafted release?

47

```
1    A.      Both Dr. Pillen's attorney and myself
2    were involved in drafting the releases.
3    Q.      When you're involved in drafting
4    documents, is it your goal to eliminate as best
5    you can any ambiguities in the documents?
6    A.      Yes.
7    Q.      Let's take a look at Exhibit No. 1, and
8    in particular the release language in paragraph
9    4.
10   A.      Okay.
11   Q.      Do you consider that language to be
12   ambiguous at all?
13   A.      No.
14   Q.      Do you consider it to be a broad form
15   release?
16   A.      Yes.
17   Q.      Intended to release all business
18   transactions or dealings between the two
19   parties?
20   A.      Certainly there was nothing included in
21   the drafting to carve out anything from the
22   release.
23   Q.      To the extent that Ms. Rasby had any --
24   or Mr. Rasby had any claims involving anything
25   that occurred prior to the date of the release,
```



51

1    A.      I believe so, yes.

2    Q.      In this transaction, did the concept of

3    bringing litigation against Dr. Pillen for

4    minority shareholder oppression, did that

5    option exist?

6    A.      Yes.

7    Q.      Was that option virtually there from the

8    time you started representing --

9    A.      Yes.

10   Q.      -- Ms. Rasby?

11           Okay.  And that was all the way up

12   through and including June 29th when the

13   transaction closed?

14   A.      Yes.

15   Q.      Did you make any recommendations to the

16   Rasbys as to whether they should not do the

17   deal and instead pursue litigation?

18                  MR. HARGENS:  Yes or no

19   question.

20                  MS. VOGT:  Object -- yeah, this

21   one's a yes or no question.

22   A.      Say it again, if you can.

23                  MR. HARGENS:  Or Lori can, if

24   you prefer.

25                  MR. ENGLER:  Let's go ahead and



52

1    have Lori read it back.

2            (The reporter read back the pending

3    question.)

4    A.      No.

5    Q.      (BY MR. ENGLER) In your experience in

6    the transactions that you've done, have you

7    ever recommended to a client that they not take

8    a deal and instead pursue litigation?

9                    MR. HARGENS:  Tim, I'm a little

10   nervous about -- I mean, you're talking about

11   attorney/client communications there.  And so,

12   you know, I mean, you're talking very

13   generically but --

14                   MR. ENGLER:  Yeah, you're fine.

15   I'll get away from it.  Good point.  Sorry.

16   Q.      (BY MR. ENGLER) Okay.  I'm going to plow

17   ahead on a couple more.  And then we'll start

18   getting into the chronology of the transaction.

19           Did you believe that the transaction at

20   the time it was consummated was fundamentally

21   unfair?

22   A.      I think that gets to a question of

23   valuation.  And I -- I'm not sure I had a

24   judgment as to whether it was unfair or not.

25           I know what the Rasbys felt.

53

1    Q.      Okay.  What did the Rasbys feel?

2    A.      They felt that the price that was being

3    paid was unfair.

4    Q.      Okay.  Did you feel that the price was

5    inadequate consideration?

6    A.      I'm not a business valuation expert.

7    Q.      Did you feel the contract was

8    unconscionable?

9    A.      No.

10   Q.      Did you feel that the contract was

11   improper?

12   A.      No.

13   Q.      Okay.

14              MR. ENGLER:  Let's -- we've gone

15   about an hour.  Let's go ahead and take a break

16   here.  I'm going to start organizing some

17   exhibits.

18              (A short recess was taken.)

19              (Exhibit Nos. 3 through 6 marked

20              for identification.)

21   Q.      (BY MR. ENGLER) I'm going to hand you

22   three exhibits here, Exhibits 3, 4 and 5.

23              MS. VOGT:  And just for clarity,

24   1238 is 3, 1245 is 4 and 93 is 5?  Just the

25   last couple of Bates numbers?

61

1   applied to all of the minority shareholders in

2   a series of transactions?

3   A.      I can't say whether that would be usual

4   or unusual.

5           Certainly in -- if there is a contract

6   that specifies a buyout of all minorities, that

7   contract would be applied to everybody.

8   Q.      Okay.  But as a course of dealing, could

9   it be done?  And would that be a recognized

10  negotiating tactic?

11  A.      It could be done.

12          I don't know if that's a recognized

13  negotiating tactic or not.  I've never had

14  anybody negotiate with me on that basis.

15  Q.      Okay.  Okay.  Let's go to exhibit --

16  wait.  Hold on a second.

17          The -- what page is it?  Fourth page of

18  the document.

19          All right.  Would this page identify

20  some options available to Ms. Rasby in

21  connection with this transaction?

22  A.      Yes.

23  Q.      And so at least at this point in time,

24  there were three different alternatives that

25  were being considered; correct?

62

1    A.      Based on this piece of paper, yes.

2    Q.      And was that your understanding as to

3    what options she wanted to consider based on

4    the transaction?

5    A.      Yes.

6    Q.      In addition to these three options, did

7    other options or possible options come up

8    during the course of your representation of

9    Rasbys in terms of dealing with Jim Pillen?

10   A.      Yes.

11   Q.      Did the concept of litigation come up?

12   A.      Yes.

13   Q.      Was that a possibility that she could

14   have considered?

15   A.      Yes.

16   Q.      Did the concept of selling to a third

17   party come up?

18   A.      Yes.

19   Q.      That's an option she could have

20   considered?

21   A.      Yes.

22   Q.      Did the option of bringing in a white

23   knight come up?

24   A.      I'm not sure a white -- the term white

25   knight --



65

1    A.     Can I go back to a question?

2    Q.     Sure.  Anytime you want.

3    A.     The question on a third party coming in,

4    we discussed the possibility of a third party

5    coming in.  And we also discussed the

6    possibility that the contract with that party

7    could have certain conditions that would allow

8    the third party not to consummate a

9    transaction.  Okay?

10   Q.     Fair enough.  And in setting up the

11   third-party contract in that fashion, it would

12   give you the opportunity to negotiate a better

13   price with the Pillens?

14   A.     Certainly would, yes.

15   Q.     Any other options during the course of

16   your representation of the Rasbys?

17   A.     Not that I recall.

18   Q.     Let's look at the last page of Exhibit

19   3.  And I'm going to focus on the last two

20   paragraphs.

21   A.     Okay.

22   Q.     All right.  In the last two sentences of

23   the second to the last paragraph, there's a

24   statement there that said, "Jim did, comma,

25   however, comma, unilaterally implement a change



67

1    Q.    All right.  Did you talk to the Rasbys

2    about their rights as a minority shareholder?

3    A.    Yes.

4    Q.    Tell me what rights a minority

5    shareholder has.

6              MS. VOGT:  Okay.  Just to

7    clarify, you want his discussion of general

8    rights of minority shareholders, not what he

9    discussed with the Rasbys about minority

10   shareholders?

11             MR. ENGLER:  I probably was

12   going to ask a two-part question.

13             MS. VOGT:  Okay.

14             MR. ENGLER:  I was going to ask

15   generally and then specifically.

16             MS. VOGT:  Okay.

17             MR. ENGLER:  So we'll talk

18   generally.

19             MR. HARGENS:  And I'll object to

20   the form.  That's awfully broad.

21   Q.    (BY MR. ENGLER) All right.  I'll do it

22   differently.

23   A.    I'm not sure I came prepared to be an

24   expert.

25   Q.    Minority shareholder would have the



77

1    A.      When I say several, two, three, four.

2    Q.      Okay.

3    A.      I don't recall.

4    Q.      There's a reference there in that

5    continuation of that sentence where it says,

6    "And it ended with an inflammatory comment

7    before he abruptly left."  Do you see that?

8    A.      Uh-huh.

9    Q.      Is that a yes?

10   A.      Yes.  Sorry.

11   Q.      Do you know what the inflammatory

12   comment was?

13   A.      I don't recall.

14   Q.      The proposed letter in the second to the

15   last paragraph from the bottom of the first

16   page, it talks about, "As for minority

17   ownership rights, there are many."  Do you see

18   that?

19   A.      I do.

20   Q.      Does that refresh your recollection as

21   to whether you discussed these minority rights

22   with the Rasbys before July of 2011?

23   A.      Yes.

24   Q.      Okay.  There's also, in that second

25   sentence of that paragraph, reference to



78

1    litigation.  Do you see that?

2    A.    I do.

3    Q.    Does that refresh your recollection that

4    prior to July of 2011, you were discussing with

5    Rasbys the potential of litigation?

6    A.    Yes.

7    Q.    That option of litigation remained on

8    the table as a consideration all the way

9    through the end of the transaction?

10    A.    Yes.

11    Q.    Okay.  Exhibit 7.  The Bates label on

12    the bottom suggests that this did come from

13    your file, over here, because it has Bate

14    label -- has the initials -- or the acronym

15    MNMK.  Do you know who prepared Exhibit No. 7?

16    A.    I received it from the Rasbys.  I don't

17    know who prepared it.

18    Q.    Do you remember when you received it

19    from the Rasbys?

20    A.    This was early on when I -- we first

21    started talking.

22    Q.    Okay.  Is it your understanding that the

23    entities where there is an asterisk represent

24    the entities in which Ms. Rasby held an

25    ownership interest?



98

1    deal with Jim as they went through the

2    negotiating process?

3                    MR. HARGENS:  Object to the

4    form.

5                    MR. ENGLER:  What's wrong with

6    it?

7                    MR. HARGENS:  You're assuming he

8    made recommendations.

9                    MR. ENGLER:  Okay.  We're

10   whispering.

11   Q.     (BY MR. ENGLER) Do you recall if you

12   made recommendations to the Rasbys as to

13   strategies they should use to negotiate with

14   Jim?

15   A.     We certainly discussed options.

16   Q.     What options did you discuss with the

17   Rasbys?

18                   MS. VOGT:  Objection.

19   Privilege.

20                   (Exhibit No. 11 marked for

21                   identification.)

22   Q.     (BY MR. ENGLER) I'll now hand you what's

23   been marked as Exhibit No. 11.

24   A.     I've got --

25   Q.     Oh, got an extra copy.



103

1     process?

2                    MS. VOGT:   Objection.

3     Privilege.

4                    (Exhibit No. 12 marked for

5                    identification.)

6     A.     Okay.

7     Q.     (BY MR. ENGLER) All right.  The top

8     portion of Exhibit 12 is an e-mail from the

9     Doug Rasby e-mail account to you dated August

10    25th, 2011; correct?

11    A.     Yes.

12    Q.     And it references an update.  Okay?

13    A.     Yes.

14    Q.     It says in that first paragraph at the

15    end, "I'm quite thankful that we were directed

16    to you."  Do you see that?

17    A.     I'm sorry?

18    Q.     In the first paragraph, end of --

19    A.     I've got it.  Sorry.

20    Q.     "I am quite thankful that we were

21    directed to you."  Do you see that?

22    A.     Yes.

23    Q.     That would suggest to me and would you

24    agree at that point in time the Rasbys were

25    satisfied with the services that you were



104

1   providing?

2   A.      I hope they were.

3   Q.      And they were thankful for that?

4   A.      Yes.

5   Q.      Did that ever change throughout the

6   course of your representation of the Rasbys?

7   A.      I don't believe so, no.

8   Q.      The last paragraph of the top half of

9   the e-mail, it says, "I will continue to work

10  in the direction of a sale if at all possible."

11          And then it goes on, "I agree with you

12  that this would be the best path."  Do you see

13  that?

14  A.      Yes.

15  Q.      Did you, in fact, recommend to the

16  Rasbys that selling their interest was the best

17  path rather than some other option?

18  A.      Certainly selling at a price that

19  everybody's happy with is better than the

20  litigation option.

21  Q.      And that was your recommendation?

22  A.      That would have been my advice, yes.

23  Q.      Did that advice ever change?

24  A.      No.

25  Q.      Can you tell me why you felt selling at



112

1    if it was a phone call.

2    Q.    Okay.  But you had one of -- either a

3    meeting or a phone call?

4    A.    Yes.

5    Q.    And Mr. Hargens was involved?

6    A.    Yes.

7    Q.    During that meeting, did you discuss the

8    strengths and/or weaknesses of potential

9    litigation?

10   A.    I'm sure we did.

11   Q.    All right.  And what did you tell the

12   Rasbys about the strengths and/or weaknesses of

13   litigation?

14                  MS. VOGT:  Objection.

15   Privilege.

16   Q.    (BY MR. ENGLER) There's a reference on

17   the bottom of the e-mail about increasing

18   salaries tenfold and cutting off cash

19   distributions.  Do you see that?

20   A.    I'm sorry.  I'm missing it.

21   Q.    Very bottom of the e-mail.

22   A.    Okay.  Got it.  Sorry.

23   Q.    Was it your understanding that

24   Dr. Pillen had increased his salary from PST?

25   A.    I don't recall if he had actually or if



119

1    Q.    Yes.

2    A.    I don't recall if it was in person or by

3    phone.

4    Q.    Okay.  Let's go through page 1 of

5    Exhibit 17 in that e-mail.

6          In the end of the first paragraph, it

7    says, "As we have discussed, this would be the

8    best strategy, and we would be willing to give

9    up something significant on the selling price

10   to get it done."

11         Is this a reference to selling her

12   interest in the companies?

13   A.    I believe so.

14   Q.    The second paragraph is a reference to

15   fiduciary duty.  And it says, "Said with a

16   smirk."  Do you see that?

17   A.    I do.

18   Q.    Do you know what "said with a smirk"

19   refers to?

20   A.    I don't.

21   Q.    All right.  Next -- it goes on, "Here

22   are my greatest fears."  And she talks in

23   paragraph 1 about a tax distribution on

24   Northern Nance, Northern Plains.  Do you see

25   that?



123

1    Q.     Okay.

2    A.     The lower the tax basis, the bigger the

3    income -- the bigger the gain.

4    Q.     Was it your understanding as to point

5    one with regard to Northern Nance and Northern

6    Plains, that because it was still in debt,

7    there may not be cash payments made even though

8    there would be taxable income?  Was that the

9    concern?

10   A.     I'm sorry, you're looking at point No.

11   1?

12   Q.     Yeah.  And makes reference to the

13   parenthetical where it says, "It would be ten

14   years before this is out of debt."

15   A.     I guess I never focused on the impact of

16   the debt, on cash available for distributions.

17   Q.     Okay.  Then the bottom of the e-mail

18   makes reference to Eastwood and -- as to

19   whether he had a feel on Jim's $1 million

20   salary and whether it's reasonable.  Did

21   Eastwood ever weigh in on that issue?

22   A.     He was never asked that question.

23   Q.     To your knowledge, was any expert asked

24   that question?

25   A.     No.  At this time, Mr. Eastwood was



124

1    suggesting that we use a different -- that we

2    hire a valuation expert that was better suited

3    for the circumstances here.

4    Q.    And was that the entity out of Kansas?

5    A.    I think he may have given us a couple of

6    different names.  But certainly the Kansas was

7    one of them.

8    Q.    Do you remember the name Melissa Goetz

9    from KC & G Agri Industry?

10   A.    Sounds vaguely familiar.

11   Q.    How about Stephanie Carlin, also with

12   that entity?

13   A.    No.  Vaguely familiar.

14   Q.    Okay.

15   A.    We never hired anybody.  So it really

16   didn't go anywhere.

17   Q.    And why didn't you hire anybody?

18   A.    It was a matter of timing and

19   willingness to spend the money to hire somebody

20   to really dig into this.

21   Q.    Willingness on the Rasbys' part?

22   A.    Yes.

23            MR. HARGENS:  Are you on to a

24   new exhibit?

25            MR. ENGLER:  Yeah.



130

1    that.

2    Q.     Okay.  There's a mention that he's

3    dissolving PST because of increased risk.  Do

4    you see that?  That's the first sentence of the

5    second --

6    A.     Yes.

7    Q.     Would you agree with me that risk would

8    be a reason for closing operation?

9    A.     I don't know what that means.

10   Q.     Okay.  And then if you look at the top

11   half of the e-mail, she indicates, "I believe

12   that Jim is getting advice to force me to take

13   legal action, have to go to court."  Were you

14   still talking to Ms. Rasby about taking legal

15   action as a possibility?

16   A.     Yes.

17   Q.     Okay.

18                  (Exhibit No. 21 marked for

19                  identification.)

20   A.     Okay.

21   Q.     (BY MR. ENGLER) All right.  Exhibit 21

22   is an e-mail string.  The original message at

23   the -- the second page is a February 2nd e-mail

24   from Deb Rasby to Jim Pillen, about 8:45 in the

25   a.m.



147

1    A.    Yes.

2    Q.    -- is that a fair way to summarize that

3    that?

4          She concludes with he'll do whatever it

5    takes.  "I don't seem to have any power to

6    negotiate, unless a lawsuit would provide

7    pressure."  Do you see that?

8    A.    I do.

9    Q.    Did you discuss with Ms. Rasby the

10   possibility of bringing a lawsuit to provide

11   pressure to bear on the values to sell the

12   interests?

13   A.    We talked about a lawsuit as a possible

14   strategy or alternative, yes.

15                  (Exhibit No. 27 marked for

16                  identification.)

17   A.    Okay.

18   Q.    (BY MR. ENGLER) All right.  Exhibit 27,

19   two-part e-mail.  There was one that is --

20   Exhibit 26 that she had sent -- strike that.

21         There's an e-mail to you from Doug Rasby

22   on Saturday, April 14th, at 8:53 a.m.

23         And then you respond on Saturday at 10

24   a.m. saying, "We did receive it and will go

25   through the material this weekend."  Correct?



148

1    A.     Yes.

2    Q.     And that would be reference to the

3    April -- the April 9th letter; correct?

4    A.     Yes.

5    Q.     And then the top e-mail on page 1 of

6    Exhibit 27 is Rasby's response to you with

7    additional information; correct?

8    A.     Yes.

9    Q.     Further thoughts on Pillen offer is the

10   way it's described?

11   A.     Yes.

12   Q.     She's setting forth two additional

13   possibilities that could -- that you could

14   pursue; is that correct?

15   A.     Yes.

16   Q.     And, first of all, she mentions Ken

17   Morrison.  Does that refresh your recollection

18   as to who Ken Morrison was?

19   A.     I know Ken Morrison's name was mentioned

20   throughout this, yes.

21   Q.     Okay.  And so she was asking --

22   considering the possibility of contacting him

23   to see if he would be involved in loaning her

24   money for future income tax?

25   A.     Yes.



149

1    Q.     And that would give her staying power if
2    she decided not to sell?
3    A.     Yes.
4    Q.     And that could be -- increase her
5    leverage to try and negotiate a buyout?
6    A.     Yes.
7    Q.     Okay.  And also possibility of visiting
8    with a lender on the same type of loan?
9    A.     Yes.
10   Q.     She concludes with, "My utmost hope
11   still is to sell at a fair market value."  Is
12   that fair?
13   A.     Yes.
14   Q.     She reference Mr. Morrison as being an
15   industry giant?  Do you see that?
16   A.     I do.
17   Q.     And do you know if Pillen, in fact,
18   bought Mr. Morrison's interest in Bartlett
19   Foods?
20   A.     I think that's right.  But I'm not
21   certain.
22          I think we covered something earlier
23   that suggested that he bought Morrison's
24   interest.
25          ///



150

1          (Exhibit No. 28 marked for

2          identification.)

3    A.    Yes.

4    Q.    (BY MR. ENGLER) Okay.  So Exhibit 28 is

5    another e-mail from Rasby to you on Sunday,

6    April 15th, more questions on the Pillen offer.

7    And it looks to me like she's coming up with

8    yet another alternative if -- in order to

9    enhance the sale of her interest, and that

10   would be trying to find an offer from a -- from

11   someone else?

12   A.    Correct.

13   Q.    Do you know if she ever did receive an

14   offer from anybody else?

15   A.    I don't know.

16   Q.    There was questions about whether a

17   buy/sell agreement existed for any of the

18   entities, PST, PST Gene Center or PST Milling.

19   Do you know, have you ever -- if you were able

20   to determine whether a buy/sell agreement ever

21   existed?

22   A.    I don't know that it was ever

23   determined.

24   Q.    Okay.  How about with regard to Northern

25   Nance, Northern Plains and Double D?



151

1    A.     My recollection is I was told that there

2    was not a buy/sell agreement executed to those.

3    Q.     Explain to me how that would -- make

4    sure I get this right.

5           The absence of a buy/sell agreement

6    would allow her to sell to a third party;

7    correct?

8    A.     Depending on if there were any

9    restrictions in the other governing charter

10   documents.

11              (Exhibit No. 29 marked for

12              identification.)

13   A.     Okay.

14   Q.     (BY MR. ENGLER) All right.  Exhibit 29

15   is a two-part e-mail.  The bottom portion of

16   Exhibit 29 is an e-mail from Rasby to you,

17   subject being counteroffer possibility.  And

18   the top is your forwarding it to Hargens;

19   correct?

20   A.     Correct.

21   Q.     Let's talk about Rasby's e-mail to you.

22   It makes reference right after the redacted

23   part to, "Gene Arnold agreed that Pillen's

24   offer looks unreasonable.  And I would guess

25   that Bill Eastwood would be of like mind."



152

1          Did you ever talk to Gene Arnold about

2     Pillen's offer being unreasonable?

3     A.     My recollection is we talked to Gene or

4     somebody in his office that was doing some

5     valuation work.

6     Q.     Okay.  And did they tell you the offer

7     was unreasonable?

8     A.     I don't know that they used exactly the

9     terms unreasonable.  My recollection is that

10    they thought the offer was low.

11    Q.     Okay.  It -- she goes on to say, "I

12    would guess that Bill Eastwood would be of a

13    like mind."  Do you know if Bill Eastwood was

14    ever contacted to give an opinion as to an

15    offer?

16    A.     Not to my knowledge.

17    Q.     Okay.  And then there's a reference

18    about a concern that Jim could withdraw his

19    offer.  Do you see that?

20    A.     I do.

21    Q.     Was that a legitimate concern, do you

22    think?

23    A.     Anytime you get an offer with a

24    deadline, it is a concern.

25    Q.     So another option in terms of looking at

156

1    I'd have to look at.

2    Q.    Yep, fair.

3              MS. VOGT:  I could tell you all

4    about Ferer and Ferer & Sons if you wanted.

5              MR. HARGENS:  Let's do that

6    later.

7              MR. ENGLER:  Should we swear you

8    in now?

9              (Exhibit No. 32 marked for

10             identification.)

11   A.    Okay.

12   Q.    (BY MR. ENGLER) All right.  Exhibit 32

13   is a -- an e-mail to you with an attached

14   letter to Jim Pillen; is that correct?

15   A.    A draft of a letter, yes.

16   Q.    Draft, yes.  Was that letter ever sent?

17   A.    I don't recall.

18   Q.    Do you recall that at some point, you

19   discussed with Rasbys whether they should

20   respond to Jim's offer or whether you should

21   send a letter?

22   A.    Yes.

23   Q.    Was the decision ultimately made that

24   the letter would come from you rather than

25   them?



157

1    A.      Yes.

2    Q.      The note receivable is also the subject

3    of the e-mail.  Was it your understanding that

4    there was a discussion about whether there was

5    a note that would be on top of the purchase

6    price or part of the purchase price?

7    A.      Yes.

8    Q.      That was the issue; correct?

9    A.      Correct.

10   Q.      And it wasn't clear which way it was

11   going to go initially; right?

12   A.      Correct.

13   Q.      Eventually, though, Dr. Pillen agreed

14   that the $350,000 note receivable would be in

15   addition to the purchase price?

16   A.      That's my recollection, yes.

17                  (Exhibit No. 33 marked for

18                  identification.)

19   A.      Okay.

20   Q.      (BY MR. ENGLER) All right.  Exhibit

21   33 --

22   A.      Yes.

23   Q.      -- is an e-mail from Rasby to you and

24   Bill Hargens revising the earlier letter; is

25   that correct?  It says on the subject line,



158

1      "Revised letter to Jim."

2      A.      Okay.

3      Q.      Okay.  Again, do you know if the revised

4      letter was ever sent?

5      A.      I don't know.

6      Q.      Okay.  All right.  Let's quickly -- the

7      last extension of Exhibit 33, the e-mail says,

8      "We appreciate all of the talent you both have

9      and the dedicated work you have done on this

10     case.  A tough situation, it has been a

11     pleasure to meet you both."

12             Were you of the view that the Rasbys

13     were satisfied with the legal representation

14     that you were providing them?

15     A.      The legal representation, may not have

16     been satisfied with where this was going in

17     terms of end result because of the low value.

18     Q.      Okay.  But certainly the legal advice

19     they were getting they felt comfortable and

20     satisfied with?

21     A.      As far as I know, yes.

22                    (Exhibit No. 34 marked for

23                     identification.)

24     A.      Okay.

25     Q.      (BY MR. ENGLER) All right.  If I could

159

1    summarize Exhibit 34, the first page of it is
2    the e-mail transmittal to you from Dr. Pillen.
3    And the next two pages are the response to his
4    April 9th letter --
5    A.      Yes.
6    Q.      -- correct?
7            So this would be consistent with your
8    earlier testimony that the actual response to
9    the original April 9th offer came from your
10   firm rather than the Rasbys; correct?
11   A.      Yes.
12   Q.      And you wanted to introduce yourself
13   through an e-mail first, but you had to send --
14   you introduced yourself by e-mail; correct?
15   A.      Yes.
16   Q.      Up until this point in time, do you know
17   if Dr. Pillen knew your firm was involved at
18   all?
19   A.      I don't know.
20   Q.      Okay.  You certainly hadn't let the
21   Pillen organizations know of your involvement
22   until this letter; correct?
23   A.      Correct.
24   Q.      All right.  Then if -- your letter of
25   April 19th, you're indicating that you're



163

1    before?

2    A.    No, I don't think I knew Bill until this

3    transaction.

4                   (Exhibit No. 36 marked for

5                   identification.)

6    A.    Okay.

7    Q.    (BY MR. ENGLER) All right.  Exhibit 36

8    is an e-mail from you to -- I'm sorry, from Tim

9    Moll to you dated May 13th, 2012; correct?

10   A.    Yes.

11   Q.    And he's providing you with valuation

12   information from Steve Weiss; correct?

13   A.    Yes.

14   Q.    All right.  Now, Exhibit 35 is the

15   e-mail where you had received a call or message

16   from Tim Moll.  And that was on Friday, April

17   27th.  Okay?

18   A.    Can I go back and look at this?

19   Q.    You certainly may.

20   A.    Okay.

21   Q.    My question is initially, do you recall

22   any communications or conversations with Tim

23   Moll between April 27th and May 13th?

24   A.    I don't remember.

25   Q.    Okay.  Fair enough.



164

1          The e-mail from Tim Moll references,

2     "Per our recent telephone conversation."

3     A.     Okay.

4     Q.     Do you know if you had more than one?

5     A.     I don't remember.

6     Q.     Okay.  And one of the things we do in a

7     deposition is we just test your memory.

8     A.     Yeah.

9     Q.     So we've got to ask the questions.

10          All right.  So you don't recall anything

11     of the telephone conversation; is that correct?

12     A.     No.

13     Q.     Is that correct?

14     A.     That's correct.

15     Q.     Okay.  He's attaching summaries

16     involving Northern Nance, Double D based on

17     Steve Weiss and the background; correct?

18     A.     Yes.

19     Q.     And then he makes references to PST Gene

20     Center and PST Milling?

21     A.     Yes.

22     Q.     And also PST.  And then he concludes

23     with setting a deadline of May 21; is that

24     correct?

25     A.     Yes.



168

1    what values per space refers to?

2    A.    I don't.  I could guess that it's based

3    on hog capacity.

4    Q.    Okay.  Is that another way to value hog

5    facilities?

6    A.    I'm the wrong person to ask.  I'm a

7    lawyer, not a valuation expert.

8    Q.    That's why I asked because I don't know

9    either.

10         The e-mail also says, "This is

11   quintessential Jim Pillen."  Do you know what

12   she meant by that?

13   A.    I would only be guessing.

14   Q.    Okay.

15              (Exhibit No. 39 marked for

16              identification.)

17   A.    Okay.

18   Q.    (BY MR. ENGLER) All right.  Exhibit 39

19   is an e-mail from Rasby to you and Bill Hargens

20   dated Wednesday, May 23rd, 2012, where she is

21   outlining three options that she may have;

22   correct?

23   A.    Yes.

24   Q.    These are options that we have talked

25   about before in this deposition; correct?



169

1    Selling at a low price.  Option two, staying

2    with -- under circumstances that may suggest

3    minority shareholder suppression.  And option

4    three, try and negotiate a better price?

5    A.     Yes.

6    Q.     The concept of litigation, is that

7    another option that was still available at that

8    time?

9    A.     Yes.

10   Q.     The question is asked, "Do we have any

11   options other than these?"  Okay.  Did you

12   respond to that question?

13   A.     I'm sure that we discussed it, and the

14   obvious option would have been litigation

15   option.

16   Q.     She also mentions that, "Our questions

17   concerning an appraisal may be moot."  Do you

18   know what she's referring to there?  Very top.

19   A.     I would only be guessing.

20              (Exhibit No. 40 marked for

21              identification.)

22   A.     Okay.

23   Q.     (BY MR. ENGLER) All right.  Exhibit 40

24   is another e-mail from Rasby to you, May 23rd.

25   It's later in the day.  Exhibit 39 I think was



170

1    May 23rd as well.

2         "The situation as I see it."  And it's

3    talking about clarifying what a win would be.

4    And because of the redaction, I'm really not

5    sure the context in which this is being

6    considered.

7         But a couple of things, very bottom it

8    says, "We would like to cancel the call with

9    the Kansas appraiser tomorrow."  Do you see

10   that?

11   A.    I do.

12   Q.    And was that the group out of Kansas

13   that was recommended by Bill Eastwood?

14   A.    Yes.

15   Q.    "We would use Frankel Zacharia if we

16   proceed with this."  And do you know what that

17   reference is, proceeding with either litigation

18   or with valuation?  Do you know which one?

19   A.    I read it to mean valuation.

20   Q.    Okay.  And references the Kansas

21   timeframe to have a call with the two of you.

22   Do you know if you had that call, do you

23   remember?

24   A.    I don't remember.

25   Q.    Okay.



171

1          (Exhibit No. 41 marked for
2          identification.)
3    A.    Okay.
4    Q.    (BY MR. ENGLER) Exhibit 41 is a two-part
5    e-mail string.  The first is from Rasby to you
6    and Hargens on Thursday, May 31st, 12:54.  It
7    says, "Attached are questions that we have.
8    Will we be meeting today?"
9          I don't know what the attachments are.
10   I'm just telling you that.
11         And then there's response from you that
12   says -- I guess it's from Hargens, a carbon
13   copy to you, "I don't think the Frankel
14   Zachariah folks are far enough along.  I'll
15   send you an e-mail with proposed time after we
16   hear back from FZA."
17         What were the Frankel Zacharia folks
18   doing at this time, do you remember?
19   A.    I think it's valuation work.
20         They may have also been looking at the
21   offer itself and comparing that with their own
22   valuation work.
23   Q.    Okay.  Did you ever get a report from
24   them?
25   A.    We discussed with them, yes.



172

1    Q.    Okay.  What did they provide you in

2    terms of a report?

3    A.    I don't remember if we got a written

4    report or not.

5    Q.    Okay.

6               (Exhibit Nos. 42 through 43

7               marked for identification.)

8    A.    I think I should also add I think the

9    Frankel Zacharia people were also looking at

10   the tax aspects of the proposal.

11              MR. HARGENS:  Could you read

12   back what he just added while I was yapping.

13        (The reporter read back the witness'

14   response.)

15   Q.    (BY MR. ENGLER) Okay.  Two e-mails I

16   handed to you, 42 and 43.  One is Friday, June

17   1, at 12:48.  And one is Friday, June 1, at

18   3:51.  It looks like you prepared two potential

19   responses, one rejecting the offer and one

20   accepting the offer; correct?

21   A.    Correct.

22   Q.    As of June 1, anyway, that was the

23   deadline that Pillen had said through Tim Moll,

24   there still wasn't a decision made; is that

25   correct?

173

1    A.    Correct.

2    Q.    You were considering weighing all

3    options still at this point?

4    A.    Yes.

5    Q.    Including the four we previously

6    discussed, the litigation option; correct?

7    A.    Yes.

8    Q.    And you did not make a recommendation on

9    which option to go forward with; correct?

10   A.    I'm not sure I know what you mean by

11   recommendation.  We certainly talked through

12   the pros and cons of each option.

13   Q.    All right.  I guess what I meant by

14   recommendation is we recommend you do one of

15   them and which one it was?

16   A.    First, let's be clear on what two

17   options we're talking about.

18   Q.    Okay.  Actually, I think there were

19   four.  One is accept the offer.  Two is reject

20   the offer, remain minority shareholder.  Three

21   is litigation.  Four is continuing to negotiate

22   for a better price.  And then -- I guess

23   litigation, I mentioned that.

24   A.    Yes.

25   Q.    And so did you make a recommendation as



174

1    to any of those, as to which one --

2    A.     No.  We talked about pros and cons and

3    possible outcomes and facts we would need to

4    know, facts that could develop.

5    Q.     And ultimately the Rasbys decided to

6    accept the offer; is that right?

7    A.     Correct.

8                (Exhibit No. 44 marked for

9                identification.)

10   Q.     (BY MR. ENGLER) And Exhibit 44 would be

11   the response from the Rasbys authorizing you to

12   go ahead and e-mail to Moll that the offer has

13   been accepted subject to the points you make in

14   the e-mail; correct?

15   A.     Yes.

16   Q.     Now, after June 1, were there further

17   attempts to negotiate?

18   A.     The price?

19   Q.     Yes.

20   A.     Not that I remembered.  We clarified

21   details in terms of distributions and tax

22   cutoffs and the $350,000 receivable obviously.

23   Q.     Okay.

24   A.     But I was not party to any further

25   negotiations as to the price itself.



175

1    Q.     So the actual price that was paid was 2
2    million plus the 350,000; correct?
3    A.     That's my recollection, yes.
4    Q.     And to go from the 1 million 881, that
5    was subject to the other true-ups of the
6    calculations and distributions?
7    A.     Yes.
8               (Exhibit No. 45 marked for
9               identification.)
10              MR. ENGLER:  I need to take a
11   minute here.  I missed something.
12              MR. HARGENS:  What are you
13   looking for?
14              MR. ENGLER:  Well, it's Bates
15   No. 1889.2.
16              MR. HARGENS:  Is that --
17              MS. BENTZEN:  DR.
18              MR. ENGLER:  Yeah, it's DR.
19              MR. HARGENS:  Okay.
20         (An off-the-record discussion was held.)
21   Q.     (BY MR. ENGLER) Exhibit 45 is an e-mail
22   string starting with June 5th e-mail from Tim
23   Moll to you, thanking you for your e-mail of
24   last Friday, which I think would have been the
25   June 1 e-mail accepting, close to finalizing



178

1    loan.  So I guess that would be the legality

2    side of it.

3    Q.      Okay.  Eventually, though, it was agreed

4    that the loan would be part of the purchase

5    price, so that issue went away?

6    A.      The $350,000 was added to it, yes.  So

7    it went away.

8    Q.      At the top half of the e-mail, exhibit,

9    is an e-mail from Rasby to you on June 8th,

10   8:34.  And it's talking now about a buy/sell

11   agreement; correct?

12   A.      Correct.

13   Q.      And whether one exists; correct?

14   A.      Yes.

15   Q.      And then it concludes with, "I believe

16   we can find a party who would be interested in

17   this."  Do you see that?

18   A.      I do.

19   Q.      What does that mean to you, do you know,

20   or how did you understand that to --

21   A.      So I had interpreted this to mean that

22   the governing documents we were talking about

23   earlier provided that sales would have to be

24   pursuant to the buy/sell agreement.  The

25   buy/sell agreement hadn't been executed



179

1    apparently.  And so Doug is pointing out that

2    the unexecuted buy/sell says you can sell

3    subject to what I would refer to as rights of

4    first refusal.

5        So he's saying that they may be able to

6    find a party that would be willing to purchase

7    the interest, subject to those rights of first

8    refusal, meaning you have to take that offer

9    back to Dr. Pillen and he'd have the right to

10   match it.

11   Q.    So even though they've accepted the

12   offer, there's still a possibility of

13   negotiating, in your mind?

14   A.    That's what's going on here, yes.

15   Q.    Okay.

16   A.    No purchase agreement had been signed

17   yet.

18   Q.    Okay.

19                  (Exhibit No. 48 marked for

20                  identification.)

21            (An off-the-record discussion was held.)

22   Q.    (BY MR. ENGLER) Exhibit 48 is another

23   e-mail string involving some of the prior

24   e-mails.  It's still on the subject of

25   primarily the buy/sell agreement.  But there's



180

1    some other issues as well.  Fair enough?

2    A.    Yes.

3    Q.    Okay.  Let's talk about the first page

4    of the e-mail -- of the exhibit.

5          The lower e-mail, which is from Rasby to

6    you on Saturday, June 9th, 12:23.  The first

7    paragraph talks about a third-party offer with

8    setting up that the offer could be revoked by

9    either side prior to closing.

10   A.    Yes.

11   Q.    Okay.  Explain to me what you were

12   working on with the Rasbys in connection with

13   that third-party offer.

14   A.    I think this is the Rasbys' idea of

15   finding a third party that would be willing to

16   make an offer that she would then take to Jim

17   and say I've got a third party willing to pay

18   this and, under the terms of the unexecuted

19   buy/sell, do you want to buy at that price.

20   Q.    All right.  But there would also be an

21   escape for the potential buyer to get out of

22   it?

23   A.    That's what she's suggesting, yes.

24   Q.    What did you respond?

25               MS. VOGT:  Objection.



181

1    Privilege.  I'm so used to the two-step

2    question, I was waiting for do you, did you.

3                MR. ENGLER:  I'm tricky

4    sometimes.

5    Q.    (BY MR. ENGLER) Did you ever find out

6    who the third party was?

7    A.    I don't remember.

8    Q.    Do you remember, do the Rasbys have a

9    son named Greg in the Kansas City area?

10   A.    That's mentioned in this e-mail string,

11   yeah.

12   Q.    All right.  Greg through the

13   brother-in-law, Scott.

14         The second paragraph talks about several

15   financially capable people who would make the

16   $4.5 million offer if the majority owner was

17   honest.  Do you see that?

18   A.    I do.

19   Q.    Okay.  Do you know who those people

20   were?

21   A.    I don't remember that I ever knew those

22   names.

23   Q.    Do you know if it were the people that

24   are being referenced in the top half of the

25   exhibit in the June 10th e-mail of 11:20



182

1     involving Greg and brother-in-law, Scott?

2     A.    I don't think Greg and the

3     brother-in-law were making -- the ones making

4     the offer. I think it was people found through

5     Greg and Scott.

6     Q.    Right. That's my read of it as well.

7     And my question is, do you know who they

8     were?

9     A.    I -- I don't remember. I don't recall

10    that I ever knew.

11    Q.    Okay. And then finally, there's a

12    letter attached. It's a three-page letter that

13    was a draft letter. Do you know if that letter

14    was ever sent?

15    A.    I don't. I don't know.

16    Q.    Was the purpose of a letter such as that

17    to try and appease to Jim to get him to

18    increase the purchase price?

19            MS. VOGT: Objection.

20    Foundation.

21    Q.    (BY MR. ENGLER) Do you know why that

22    letter was being proposed?

23    A.    I could speculate.

24    Q.    Do you know why?

25    A.    I assume that it's another attempt to

183

1     get Jim to increase his price because of the

2     view that the price was unfair.

3     Q.      Did you make any recommendations

4     concerning the letter?

5     A.      Yes.

6     Q.      What recommendation did you make?

7                   MS. VOGT:   Objection.

8     Privilege.

9                   MR. HARGENS:   Off the record.

10    (An off-the-record discussion was held.)

11                  (Exhibit No. 49 marked for

12                  identification.)

13    Q.      (BY MR. ENGLER) Exhibit 49 is a

14    multi-page -- in fact, it's a combination of

15    things.  But in the interest of just getting

16    through this, I went ahead and just had it

17    marked because we were having trouble locating

18    it.

19          The first two pages are some e-mails

20    dated May 24th, 2012, between Mr. Hargens and

21    Deb and Doug Rasby.

22    A.      Yes.

23    Q.      Okay.  And they're talking about a

24    meeting with -- canceling the meeting with the

25    Kansas folks and then setting up a meeting with



184

1    the FZA people; right?

2    A.    Yes.

3    Q.    And there's also discussion of the

4    litigation and what would need to be proven;

5    correct?  And what the goal would be?

6         If I look at the third -- the second

7    page of the exhibit, the top e-mail, it said,

8    "If we had to sue, our goal from a lawsuit

9    would be a reasonable buyout price," period.

10   And it lists several things.

11   A.    So that is setting forth Mrs. Rasby's

12   goal, not necessarily what the outcome of this

13   type of litigation would lead to.

14   Q.    Okay.

15   A.    Two different things.

16   Q.    Sure.  And then the last three pages

17   involve a meeting that was held at some point.

18   The e-mail is dated May 31st and attaches the

19   last two pages of the exhibit a series of

20   questions for the FZA people as well as McGrath

21   North.

22   A.    Yes.

23   Q.    All right.  Did you have a meeting with

24   the Rasbys, the FZA people and McGrath North to

25   discuss these issues -- these questions?



185

1    A.      I don't recall if we had a meeting or a
2    call to discuss these issues.
3    Q.      Okay.  Do you recall, though, that there
4    was a discussion of those issues?
5    A.      I'm sure there was.
6    Q.      Okay.  And did you go through each one
7    of these questions with them?
8    A.      I don't have specific recollection.  But
9    given the nature of this, I think we would
10   have, yes.
11   Q.      Sure.  And that was part of the process
12   of going through each of the options and
13   looking at the pros and cons?
14   A.      Yes.
15   Q.      Okay.
16                   (Exhibit No. 50 marked for
17                   identification.)
18   A.      Yes.
19   Q.      (BY MR. ENGLER) All right.  Exhibit 50
20   is an e-mail from you to the Rasbys with, "I'll
21   call you about this."  And there's an attached
22   draft letter; would that be right?
23   A.      Yes.
24   Q.      Draft e-mail.
25                   And this e-mail would be advising Tim



188

1    Q.      Okay.  So at that point in time, Rasby

2    is still considering the possibility of

3    bringing in a third party; right?

4    A.      I believe so, yes.

5    Q.      Okay.

6                    (Exhibit No. 52 marked for

7                    identification.)

8    A.      Okay.

9    Q.      (BY MR. ENGLER) Exhibit 52 is a

10   three-page exhibit.  First two pages are an

11   e-mail string, June 14th, 2012, between you and

12   the Rasbys.  And the last page is a letter.

13           Now, it appears that you may have

14   revised -- well, okay.  You had revised the

15   e-mail to Tim Moll because it says, "Revised

16   Moll e-mail."

17           And then, actually, Deb responds with

18   her e-mail which includes the attachment.

19   A.      Correct.

20   Q.      Okay.  So it references conversation

21   yesterday about the operating agreement.  Do

22   you see that?

23   A.      I do.

24   Q.      Okay.  So that would have been a

25   conversation between you and Rasby?



189

1    A.      It would appear to be, yes.

2    Q.      Do you recall -- do you recall what was

3    discussed in that conversation?

4    A.      I think it was the discussion we had --

5                MS. VOGT:   Objection.

6    Privilege.

7    A.      Okay.

8    Q.      (BY MR. ENGLER) And is it my

9    understanding then that what happened was there

10   was a decision to accept the offer but the

11   letter was delivered by Rasby to Pillen?  Is

12   that what I understand happens?

13   A.      Based on this e-mail, correct.

14   Q.      Okay.  And in the letter, the third page

15   of the exhibit and the third to the last

16   paragraph, it said this isn't an attempt to

17   negotiate or a rejection of your offer but

18   asking there to be a certified appraised value.

19   Do you see that?

20   A.      Yes.

21   Q.      Did you understand that there was still

22   ongoing efforts to try and get the agreed price

23   increased?

24   A.      Yes.

25   Q.      Okay.



190

1                    (Exhibit No. 53 marked for

2                    identification.)

3    A.    Okay.

4    Q.    (BY MR. ENGLER) All right.  Exhibit 53

5    is a 6-page exhibit.  The first two pages

6    starts with an e-mail from Nancy Schroeder at

7    Rembolt Ludtke sending a draft of the Unit

8    Purchase Agreement.  You then forward it to Deb

9    Rasby.  And Deb then forwards it to Gene

10   Arnold; would that be correct?

11   A.    Yep.

12   Q.    Okay.

13   A.    Yes.

14   Q.    And the Unit Purchase Agreement which is

15   attached is the first draft of the contract;

16   correct?

17   A.    Yes.

18   Q.    And I note that the first draft did not

19   contain a release; is that correct?

20   A.    Correct.

21   Q.    Okay.  There's a gentleman by the name

22   of Matt Stadler.  Do you know Matt Stadler?

23   He's with FZA.

24   A.    The name sounds familiar.  I don't know

25   Matt.



192

1    second sentence at the end of that line -- I

2    guess it's going to be the start of the third

3    sentence, "Of course, time is of the essence

4    for the transfer of funds."  Do you see that?

5    A.    I do.

6    Q.    Do you know why time was of the essence

7    for the transfer of funds?

8    A.    I don't recall.

9              (Exhibit No. 55 marked for

10             identification.)

11   Q.    (BY MR. ENGLER) Okay.  Exhibit 55 is an

12   e-mail from you to Tim Moll sending him the

13   revised Unit Purchase Agreement; correct?

14   A.    Yes.

15   Q.    And, actually, you sent him two.  You

16   sent him the revision clean and then also a

17   red-line copy?

18   A.    Yes.

19   Q.    Although, it didn't show up on the

20   copies we have.

21         The one thing I want to note -- the main

22   thing I want to note, the revision that you

23   sent back now, you've included a release;

24   correct?

25   A.    Correct.



193

1    Q.    And it's paragraph 4; correct?

2    A.    Yes.

3    Q.    And it's release of Rasby only; correct?

4    A.    Yes.

5    Q.    Does not include a release of Pillen,

6    does it?

7    A.    Correct.

8    Q.    So inserting the concept of release of

9    Rasby came from you?

10   A.    Yes.

11   Q.    And you drafted the terms?

12   A.    I did.

13   Q.    Okay.  And the final agreement, though,

14   which would have been Exhibit No. 1 that we

15   looked at a long time ago this morning, has a

16   mutual release; correct?

17   A.    Correct.

18   Q.    And so that was a change that was

19   requested by Tim Moll?

20   A.    Yes.

21   Q.    And you accepted that change?

22   A.    We did accept the change.

23   Q.    Okay.

24   A.    By we, I want to make sure I'm clear,

25   it's the Rasbys and the lawyers accepted it.



194

1    Q.     Thank you.

2              (Exhibit No. 56 marked for

3              identification.)

4    A.     Okay.

5    Q.     (BY MR. ENGLER) All right.  Exhibit 56

6    is a three-page exhibit which is an e-mail

7    string which begins on the second page starting

8    with an e-mail from Tim Moll to you dated

9    Thursday, June 28th, 1:44.  He's accepting

10   yours, and then also he's noting three

11   additional changes; correct?

12   A.     Correct.

13   Q.     And then he's asking that the

14   arrangements be made for signatures to be done

15   and exchanged later; correct?

16   A.     Correct.

17   Q.     All right.  And then you sent it to

18   Rasby on 2:50.  You attached the release.  You

19   note that he has revised the release but you

20   don't have a problem with that as long as --

21   unless you think you, being Rasby, have some

22   kind of claim that you would assert in the

23   future.  Do you see that?

24   A.     Yes.

25   Q.     Okay.  Did Rasby ever alert you as to



195

1   any claims that she wanted to assert in the

2   future?

3   A.    No.

4   Q.    And then she responds 3:06, she's okay

5   with it if you are but she wants to express the

6   pain caused to her by the unilateral decisions

7   that were made.  Do you see that?

8   A.    I do.

9   Q.    What unilateral decisions is she

10  referring to, do you know?

11  A.    I assumed it was his dictation of the

12  purchase price.

13  Q.    Okay.  Then you respond with, "I'm not

14  sure why, but the agreement does not include

15  any kind of mutual nondisparagement clause";

16  correct?

17  A.    Correct.

18  Q.    And then she sends, "Attached are my

19  thoughts," which is a letter.  I have that

20  here.  I think I have another e-mail that we

21  didn't get to.

22              (Exhibit No. 57 marked for

23              identification.)

24  Q.    (BY MR. ENGLER) Okay.  Exhibit 57 is an

25  e-mail string starting with Tim Moll, the



196

1   morning of June 29th, indicating that Pillen's

2   going to sign the Unit Purchase Agreement, scan

3   and e-mail it to you and you wanted Ms. Rasby

4   to do the same and then do the exchange and we

5   can get it done by funding the -- funding the

6   account; correct?

7   A.     Correct.

8   Q.     And then your response is, "yes."

9          And then later that day, that morning,

10  you write, "Apparently your client called my

11  client and scheduled to meet in person and sign

12  the documents."  And they're going to be

13  forwarded; correct?

14  A.     Yes.  She wrote that to me, yes.

15  Q.     Okay.  So at this point in time, the

16  Unit Purchase Agreement still has the

17  $2,350,000 purchase price; correct?

18  A.     Correct.

19  Q.     And then when the document's actually

20  signed and delivered back to Tim Moll from Jim

21  Pillen, one of the pages has been switched;

22  correct?

23  A.     The purchase price is different.

24  Q.     Right.  Okay.  Purchase price is

25  different.  And you're not sure how that



198

1           (Exhibit No. 59 marked for

2           identification.)

3   A.      Okay.

4   Q.      (BY MR. ENGLER) All right.  59 is a

5   multiple page document, but it starts the first

6   two pages with an e-mail string, starts with

7   Tim Moll's e-mail to you of June 29th at 1:03

8   p.m. where he's attaching a copy of the signed

9   Unit Purchase Agreement; correct?

10  A.      Yes.

11  Q.      And this attached Unit Purchase

12  Agreement has the purchase price of $3,975,000;

13  correct?

14  A.      Correct.

15  Q.      Okay.  And then you get it.  And you

16  forward it to the Rasbys on June 29th at 2:12;

17  correct?

18  A.      Correct.

19  Q.      And then at the top e-mail in that

20  exhibit, there's an e-mail from Deb Rasby to

21  Jim Pillen, carbon copy to you, Friday June

22  29th at 7:25.  Where she's talking about a

23  change of heart.  Do you see that?

24  A.      I do.

25  Q.      What do you understand that e-mail to



199

1    have been?

2    A.    As I sit here and look at it now?

3    Q.    Yeah.

4    A.    Looking at it now, it appears that she

5    thought the purchase price had been changed.

6    Q.    Did Rasby ever admit to you that she was

7    the one that changed the purchase price?

8    A.    No.

9    Q.    So you don't know who changed the

10    purchase price?

11    A.    I don't.

12             (Exhibit No. 60 marked for

13             identification.)

14    Q.    (BY MR. ENGLER) All right.  Exhibit 60

15    is an e-mail originally from Jim Pillen to Deb

16    Rasby sent Friday at 9:26 p.m., saying he did

17    not have a change of heart and the agreement

18    was 2.35 and the original is attached,

19    apparently someone changed the pages.

20    And then you forwarded that to Deb Rasby

21    on Saturday, June 30th, at 7:54; correct?

22    A.    I think Deb forwarded it to me.

23    Q.    I'm sorry, Deb forwarded it to you?

24    A.    Yes.

25    Q.    But you never followed up with Deb on



207

1   think about something, I'll let you know.

2   A.     Yes.

3   Q.     And I think one dealt with the topic of

4   whether you were aware of any representations

5   attributable to Pillen that were not false

6   and --

7                  MS. BENTZEN:  Were false.

8   Q.     (BY MR. ENGLER) That was false.  I'm

9   sorry.  And you didn't -- couldn't think of

10  any.  But during the course of reviewing any of

11  these e-mails or documents, did that help you?

12  A.     No.

13  Q.     Okay.  I think the other subject was on

14  whether there were any other options available

15  that you discussed with the Rasbys in terms of

16  their dealing with Pillen.  And we went through

17  a number.  But did you think of any others?

18  A.     No.

19  Q.     Okay.

20                 MR. ENGLER:  That's all the

21  questions I have.

22                 <u>CROSS-EXAMINATION</u>

23  BY MS. VOGT:

24  Q.     While you were representing the Rasbys,

25  compared to, like, an ordinary business



216

1     as much as you normally are in a situation with

2     a minority shareholder and majority

3     shareholder.  Was that at the request of the

4     Rasbys?

5     A.     The answer is, yes.  The Rasbys were

6     very careful to try to maintain a relationship

7     with Dr. Pillen.

8     Q.     Is that because they thought maybe they

9     can get a better deal that way?

10                    MR. HARGENS:  Object to the

11    form.

12    Q.     (BY MR. ENGLER) If you know.

13                    MS. VOGT:  And foundation.

14    A.     Yeah, I don't know.

15    Q.     (BY MR. ENGLER) Okay.  There was a

16    question that, based on your representation of

17    the Rasbys, at least -- I'll paraphrase, but

18    Deborah Rasby felt throughout the entire

19    transaction that the price was not fair; right?

20    A.     Yes.

21    Q.     Okay.  In spite of her belief that the

22    price was not fair, she did have options other

23    than accepting it; correct?

24    A.     Yes.

25    Q.     She accepted the offer that had in a



217

1  document a full and broad release; correct?

2  A.      Yes.

3  Q.      She accepted that price voluntarily;

4  correct?

5  A.      Yes.

6  Q.      She accepted it knowingly; correct?

7  A.      Yes.

8  Q.      And she accepted with the advice of one

9  of the best transactional lawyers in the state;

10 right?

11 A.      I'll leave that up to you.

12              MS. VOGT:  I'll feel rude if I

13 object on foundation.

14              MR. ENGLER:  Nothing further.

15              MS. VOGT:  I don't have

16 anything.

17              MR. HARGENS:  You've got the

18 right to read and sign the deposition.

19      You can't change your testimony.  But

20 you can correct errors the court reporter might

21 make taking down the testimony.

22      You can either exercise that right or

23 waive that right.

24              THE WITNESS:  I would -- I

25 assume you're going to tell me to exercise it?



## UNIT PURCHASE AGREEMENT

THIS UNIT PURCHASE AGREEMENT (the "Agreement") is made and entered into this 29th day of June, 2012, by and between Deborah R. Rasby ("Rasby") and James D. Pillen ("Pillen"), and relates to the sale of ownership interests in the following entities (herein collectively the "Subject Entities"):

Double D Family Farms, LLC, a Nebraska limited liability company ("Double D");
Northern Nance, LLC, a Nebraska limited liability company ("Northern Nance");
Northern Plains, LLC, a Nebraska limited liability company ("Northern Plains");
PST Milling, Inc., a Nebraska corporation ("Milling")
PST Gene Center, LLC, a Nebraska limited liability company ("Gene Center"); and
Progressive Swine Technologies, Inc., a Nebraska corporation ("PST").

WHEREAS, Rasby owns the following interests in the Subject Entities:

Double D - 5 units out of 100 total outstanding units;
Northern Nance - 10 units out of 100 total outstanding units;
Northern Plains - 10 units out of 100 total outstanding units;
Milling - 100 shares out of 1,000 total outstanding shares;
Gene Center - 10 units of out 100 total outstanding units; and
PST - 10 units out of the 100 total outstanding units.

WHEREAS, Northern Nance is indebted to Rasby in the principal amount of $350,000.00 (the "Subordinated Debt"); and

Rasby desires to sell all of her interests in the Subject Entities (including the Subordinated Debt) and Pillen desires to purchase all of said interests from Rasby on the terms and conditions of this Agreement.

FOR VALUABLE CONSIDERATION, the parties agree as follows:

1.    Price and Terms. Effective as of Closing, as hereunder defined, Rasby shall transfer to Pillen all of her ownership interests in the Subject Entities, including the Subordinated Debt (herein collectively the "Purchased Interests"). Pillen shall pay to Rasby the sum of Two Million Three Hundred Fifty Thousand Dollars ($2,350,000) in full consideration for the Purchased Interests. Said funds shall be paid in immediately available funds at Closing. The parties agree that the purchase price shall be allocated among the Purchased Entities and the repayment of the Subordinated Debt as follows:



DR 001004.1

[ 1 ]

| | |
|---|---|
| Double D: | $192,601.00 |
| Northern Nance: | $1,090,096.00 |
| Northern Plains: | $57,373.00 |
| Milling: | $380,844.00 |
| Gene Center: | $155,318.00 |
| PST: | $123,768.00 |
| Subordinated Debt Repayment: | $350,000.00 |
| | ------------------------ |
| TOTAL | $2,350,000.00 |

2.  Closing. The date of the closing (the "Closing") for the Purchased Interests shall be no later than June 29, 2012.

3.  Representations of Rasby. Rasby represents and warrants to Pillen that the Purchased Interests are conveyed and assigned to Pillen free and clear of all liens and encumbrances and that Rasby has full authority to transfer the Purchased Interests to Pillen without the consent or agreement of any other party. Rasby further represents and warrants that the Purchased Interests represent any and all interests of Rasby in the Subject Entities.

4.  Releases. Rasby and Pillen acknowledge and agree that this Agreement is intended as a complete termination and resolution of the business dealings between Rasby and Pillen and the Subject Entities. Except for, and subject to, any obligations set forth in this Agreement, (i) each of Pillen and the Subject Entities, on behalf of it/himself and its/his partners, affiliates, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers (and each of their respective partners, affiliates, subsidiaries, directors, officers, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers) (the "Pillen Parties") hereby unconditionally and fully release and discharge each of Rasby and her assigns, heirs, agents, employees, representatives and insurers (and each of their respective partners, affiliates, subsidiaries, shareholders, directors, officers, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers) (the "Rasby Parties") from any and all obligations, claims, actions, liability, past, present, and future, of every kind or character, known or unknown, and unforeseen injuries and damages, and the consequences which the Pillen Parties have or may have in the future, by reason of, growing out of, arising out of or existing in connection with the business dealings between the parties, including, but not limited to Rasby's employment by, or ownership of any interest in, the Subject Entities.  Likewise, the Rasby Parties hereby unconditionally and fully release and discharge the Pillen Parties  from any and all obligations, claims, actions, liability, past, present, and future, of every kind or character, known or unknown, and unforeseen injuries and damages, and the consequences which the Rasby Parties have or may have in the future, by reason of, growing out of, arising out of or existing in connection with the business dealings between the parties, including, but not limited to, Rasby's employment by, or ownership of any interest in, the Subject Entities.

5.  Distributions and Allocation of Income. The parties agree that Rasby shall not be entitled to any dividends or distributions from any of the Subject Entities with regard to the 2012 taxable year of any of the Subject Entities; provided, however, that, notwithstanding anything to the contrary in this Agreement, in the event any income of any of the Subject Entities with regard to the 2012 taxable year is allocated to Rasby, each such Subject Entity to which such an allocation relates shall promptly distribute, and Pillen shall cause the Subject Entities to distribute to Rasby, in cash, an amount equal to Rasby's state and federal income tax liability (including any penalties and interest) relating to such

2

DR 001005.1

allocation. The effective date of the transfer of the Purchased Interests shall be January 1, 2012, such that all income generated by the Subject Entities in calendar year 2012 and allocable to the Purchased Interests shall be allocated to Pillen for federal and state income tax reporting purposes. With regard to 2011 and prior years, the parties shall be liable for the income of the Subject Entities allocable to them based on their respective ownership interests in said years. With regard to any distributions made to Rasby from the Subject Entities during 2012, the applicable Subject Entity will issue a Form 1099 to Rasby and Rasby will be responsible for reporting and paying income tax associated with said payments.

6.      Deliveries at Closing. At Closing, Rasby agrees to sign, deliver and release to Pillen such documents as are reasonably necessary to assign and transfer all the Purchased Interests to Pillen or Pillen's nominee and to consent to dissolution of PST. Pillen agrees to deliver to Rasby the purchase price for the Purchased Interests in immediately available funds by cashier's check or wire transfer. The parties each, for no additional consideration, agree to execute and deliver such other and further documents as may be necessary to consummate and document the matters described in this Agreement.

7.      Miscellaneous.

     a.      Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Nebraska.

     b.      Entire Agreement. This Agreement contains the understandings and agreement of the parties, and shall supersede all previous negotiations and writings. This Agreement shall not be released, discharged, abandoned, changed or modified in any manner, except by a written document signed by the parties.

     c.      Severability. If any term or provision of this Agreement or corresponding Schedules shall to any extent be invalid or unenforceable, the remainder of this Agreement shall not be affected.

     d.      Further Assurances. Each party will, whenever reasonably requested to do so by the other party, promptly execute and deliver any and all further documents and accomplish such acts as may be necessary to effectuate this Agreement.

     e.      Time of the Essence. Time is of the essence of this Agreement.

     f.      Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, devisees, personal representatives, successors and assigns.

     g.      Paragraph Titles. Any title of a paragraph of this Agreement is inserted for convenience only and shall be disregarded in construing or interpreting the provisions of this Agreement.

3

DR 001006.1

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date and year first above written.

Double D Family Farms, LLC
Northern Nance, LLC
Northern Plains, LLC
PST Milling, Inc.
PST Gene Center, LLC
Progressive Swine Technologies, Inc.

By: _____
      JAMES D. PILLEN, Authorized Signer

_____
DEBORAH R. RASBY

_____
JAMES D. PILLEN

DR 001007.1

[ 4 ]

STATE OF NEBRASKA     )
                         ) ss.
COUNTY OF *Platte*    )

The foregoing instrument was acknowledged before me this 29 day of June, 2012, by Deborah R. Rasby.

(S E A L)

BRENDA A. JAZWICK
MY COMMISSION EXPIRES
October 13, 2013

_____
Notary Public


STATE OF NEBRASKA     )
                         ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this ___ day of June, 2012, by James D. Pillen, individually, and as an authorized signer of the Subject Entities.

(S E A L)

_____
Notary Public

5

DR 001008.1

[ 5 ]

STATE OF NEBRASKA     )
                            ) ss.

COUNTY OF _____ )

      The foregoing instrument was acknowledged before me this ___ day of June, 2012, by Deborah R. Rasby.

      (SEAL)

_____
Notary Public

STATE OF NEBRASKA     )
                            ) ss.

COUNTY OF _Platte_ )

      The foregoing instrument was acknowledged before me this _29_ day of June, 2012, by James D. Pillen, individually, and as an authorized signer of the Subject Entities.

      (SEAL)

BRENDA A. JAZWICK
MY COMMISSION EXPIRES
October 13, 2013

_Brenda A. Jxl_
Notary Public

5

DR 001009.1

*This is what I requested which I don't get it through received $2,000,000 plus loan payback of $350,00*

## UNIT PURCHASE AGREEMENT

THIS UNIT PURCHASE AGREEMENT (the "Agreement") is made and entered into this 29th day of June, 2012, by and between Deborah R. Rasby ("Rasby") and James D. Pillen ("Pillen"), and relates to the sale of ownership interests in the following entities (herein collectively the "Subject Entities"):

Double D Family Farms, LLC, a Nebraska limited liability company ("Double D");
Northern Nance, LLC, a Nebraska limited liability company ("Northern Nance");
Northern Plains, LLC, a Nebraska limited liability company ("Northern Plains");
PST Milling, Inc., a Nebraska corporation ("Milling")
PST Gene Center, LLC, a Nebraska limited liability company ("Gene Center"); and
Progressive Swine Technologies, Inc., a Nebraska corporation ("PST").

WHEREAS, Rasby owns the following interests in the Subject Entities:

Double D - 5 units out of 100 total outstanding units;
Northern Nance - 10 units out of 100 total outstanding units;
Northern Plains - 10 units out of 100 total outstanding units;
Milling - 100 shares out of 1,000 total outstanding shares;
Gene Center - 10 units of out 100 total outstanding units; and
PST - 10 units out of the 100 total outstanding units.

WHEREAS, Northern Nance is indebted to Rasby in the principal amount of $350,000.00 (the "Subordinated Debt"); and

Rasby desires to sell all of her interests in the Subject Entities (including the Subordinated Debt) and Pillen desires to purchase all of said interests from Rasby on the terms and conditions of this Agreement.

FOR VALUABLE CONSIDERATION, the parties agree as follows:

1. _Price and Terms_. Effective as of Closing, as hereunder defined, Rasby shall transfer to Pillen all of her ownership interests in the Subject Entities, including the Subordinated Debt (herein collectively the "Purchased Interests"). Pillen shall pay to Rasby the sum of Three Million Nine Hundred Seventyfive Thousand Dollars ($3,975,000) in full consideration for the Purchased Interests. Said funds shall be paid in immediately available funds at Closing. The parties agree that the purchase price shall be allocated among the Purchased Entities and the repayment of the Subordinated Debt as follows:



EXHIBIT
2
8-21-17

DR 001016.1

[ 1 ]

| | |
|---|---|
| Double D: | $349,089.00 |
| Northern Nance: | $1,975,799.00 |
| Northern Plains: | $103,989.00 |
| Milling: | $690,281.00 |
| Gene Center: | $281,513.00 |
| PST: | $224,329.00 |
| Subordinated Debt Repayment: | $350,000.00 |
| | ------------------------- |
| TOTAL | $3,975,000.00 |

2.   Closing. The date of the closing (the "Closing") for the Purchased Interests shall be no later than June 29, 2012.

3.   Representations of Rasby. Rasby represents and warrants to Pillen that the Purchased Interests are conveyed and assigned to Pillen free and clear of all liens and encumbrances and that Rasby has full authority to transfer the Purchased Interests to Pillen without the consent or agreement of any other party. Rasby further represents and warrants that the Purchased Interests represent any and all interests of Rasby in the Subject Entities.

4.   Releases. Rasby and Pillen acknowledge and agree that this Agreement is intended as a complete termination and resolution of the business dealings between Rasby and Pillen and the Subject Entities. Except for, and subject to, any obligations set forth in this Agreement, (i) each of Pillen and the Subject Entities, on behalf of it/himself and its/his partners, affiliates, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers (and each of their respective partners, affiliates, subsidiaries, directors, officers, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers) (the "Pillen Parties") hereby unconditionally and fully release and discharge each of Rasby and her assigns, heirs, agents, employees, representatives and insurers (and each of their respective partners, affiliates, subsidiaries, shareholders, directors, officers, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers) (the "Rasby Parties") from any and all obligations, claims, actions, liability, past, present, and future, of every kind or character, known or unknown, and unforeseen injuries and damages, and the consequences which the Pillen Parties have or may have in the future, by reason of, growing out of, arising out of or existing in connection with the business dealings between the parties, including, but not limited to Rasby's employment by, or ownership of any interest in, the Subject Entities.   Likewise, the Rasby Parties hereby unconditionally and fully release and discharge the Pillen Parties  from any and all obligations, claims, actions, liability, past, present, and future, of every kind or character, known or unknown, and unforeseen injuries and damages, and the consequences which the Rasby Parties have or may have in the future, by reason of, growing out of, arising out of or existing in connection with the business dealings between the parties, including, but not limited to, Rasby's employment by, or ownership of any interest in, the Subject Entities.

5.   Distributions and Allocation of Income. The parties agree that Rasby shall not be entitled to any dividends or distributions from any of the Subject Entities with regard to the 2012 taxable year of any of the Subject Entities; provided, however, that, notwithstanding anything to the contrary in this Agreement, in the event any income of any of the Subject Entities with regard to the 2012 taxable year is allocated to Rasby, each such Subject Entity to which such an allocation relates shall promptly distribute, and Pillen shall cause the Subject Entities to distribute to Rasby, in cash, an amount equal to Rasby's state and federal income tax liability (including any penalties and interest) relating to such

2

DR 001017.1

allocation. The effective date of the transfer of the Purchased Interests shall be January 1, 2012, such that all income generated by the Subject Entities in calendar year 2012 and allocable to the Purchased Interests shall be allocated to Pillen for federal and state income tax reporting purposes. With regard to 2011 and prior years, the parties shall be liable for the income of the Subject Entities allocable to them based on their respective ownership interests in said years. With regard to any distributions made to Rasby from the Subject Entities during 2012, the applicable Subject Entity will issue a Form 1099 to Rasby and Rasby will be responsible for reporting and paying income tax associated with said payments.

6.   <u>Deliveries at Closing</u>. At Closing, Rasby agrees to sign, deliver and release to Pillen such documents as are reasonably necessary to assign and transfer all the Purchased Interests to Pillen or Pillen's nominee and to consent to dissolution of PST. Pillen agrees to deliver to Rasby the purchase price for the Purchased Interests in immediately available funds by cashier's check or wire transfer. The parties each, for no additional consideration, agree to execute and deliver such other and further documents as may be necessary to consummate and document the matters described in this Agreement.

7.   <u>Miscellaneous</u>.

   a.   <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Nebraska.

   b.   <u>Entire Agreement</u>. This Agreement contains the understandings and agreement of the parties, and shall supersede all previous negotiations and writings. This Agreement shall not be released, discharged, abandoned, changed or modified in any manner, except by a written document signed by the parties.

   c.   <u>Severability</u>. If any term or provision of this Agreement or corresponding Schedules shall to any extent be invalid or unenforceable, the remainder of this Agreement shall not be affected.

   d.   <u>Further Assurances</u>. Each party will, whenever reasonably requested to do so by the other party, promptly execute and deliver any and all further documents and accomplish such acts as may be necessary to effectuate this Agreement.

   e.   <u>Time of the Essence</u>. Time is of the essence of this Agreement.

   f.   <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, devisees, personal representatives, successors and assigns.

   g.   <u>Paragraph Titles</u>. Any title of a paragraph of this Agreement is inserted for convenience only and shall be disregarded in construing or interpreting the provisions of this Agreement.

3

DR 001018.1

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date and year first above written.

Double D Family Farms, LLC
Northern Nance, LLC
Northern Plains, LLC
PST Milling, Inc.
PST Gene Center, LLC
Progressive Swine Technologies, Inc.

By: _____
   JAMES D. PILLEN, Authorized Signer

_____
DEBORAH R. RASBY

_____
JAMES D. PILLEN

DR 001019.1

[ 4 ]

STATE OF NEBRASKA )
) ss.
COUNTY OF _Platte_ )

    The foregoing instrument was acknowledged before me this 29 day of June, 2012, by Deborah R. Rasby.

BRENDA A. JAZWICK
MY COMMISSION EXPIRES
October 13, 2013

_____
Notary Public

STATE OF NEBRASKA )
) ss.
COUNTY OF _Platte_ )

    The foregoing instrument was acknowledged before me this 29 day of June, 2012, by James D. Pillen, individually, and as an authorized signer of the Subject Entities.

( S E A L )

BRENDA A. JAZWICK
MY COMMISSION EXPIRES
October 13, 2013

_____
Notary Public

5

DR 001020.1

[ 5 ]

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto JAMES D. PILLEN, Ten (10) units of interest in NORTHERN PLAINS, LLC, a Nebraska limited liability company (the "*Company*"). Said units of interest are represented by Certificate No. 2 standing in the name of the undersigned on the books of said Company. The undersigned represents that the above units are her entire interest in the Company and this Assignment is intended to transfer her entire interest in the Company. The undersigned does hereby irrevocably constitute and appoint the Manager of said Company to transfer the said units of interest on the books of the within named Company, with full power of substitution in the premises.

Dated this 29th day of June, 2012 to be effective as of January 1, 2012.

_____
Deborah Rasby

WITNESS:

_____

3

DR 001021.1

[ 6 ]

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto JAMES D. PILLEN, Ten (10) shares of the common stock of PROGRESSIVE SWINE TECHNOLOGIES, INC., a Nebraska corporation (the "*Company*"). Said shares of stock are represented by a certificate, but the certificate is not in the possession of the undersigned and has apparently been lost or inadvertently destroyed. The undersigned represents that the above shares of stock are her entire interest in the Company and this Assignment is intended to transfer her entire interest in the Company. The undersigned does hereby irrevocably constitute and appoint the Secretary of said Company to transfer the said shares of stock on the books of the within named Company, with full power of substitution in the premises. In the event the original certificate is located, the undersigned agrees to promptly surrender it to the Company.

Dated this 29th day of June, 2012 to be effective as of January 1, 2012.

Deborah Rasby

WITNESS:

6

DR 001022.1

[ 7 ]

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto JAMES D. PILLEN, Ten (10) units of interest in PST GENE CENTER, LLC, a Nebraska limited liability company (the "*Company*"). Said units of interest are represented by Certificate No. 2 standing in the name of the undersigned on the books of said Company. The undersigned represents that the above units are her entire interest in the Company and this Assignment is intended to transfer her entire interest in the Company. The undersigned does hereby irrevocably constitute and appoint the Manager of said Company to transfer the said units of interest on the books of the within named Company, with full power of substitution in the premises.

Dated this 29th day of June, 2012 to be effective as of January 1, 2012.

_____
Deborah Rasby

WITNESS:

_____

4

DR 001023.1

[ 8 ]

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto JAMES D. PILLEN, Five (5) units of interest in DOUBLE D FAMILY FARMS, LLC, a Nebraska limited liability company (the *"Company"*). Said units of interest are represented by Certificate No. 5 standing in the name of the undersigned on the books of said Company. The undersigned represents that the above units are her entire interest in the Company and this Assignment is intended to transfer her entire interest in the Company. The undersigned does hereby irrevocably constitute and appoint the Manager of said Company to transfer the said units of interest on the books of the within named Company, with full power of substitution in the premises.

Dated this 29th day of June, 2012 to be effective as of January 1, 2012.

_____
Deborah Rasby

WITNESS:

_____

1

DR 001024.1

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto JAMES D. PILLEN, Ten (10) units of interest in NORTHERN NANCE, LLC, a Nebraska limited liability company (the "*Company*"). Said units of interest are represented by Certificate No. 2 standing in the name of the undersigned on the books of said Company. The undersigned also sells, assigns and transfers unto JAMES D. PILLEN all of the undersigned's rights in and to certain subordinated indebtedness owed by the Company to the undersigned in the principal amount of $350,000. The undersigned represents that the above units and indebtedness are her entire interest in the Company and this Assignment is intended to transfer her entire interest in the Company. The undersigned does hereby irrevocably constitute and appoint the Manager of said Company to transfer the said units of interest and the evidence of indebtedness on the books of the within named Company, with full power of substitution in the premises.

Dated this 29th day of June, 2012 to be effective as of January 1, 2012.

_____
Deborah Rasby

WITNESS:

_____

2

DR 001025.1

[10]

## Wells, Roger

| | |
|---|---|
| From: | Doug Rasby <ddrasby@frontiernet.net> |
| Sent: | Sunday, May 22, 2011 10:14 PM |
| To: | Wells, Roger |
| Subject: | Deborah Rasby retirement information |
| Attachments: | Deborah Rasby Retirement Information.xlsx |

Hello Roger,

Attached is some background information on our business.  Tomorrow (Monday) we will overnight the financials, 2011 budgets, buy/sell and operating agreements, an overview "picture" of our group businesses and my retirement letter.

We will be out of town June 7 – 13.  Would there be an opportunity to meet before we leave?

Thank you for your assistance, we appreciate it very much.

Sincerely,

Deborah Rasby



1

**DR001238.2**

<u>*Retirement Information for Deborah Rasby from Progressive Swine Technologies, Inc.*</u>

<u>*Intent:*</u>

*My intent is to establish a fair and equitable agreement with the majority owner, Jim Pillen.  Whether my*

*ownership interests are sold, partially sold, or maintained I would like to retire in a positive*

*way that is good for everyone concerned (our business, my family, Jim and me).*

*I will do whatever I can to have a win/win parting.*

DR001239.2



Progressive Swine Technologies (PST) is the management company for associated pork production farms, feed mills and a swine genetics company.

We began operations in the fall of 1993 but the official start date was 1/1/1994.

Jim Pillen established a 2500 sow weaning pig facility (RC West) with another partner in 1994
and from there we grew to over 50,000 sows in various farrow - finish partnerships.

I established the financial and production reporting information and
and the administrative support systems of PST from inception.

Jim's and my salaries were modified slightly once, over a decade ago, but have
since remained the same. Our primary income from PST comes
through distribution of profits.

The business entities that PST manages have remained the same since 2008
although modifications have occurred such as additional finishers added
and changes to the internal flows of pigs from one site to another.

Management agreements with the managed entities
have remained the same since the inception of the managed entities.

PST manages the following entities (red text indicates my ownership):

| Bartlett Foods | Sole Proprietor | Montana Enterprises 100% |
|---|---|---|
| GGP | LLC | Jim Pillen 33.33%, Bob Gottsch 33.33%, Brett Gottsch 33.33% |
| Danbred Production | LLC | Jim Pillen 30.17%, Morrison Enterprises 30.17%, Bob Gottsch 15.06%, Brett Gottsch 15.06%, SEA USA Inc. 9.5% |
| Danbred PMS | S Corp | Jim Pillen 30.17%, Morrison Enterprises 30.17%, Bob Gottsch 15.06%, Brett Gottsch 15.06%, SEA USA Inc. 9.5% |
| Double D Family Farms, LLC | LLC | J Pillen 64%, C Pillen 10%, T Pillen 10%, O'Connor 5%, Bonwell 5%, Rasby 5%, PST 1% |
| Imperial Foods, LLC* | LLC | J Pillen 100% |
| Inland Foods Partnership | Partnership | J Pillen 27% Morrison Enterprises 73% |
| Northern Nance LLC | LLC | J Pillen 69%, O'Connor 20%, Rasby 10%, PST 1% |
| Northern Platte LLC | LLC | J Pillen 69%, O'Connor 20%, Rasby 10%, PST 1% |
| Platte Center West LLC | LLC | J Pillen 99%, PST 1% |
| JDP, LLC | LLC | J Pillen 100% |
| JD Hogg | Partnership | J Pillen 50%, Keech 50% |
| PST Billing | S Corp | J Pillen 70 %, Bonwell 20%, Rasby 10% |
| H E | LLC | J Pillen 100% |
| Progressive Swine Technologies (PST) | S Corp | J Pillen 90%, Rasby 10% |
| PST Gene Center LLC | LLC | J Pillen 99 %, Rasby 10%. PST 1% |
| PST Vet Services | Sole Proprietor | J Pillen 100% |

Management fees paid to PST are based on:
1) Lbs sold at pork production facilities*
2) Tons sold at the feed mill
3) Doses sold at the gene center
4) Doses sold and selected animals at Danbred

* I have experienced unilateral decisions implemented by Jim to change rates
that have been financially detrimental to me.

DR001240.2

DR0012741.2

### RASBY DISTRIBUTION HISTORY FOR 2009, 2010 AND ESTIMATED 2011

| PST | | PST, PST Gene Center & PST Milling 3 (or 2) yr avg $468,370 | PST & PST Gene Center 3 year average * $408,538 |
|---|---|---|---|
| | | 3 Year Average | *Note: There is a possibility that our feed |
| 2011 (1st Qtr Annualized) | $318,647 | $340,667 | mill will become obsolete and |
| 2010 | $347,156 | | consequently be sold or abandoned. |
| 2009 | $356,196 | | |

**PST GENE CENTER**

| | | 3 Year Average |
|---|---|---|
| 2011 (1st Qtr Annualized) | $58,431 | $67,872 |
| 2010 | $85,062 | |
| 2009 | $60,122 | |

**PST MILLING**

| | | 2 Year Average | |
|---|---|---|---|
| 2011 (Continued Pmt of Grain Bin) | N/A | $59,832 | |
| 2010 (1st - 3rd Qtrs Annualized) | $64,072 | (Purchase of grain bin - distributions ceased in Oct until paid off) | |
| 2009 | $55,592 | | |

### RASBY DISTRIBUTION HISTORY SINCE 2000

**PST**

| | |
|---|---|
| 2011 (1st Qtr Annualized) | $318,646 |
| 2010 | $347,156 |
| 2009 | $356,196 |
| 2008 | $279,814 |
| 2007 | $331,103 |
| 2006 | $268,574 |
| 2005 | $256,492 |
| 2004 | $209,529 |
| 2003 | $177,971 |
| 2002 | $153,177 |
| 2001 | $122,391 |
| 2000 | $95,224 |
| Total | $2,250,471 |

**PST Gene Center**

| | |
|---|---|
| 2011 (1st Qtr Annualized) | $58,431 |
| 2010 | $85,062 |
| 2009 | $60,122 |
| 2008 | $44,068 |
| 2007 | $32,645 |
| 2006 | $14,402 |
| 2005 | $20,569 |
| 2004 | $19,053 |
| 2003 | $4,925 |
| 2002 | $17,699 |
| 2001 | $31,634 |
| 2000 | $27,910 |
| Total | $273,028 |

**PST Milling**

| | |
|---|---|
| 2009 | $55,592 |
| 2008 (debt paid, 1st year of distributions) | $30,760 |

[ 4 ]

## MY THOUGHTS ON THREE POSSIBLE ACTIONS

**1) FULL BUY OUT (Double D, Northern Nance, Northern Plains, PST, PST Gene Center and PST Milling):**

A buy out over 3 years that will give Jim a possible 7 year payback.

**2) PARTIAL BUY OUT - (Sell -PST, PST Gene Center and PST Milling):( Retain) - Double D, Northern Nance, Northern Pl**

This incorporates a minimum payment - based on the prior two years

This incorporates a minimum payment plus annualized 1st quarter 2011 distributions. The exception is for PST Milling actual cash distributions plus annualized 1st quarter 2011 distributions. The exception is for PST Milling which suspended distributions to purchase an additional grain bin. The 1st, 2nd and 3rd quarters of 2010 would be annualized and averaged with 2008 distributions. These minimum payments would be made until the farms begin generating cash distributions, excluding those distributions made with the intent to cover tax liability only and would kick in again if the farms discontinued or reduced distributions below the minimum.

**3) MAINTAIN ALL CURRENT OWNERSHIP:**

Is there a way to safeguard the integrity of the businesses so that future operations and policies are at least as beneficial to my interests as they are at present?

DR001242.2

**SENSITIVITY ANALYSIS**
**ON PAYBACK TO JIM PILLEN**
**FOR FULL BUY OUT OF DEBORAH RASBY**

| | 2012 Rasby Estimated Annual Income *** | Total Buy Out $10,000,000 | Decrease # 1 Estimated Annual Income | Total Buy Out $10,000,000 | Decrease # 2 Estimated Annual Income | Total Buy Out $10,000,000 | Increase # 1 Estimated Annual Income | Total Buy Out $10,000,000 | Increase # 2 Estimated Annual Income | Total Buy Out $10,000,000 | Increase # 3 Estimated Annual Income | Total Buy Out $10,000,000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| N Nance/N Plains | $780,000 | | $700,000 | | $650,000 | | $800,000 | | $850,000 | | $900,000 | |
| Double D * | $90,000 | | $75,000 | | $52,500 | | $120,000 | | $127,500 | | $135,000 | |
| Other ** | $502,000 | $1,372,000 | $437,000 | $1,212,000 | $397,000 | $1,099,500 | $437,000 | $1,357,000 | $502,000 | $1,479,500 | $502,000 | $1,537,000 |
| # Years Payback | | 7.29 | | 8.25 | | 9.10 | | 7.37 | | 6.76 | | 6.51 |

| Double D Operations | $ | 7,000,000 |
|---|---|---|
| Double D * 30% | $ | 2,100,000 |
| Double D Net | $ | 1,800,000 |
| Double D Net * 5% | $ | 90,000 |

**

| | 2012 Estimates | |
|---|---|---|
| PST | $360,000 | |
| PST Gene Center | $77,000 | |
| PST Milling | $65,000 | |
| Total | $502,000 | |

| | 2012 Variations | |
|---|---|---|
| PST | $360,000 | |
| PST Gene Center | $77,000 | |
| PST Milling | $0 Possibility that our feed mill could become obsolete and be sold or abandoned |
| Total | $437,000 | |

| | 2013 Variations | |
|---|---|---|
| PST | $320,000 | |
| PST Gene Center | $77,000 | |
| PST Milling | $0 | |
| Total | $397,000 | |

***
Estimated Annual Incomes are based on 2011 budgets and anticipated changes for 2012 but Jim could make decisions that would affect all of them.

DR001243.2

[ 6 ]

DR0012442

In accordance with the agreement of all partners at the December 2008 partnership meeting, the
Operating Agreements for PST, PST Gene Center and PST Milling were revised to exclude
retirement as an operative event requiring the sale of ownership interests.
The stated intent of this change was to allow the partners to use distributions from
the businesses to fund retirement.

Distributions from PST, PST Gene Center and PST Milling have been calculated the same
way throughout the history of these businesses (years 1994, 2000 and 2008 respectively).

I signed the operating and buy-sell agreements for PST, PST Gene Center and
PST Milling.  After I signed and returned these agreements I
began to consider more strongly the down side of signing the agreements
for the highest risk businesses - our pork production farms.
The agreements were written by Jim's daughter (an attorney who is now
employed by PST) and were heavily weighted in Jim's favor.
Another partner, who no longer works within our business (and who
abruptly left PST several years ago), and I declined to sign.

After the 2008 partner meeting there was no subsequent change in the method
used to calculate monthly distributions, no subsequent change in the management
agreements of these or any other businesses managed by PST, and no subsequent
change in the financial operating policies of the businesses managed by PST.
Jim did, however, unilaterally implement a change in management fees which was
beneficial to him and detrimental to me.  Given this, I am wondering if there is
any way in which I can protect the integrity of these businesses based on precedent
established over the years.

As I have mentioned, Jim has made intimidating comments that the profits
will be moved to the farms (pork production businesses) with the knowledge that the
PST business produces my primary cash flow.  My concern is that there will be a
manipulation of expenses (salaries to family members, absorbing expenses from the farms,
donations through PST instead of personal accounts, etc).

[ 7 ]



MNMK000281

| From: | Doug Rasby |
|---|---|
| To: | Wells, Roger |
| ~t: | 8/25/2011 8:04:46 AM |
| ~ject: | Update |

Good morning Roger,

After receiving no reply to another request for information earlier in the day on Monday, I sent the email below to Jim Pillen on Monday evening (prompted by our meeting with you, a great deal of prayer and contemplation). I realize that the law can do only so much and I keep coming back to the one true and firm foundation in life – faith in God. I am quite thankful that we were directed to you – it is certainly one of the ways in which we have been taken care of through prayer.

I received the requested information on Wednesday.

From the information received I was able to discover what happened to the funds. There was inaccurate accounting after I left which I think I will be able to have corrected.

I will continue to work in the direction of a sale if at all possible. I agree with you that this would be the best path. I will keep you posted on what transpires.

Best regards,

Deb

**From:** Deb Rasby [mailto:debrasby@gmail.com]
**Sent:** Thursday, August 25, 2011 6:47 AM
**To:** Doug Rasby
~ect: Fwd: Current thoughts

---------- Forwarded message ----------
From: **Deb Rasby** <debrasby@gmail.com>
Date: Mon, Aug 22, 2011 at 5:50 PM
Subject: Current thoughts
To: "Jim D. Pillen" <jimdp@pstdanbred.com>

Jim,

When money disappears and requested financial information about it is not forthcoming the appearance is that something is wrong.

I may have been overly confidant to believe in the words that you have spoken - that "everything would be alright". I hope that I wasn't mistaken. I took you to be a man of integrity, a man of your word. I may have also been overly confidant that you appreciated what I have given up to allow you freedom from conflict with me. It is up to you alone to make decisions according to your principles. As Bob Dylan's lyrics say: "It may be the devil or it may be the Lord, but you're gonna have to serve somebody." Ultimately, the only thing that matters from either side of the fence is who we serve, who we are and the actions that reflect this. We are told that what we do to others is what we do to Jesus. I keep this in mind in my actions that involve you and believed the same would be true of you in your actions toward me. The highest and best vision for our future is to be the people God wants us to be. If good prevails we will both win, if not, we will both lose. The winning and losing pertains to tangible and intangible things.

**EXHIBIT**
12
~m 3-21-19

MNMK000234

1

I have given much thought to the possible sale of my ownership interests. I understand your feelings that run deep for PST. Mine have for 18 years as well. I had always viewed myself as a business partner, not an employee, but I understand from John that this was not your view. I don't understand this way of thinking, but I have contemplated it ⌒rtheless. With respect for your feelings I told John that I would be open to visiting with you about it.

I believe that it would be the best if you and I meet but if you would like me to continue to meet with John I will. Let me know. I hope that my confidence in you has not been misplaced.

Deb

MNMK000235

2

[ 2 ]



**Wells, Roger**

| | |
|---|---|
| **From:** | Doug Rasby <ddrasby@frontiernet.net> |
| **Sent:** | Tuesday, October 11, 2011 8:53 AM |
| **To:** | Wells, Roger |
| **Subject:** | Meeting with investment banker and also with you and your colleague? |

Note: This information has been created for my attorney and is privileged client/attorney communication.

Good morning Roger,

Have you had any luck reaching your investment banker friend? We hope that this meeting is a possibility soon and that we can do it on a day in the near future in which we can also meet with you and your colleague who handles situations such as ours. I am forwarding my most current email communication with Jim Pillen. Last Friday he had promised to pay the outstanding distributions after we met with our tax accountant to clear up an S Corp related issue. We met with Rick yesterday and upon leaving the meeting he would not commit to paying the distribution. He said "maybe we'll pay them annually". I followed up with an email reminding him of his promise on Friday. I will also forward another email to you that I sent him this morning.
Deb Rasby

**From:** Deb Rasby [mailto:debrasby@gmail.com]
**Sent:** Tuesday, October 11, 2011 8:42 AM
**To:** Doug Rasby
**Subject:** Fwd: Your word?

---------- Forwarded message ----------
From: <debrasby@gmail.com>
Date: Tue, Oct 11, 2011 at 7:17 AM
Subject: Re: Your word?
To: Jim Pillen <jimdp@pstdanbred.com>

Well, are you or aren't you Jim? Isn't it time to let go of the anger?

Sent from my BlackBerry Smartphone provided by Alltel

---

**From:** "Jim D. Pillen" <jimdp@pstdanbred.com>
**Date:** Tue, 11 Oct 2011 11:59:07 +0000
**To:** Deb Rasby<debrasby@gmail.com>
**Subject:** RE: Your word?

Deb

Please don't plan on coming by the office.

Jim



1

**DR001271.2**

**From:** Deb Rasby [mailto:debrasby@gmail.com]
**Sent:** Monday, October 10, 2011 6:39 PM
**To:** Jim D. Pillen
**Subject:** Your word?

Jim,

You told me on Friday that the PST distribution would be paid after we met with Rick today and took care of the receivable. Per the discussion today we have agreed that the receivable will be taken care of by including this in my W-2 earnings. If the PST distributions aren't paid this means that you are not a man of your word.

I will be in tomorrow to pick up the check.

Deb

2

**DR001272.2**

[ 2 ]

| From: | Doug Rasby |
| To: | Wells, Roger |
| ~t: | 10/12/2011 9:53:21 AM |
| ..oject: | RE: Meeting with investment banker and also with you and your colleague? |

Thank you Roger, we hope that Eastwood will be able to take a look at our figures as soon as possible since Jim has mentioned moving ahead using an outside professional (I don't know what has happened to his negotiator, John Meyer). I would like to move on this while he is in the mood and before he thinks up other squeeze strategies. Jim is a highly aggressive person - people who know him well would place him at an extreme level. He will definitely be emboldened to do more if he can get away with it. If Eastwood thinks that we have solid numbers maybe he and Jim's person could resolve this. As we have discussed, this would be the best strategy and we would be willing to give up something significant on the selling price to get it done. I just want to get away from the guy.

Jim's strategy, of course, is definitely to squeeze me by not paying the distributions - when I asked him directly after our Monday meeting if they would be paid the next day he said "maybe we'll pay them annually - the money is there, I DO have a fiduciary duty, don't I?" (said with a smirk).

Here are my greatest fears:

1) Jim squeezing me in an even more potent way by not paying tax distributions on the N Nance/N Plains farm which would quickly drain all of our savings (it w/b - 10 yrs before this is out of debt)

2) Further manipulation of PST's expenses and the drain of almost all of the profits

[blacked out] (BTW, other increases have included PST building rent paid to Jim and expenses that have been moved to PST from other entities owned 100 % by Jim); and the requirement of tax distributions paid out for our mutual farms. (Could consistency be required if tax distributions are paid for other entities owned by Jim? I would not know if he paid tax distributions on other entities or not.)

Eastwood might also have a feel for whether Jim's $1MM salary is reasonable in our industry rather than a smaller salary and a % of profits. (In the past, Jim's 90% of profits gave him ~ $2.7MM in distributions per year and our salaries were low - his was $110,000, mine was $85,000.) I don't have a problem with Jim increasing his salary to a reasonable level, I just don't want to see Jim's aggression drain all of the profits away.

We hope Eastwood gets back to you soon.

Deb Rasby



MNMK000262

1



From: Wells, Roger [mailto:rwells@mcgrathnorth.com]
Sent: Tuesday, October 11, 2011 5:20 PM
To: 'Doug Pasby'
Subject: RE: Meeting with investment banker and also with you and your colleague?

I have not heard back yet from Eastwood, and Bill Hargens (one of our senior litigators) is
looking at the information…and I will brief him in detail before we meet.



Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773

Home (402) 488-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com

From: Doug Pasby [mailto:ddrasby@frontiernet.net]
Sent: Tuesday, October 11, 2011 8:53 AM
To: Wells, Roger
Subject: Meeting with investment banker and also with you and your colleague?

Note: This information has been created for my attorney and is privileged client/attorney
communication.

Good morning Roger,

Have you had any luck reaching your investment banker friend? We hope that this meeting is a
possibility soon and that we can do it on a day in the near future in which we can also meet
with you and your colleague who handles situations such as ours. I am forwarding my most
current email communication with Jim Pillen. Last Friday he had promised to pay the
outstanding distributions after we met with our tax accountant to clear up an S Corp related
issue. We met with Rick yesterday and upon leaving the meeting he would not commit to paying
the distribution. He said "maybe we'll pay them annually". I followed up with an email
reminding him of his promise on Friday. I will also forward another email to you that I sent
this morning.

MNMK000263

2

[ 2 ]

Deb Rasby


From: Deb Rasby [mailto:debrasby@gmail.com]
Sent: Tuesday, October 11, 2011 8:42 AM
To: Doug Rasby
Subject: Fwd: Your word?

---------- Forwarded message ----------
From:
Date: Tue, Oct 11, 2011 at 7:17 AM
Subject: Re: Your word?
To: Jim Pillen

Well, are you or aren't you Jim? Isn't it time to let go of the anger?

Sent from my BlackBerry Smartphone provided by Alltel

_____

From: "Jim D. Pillen"

Date: Tue, 11 Oct 2011 11:59:07 +0000

To: Deb Rasby

Subject: RE: Your word?

Please don't plan on coming by the office.

Jim

From: Deb Rasby [mailto:debrasby@gmail.com]
Sent: Monday, October 10, 2011 6:39 PM
To: Jim D. Pillen
Subject: Your word?

Jim,

You told me on Friday that the PST distribution would be paid after we met with Rick today and
took care of the receivable. Per the discussion today we have agreed that the receivable will
be taken care of by including this in my W-2 earnings. If the PST distributions aren't paid
this means that you are not a man of your word.

I will be in tomorrow to pick up the check.



MNMK000264

s message and any attachments are confidential, may contain privileged information, and are i..tended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery to the named recipient, you are notified that any review, distribution, dissemination or copying is prohibited. If you have received this message in error, you should notify the sender by return email and delete the message from your computer system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

MNMK000265

4

**From:** Wells, Roger
**To:** 'Doug Rasby'
**Sent:** 3/15/2012 5:05:22 PM
**Subject:** RE: Update and a request for you opinion

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773

Home (402) 498-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com

From: Doug Rasby [mailto:ddrasby@frontiernet.net]
Sent: Thursday, March 15, 2012 1:34 PM
To: Wells, Roger
Subject: Update and a request for you opinion

The following communication is subject to attorney/client confidentiality:

Hi Roger,

I have an update and a question for you.

Update:

I should know within the next few weeks what Jim's stance will be regarding paying
distributions to cover taxes on our farms' taxable income. I have asked him about them and Dan
O?Connor, the other minority owner of Northern Nance/Northern Plains, plans to visit with him
about them in a few days. (We have a history of paying tax distributions for farms with a
taxable income.) If a tax distribution does not materialize the time may be right for a letter
from you.

If you will recall, our last conversation was concentrated around Jim?s statement that he was
going to dissolve PST right away. To the best of my knowledge the company is still operating
as PST ? the January income statement showed a projected 12/31/2012 year end profit of
$2,147,783, the same people are doing the same work, there is the same automated PST phone
greeting and the same PST sign on the building, etc. I received a distribution for January
from PST but have not yet received January distributions for PST Gene Center or PST Milling.
PST Milling's income statement included a calculation of the amount to be distributed. PST
Gene Center's statement typically doesn't show this but the distributions have been made each
month. I emailed Jim asking about these and got a response that didn?t answer my question and
sounded defensive.

EXHIBIT
22

MNMK000326

I don?t know if you are aware of this but Jim has announced that he is a candidate seeking the
vacant UNL Board of Regents spot for our area. Actually, I think that he would serve UNL well.
I also think that he would want to avoid any hint of wrong doing on his part or a lawsuit from
a business partner so I am glad to see him in the spotlight.


Request for opinion:

I would like to communicate (and would like your opinion on) the following in order to remind
Jim that there are communications that could be damaging to his image. I hope that this will
help protect me from future harmful actions by him and perhaps bring about some forward
progress on a buy out (I have heard nothing on it). This is meant to be a warning that there
is something out there of his own making that could be damaging to him. These communications
to him include my addressing actions on his part that could have crossed the line to criminal
if they went further. I won't go into detail but he was angry with me on both of these. I
communicated both verbally and in writing since he had reversed himself in the past or said he
never said certain things – I had lost trust in him. Here is the proposed email to him:


Jim,


Although you have said in the past that peace of mind is overrated in your opinion, there is
something that has been on my mind that I plan to destroy when we reach financial closure. I
would think that this would be something on which you would like to have some assurance. As
you know from my last day in the office I have kept our communications – emails and written
notes – over the years. You can probably remember back to the time that I told you that I
would communicate in writing in order to be clear and to ensure that we were on the same page.
I also kept copies when it looked as if I needed to maintain clarity of my position on various
issues or, possibly, to defend myself. I addressed sensitive subjects in some of them as you
may recall – actions that, were you to take, could have had terrible consequences. There are
others that reflected harshness and there are some responses that made little sense. I have
not shown them to anyone and I want you to know that I will destroy them when our financial
ties have come to an end. My desire is to not cause harm to you and to wipe the slate clean.


Deb

MNMK000327

## Wells, Roger

| | |
|---|---|
| **From:** | Doug Rasby <ddrasby@frontiernet.net> |
| **Sent:** | Friday, April 13, 2012 10:13 AM |
| **To:** | Wells, Roger; Hargens, William F. |
| **Subject:** | Offer of sale from Jim Pillen & notes to 2010 balance sheet showing note receivable |
| **Attachments:** | 04-13-2012 09;36;13AM.pdf; Annual EBITDA and Net Tangible Values.xlsx |

The following is subject to attorney/client confidentiality:

Good morning,

I received the attached letter from Jim Pillen this morning via UPS.  The offer totals $1,931,029.  He plans on liquidating the company and discontinuing all the business' distributions.  Also attached are:

1)    A spreadsheet showing my annual EBITDA (based on 2/29/12 financials) of $1,597,307

2)    My share of net tangible assets, which we currently use for our cash flow assistance program with Tyson, of $3,207,008

3)    The notes to a 2010 balance sheet which shows my note receivable of $350,000  (we also have check stubs for interest payment receipts if needed)

I will be available today prior to 3:30 (we have a 4:00 wedding to attend - Friday the 13th - very unsuperstitious

What can we do and how should we respond?  We do not want to accept this low ball offer if we don't have to - our after tax proceeds wouldn't be much more than $500,000.

Thank you for your help,

Deb and Doug

Home #: 402-563-2180



1

DR001294.2

[ 1 ]

April 9, 2012

Deb Rasby
3474 24th Avenue
Columbus, NE 68601
VIA OVERNIGHT MAIL

Dear Deb:

We have come to a place where you need to make a decision about your ownership interests. You are no longer an employee and there are clear differences of opinion regarding the companies and how they should operate. I am writing to advise you of some changes we are implementing and to present you with a proposal for resolving all pending issues.

With respect to Progressive Swine Technologies, Inc. ("PST"), our plan is to liquidate the corporation since it no longer meets our business objectives. As part of an orderly liquidation, you will receive ten percent of the net assets available for distribution after payment of all outstanding liabilities. Based on the March 31, 2012 balance sheet, we anticipate that total assets available for distribution will be just over $500,000. That means your share of the final distribution would be just over $50,000. Until PST is liquidated, there will no distributions paid to shareholders. When everything has been concluded, there will be a final distribution. If you are in agreement with this plan, we will proceed based on consent resolutions. If you disagree, we will take steps to call a meeting of the shareholders to consider and vote on the plan of liquidation.

With respect to PST Milling, Inc, PST Gene Center, LLC, Double D Family Farms, LLC, Northern Nance, LLC, and Northern Plains, LLC, regular cash distributions from these entities will not be continued. Instead, cash from operations will be reinvested in the companies to fund future operations, provide a cushion against market fluctuations and unexpected economic events, and maintain acceptable debt levels. In light of the losses sustained over the past several years in agriculture, our business model today is to ensure sustainability of our businesses.

With that being said, I am willing to buy your interests in all of the above-noted businesses. The basic terms of the agreement would be as follows (all subject to being finalized in a written legal agreement between the parties):

    I would purchase your 10% interest in PST Milling for $276,465. This value is based on total cash invested into PST Milling, Inc as of 3/31/12.

    I would purchase your 5% interest in Double D for $421,642. This value is based on an agreed upon fair market value approach formulated by Steve Weiss and used in determining the 2012 sales price for the GGP, LLC buy-out.

    I would purchase your 10% interest in Northern Nance and your 10% interest in Northern Plains for a total purchase price of $1,114,142. This value is based on a standard balance sheet approach formulated by Steve Weiss and used in determining sales price for the 2012 GGP, LLC buy-out.

**DR001295.2**

[ 2 ]

I would purchase your 10% interest in PST Gene Center $68,780. This value is based on the value paid to Les Griess for his 10% interest in 2011.

If the proposed terms set forth above are agreeable to you, please respond in writing by Friday, April 20th, 2012, and we will arrange for a formal agreement and transfer documents to be prepared for the parties to review and sign.   If the proposed terms are not acceptable to you, I would also appreciate written confirmation from you to that effect by Friday, April 20th, 2012. In such event, we will continue business in accordance with the terms set forth in this letter.  If you choose not to honor our request to respond in writing by Friday, April 20th, 2012, the terms set forth in this letter is how we will do business from this point forward whether you remain a minority owner or sell your interests. Our communication has broken down through the years so I believe it is appropriate that such communications be done solely in writing.  Thank you for your consideration.

Sincerely,

Jim

**DR001296.2**

[ 3 ]

## September 2010
### Balance Sheet Analysis

1. Accounts Receivable includes $302,984.01 for slaughter hog sales to Tyson and $37,177.41 for cull sales to Pine Ridge and Heinold. Beaver Valley Pork, Imperial, and GGP owe $22,050 in payroll reimbursements and the remainder is made up of other miscellaneous reimbursements due to NN/NP.

2. Inventory includes $493,229 for month end feed on hand, which was not recorded in September 2009. Current 2010 nursery/finisher inventory valuations represent an approximate 8,200 head increase. Please see *Special Issues* tab page 13 for details.

3. Prepaid insurance increased from 2009 due to the inclusion of the prepaid commercial policies vs. only prepaying Workers' Comp. insurance. Prepaids also include $40,300 to Creston LP Gas for propane.

4. Please see *Special Issues* tab page 13 for details.

5. Buildings and equipment increased from prior year due to the installation of lay bars at NN & NP reproductive sites costing $56,313, and VE fire repairs totaling $69,795.

6. Wells and lagoon increased due to the Highline lagoon repairs totaling $12,946 and Anson well repairs totaling $5,646.

7. Transportation equipment includes the purchase of a 2003 Chevy Silverado for NP costing $11,094, it also reflects the sale of a 2007 Ford F-250 for $11,050 and the loss of $12,068 on the sale.

8. Construction in progress represents the following, most of which will be expensed:

|  | 2010 | 2009 |
|---|---|---|
| #60503 NN Nursery Flooring | $174,631 | |
| #60502 NN Filtration | $209,164 | |
| #60607 Rogers, #60105 Anson, | | |
| #60301 Jenkins, & #60504 NN | | |
| Wet/Dry Feeders | $274,623 | |
| #60606 Rogers Nursery Fire | | $2,167 |
| #60707 VE Nursery Fire (netted with insurance proceeds) | | $86,368 |
| #90204 NP Filtration | | $6,978 |
| #90506 NN Lay Bars | | $28,234 |
| #90506 NP Lay Bars | | $28,237 |

9. Accounts Payable and the Line of Credit are slightly higher due to the current projects listed in #8 above.

10. Accrued expenses are lower than prior year due to lower real estate taxes and no longer accruing for earnings. Earnings are paid on a monthly vs. quarterly basis.

Page 4

**DR001297.2**

[ 4 ]

11. Note payable consists of:

2009

| | |
|---|---|
| PCW, LLC | $235,000 |
| Deb Rasby | $350,000 |
| Dan O'Conner | $800,000 |
| JDP, LLC | $1,450,000 |
| Jim Pillen | $2,600,000 |

2010 (additions)

| | | |
|---|---|---|
| Swap | $1,148,241 | (FNBO) |
| Feeder Project | $379,313 | (FNBO-Matures 11/1/2011) |
| Total | $6,962,554 | |

12. NN/NP has paid down in full all monies due to Tyson from the CFA. NN/NP is currently building a reserve account with Tyson per the CFA agreement, which states NN/NP will build a reserve account up to $10/head of annual production, equal to $2,550,000. (When the market price is greater than $5.00/cwt above our breakeven, 7% of the market price is deposited into our reserve account which earns at the 3 month LIBOR rate plus 4%.)

13. NN has paid down $1,252,522 in term debt since September 2009.

14. Other Comprehensive Income/Loss reflects the $1,148,241 debt value on the Swap agreement, which is accounted for as a derivative (hedge). This will disappear in 2013 when the term note matures. Refinancing will be required to cover the $11 MM balloon payment due.

Page 5

DR001298.2

[ 5 ]



### Annualized EBITDA Based on 2/29/12 Finan

|  | N Nance/N Plains* | Double D* | PST Gene Center** |
|---|---|---|---|
| Rasby Ownership % | 10% | 5% | 10% |
| Rasby share of EBITDA | 1,030,692 | 193,860 | 80,267 |

### Net Tangible Values Used for CFA w

|  | **NN/NP** | **DD** | **PST Gene Center*** |
|---|---|---|---|
| Net Tangible Value | 2,404,557 | 502,411 | 68,779 |

\* Rasby equity per 2/29/2012 balance sheets, earnings is net of debt service, NN/NP & DD based on 2012 b

Note: Net Tangible Values for NN/NP and Double D are based on appraisals from several years ago - I don't r
as a basis for the Cash Flow Assistance program with Tyson.

**DR001299.2**

[ 6 ]



## ncial Statements

| | PST Mill** | PST** | Total |
|---|---|---|---|
| | **10%** | **10%** | |
| | 72,460 | 220,028 | **1,597,307** |

### ith Tyson

| PST Mill* | PST* | Total |
|---|---|---|
| 179,084 | 52,176 | 3,207,008 |

udgets,

emember the year.  These values are currently being used

**DR001300.2**

## Wells, Roger

| | |
|---|---|
| From: | Doug Rasby <ddrasby@frontiernet.net> |
| Sent: | Saturday, April 14, 2012 8:53 AM |
| To: | Wells, Roger; Hargens, William F. |
| Subject: | Pillen offer |

The following is subject to attorney/client confidentiality:

I hope that you received my email containing Jim Pillen's offer which requires a response by Friday, April 20th. ████████████████████ Pillen will continue to operate in a way that will harm me, no matter how profitable an enterprise happens to be. As in this case, Pillen uses unscrupulous tactics.

With regard to PST no longer meeting the business objectives, the work that is performed will still need to be done for all of the business entities. This includes production reporting and analysis, decision making on production practices, marketing strategies, financing needs, and personnel requirements; handling human resource functions, accounts payable, accounts receivable, preparation of financial statements, and all of the administrative work that is needed to operate a 50,000 sow operation. The same staff will handle the work.

The only change has been in the ownership of one of the business entities from 1/3 Jim Pillen to 100% Jim Pillen. One of our other pork production business entities, PC West, is also owned entirely by Jim Pillen. PC West was our first farm and the original ownership was 50% Pillen and 50% Mike Wilke. Management fees have always been paid. Pillen and Wilke split in the late 90's, I believe. The management fee structure did not change.

I don't know if the law looks at reasonable business practices when holding onto cash to reinvest in the business when there is no debt - not distributing even a minimum amount of net profit to cover income taxes. We do know that Pillen could come up with schemes to use cash for the business, if only to squeeze me. Two of the businesses named in the letter for which cash distributions of net profits will be discontinued, PST Gene Center and PST Milling, have no debt. Net profits have been distributed for many years, as they have for PST.

From what I have learned a bottom line reasonable offer might have been 4 years EBITDA or even tangible net value. As you know, this year we are experiencing the most profitable year in our business' history. The balance sheet values Jim is using for N. Nance, N. Plains and PST Gene Center are old and low. Dr. Griess was beaten down by the time he left and did not question the balance sheet value he was paid for PST Gene Center (I was not included in any of these discussions but Jim said there was little discussion). Like me, Dr. Griess simply wanted out. In negotiating with Bob Gottsch's widow and Brett Gottsch (who is in the midst of a nasty divorce) on the purchase of GGP, LLC I don't know all of the dynamics that would possess them to use such a low value. I do know that Bob Gottsch's widow is not a business woman and the death of her husband was recent. I have also heard that Brett Gottsch was doing whatever he could to minimize the amount he would have to give his ex-wife.

Given the fact that Pillen will do whatever it takes, ethical or not, to get me out I don't seem to have any power to negotiate, unless a lawsuit would provide pressure.

I will need your help to respond by April 20th.

Thanks,

1

**DR001329.2**




Deb Rasby

2

**DR001330.2**

2

[ 2 ]



## Wells, Roger

| | |
|---|---|
| **From:** | Doug Rasby <ddrasby@frontiernet.net> |
| **Sent:** | Saturday, April 14, 2012 4:31 PM |
| **To:** | Wells, Roger; Hargens, William F. |
| **Subject:** | Further thoughts on Pillen offer |

**Categories:** Rasby

The following communication is subject to attorney/client confidentiality:

I have been thinking of two other possibilities that might give me some financial and relationship strength from which to negotiate. The first is to visit with Ken Morrison who gave Pillen his start. Mr. Morrison has a reputation of being tough but fair in his business dealings. I would give him the history over the last several years (which I emailed to you last week) and the strategy being used in the offer to me. I would ask if Mr. Morrison would consider loaning me the funds to pay future income taxes in order to negotiate a fair value or to enable me to stay in the businesses. The fair market value is obviously highly important to me, but also I want to take action to show Pillen that this is not the way to do business. It is not the way to teach his son and daughter, both future leaders, to do business. (I think Pillen's daughter wrote the letter to me.) The other possibility is to visit with some lenders on this type of loan. I wonder if the use of a financial backer would provide any leverage to establish at what point cash distributions would be made. I believe that this would be imperative and, if you could communicate on this issue to Pillen, this might be intimidating enough to force a commitment. My utmost hope, still, is to sell at a fair market value. I think Pillen wants me out badly enough to pay it. Having Ken Morrison involved would definitely make Pillen angry because he has courted Mr. Morrison throughout our history, but the intimidation factor might put pressure on him to act properly. Pillen thinks highly of him, in large part because Mr. Morrison is an industry giant. But yet Pillen still tried to purchase the Bartlett Foods farrow - finish business in the last year or two with a low ball offer. What do you think?

From: Wells, Roger [mailto:rwells@mcgrathnorth.com]
Sent: Saturday, April 14, 2012 10:00 AM
To: 'Doug Rasby'; Hargens, William F.
Subject: RE: Pillen offer

We did receive it, and will go through the material this weekend

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773

Home (402) 498-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com <http://www.mcgrathnorth.com/>

1



**DR001252.2**



From: Doug Rasby [mailto:ddrasby@frontiernet.net]
Sent: Saturday, April 14, 2012 8:53 AM
To: Wells, Roger; Hargens, William F.
Subject: Pillen offer

The following is subject to attorney/client confidentiality:

I hope that you received my email containing Jim Pillen's offer which requires a response by Friday, April 20th.
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮Pillen will continue to operate in a way that will harm me, no matter how
profitable an enterprise happens to be. As in this case, Pillen uses unscrupulous tactics.

With regard to PST no longer meeting the business objectives, the work that is performed will still need to be
done for all of the business entities. This includes production reporting and analysis, decision making on
production practices, marketing strategies, financing needs, and personnel requirements; handling human
resource functions, accounts payable, accounts receivable, preparation of financial statements, and all of the
administrative work that is needed to operate a 50,000 sow operation. The same staff will handle the work.

The only change has been in the ownership of one of the business entities from 1/3 Jim Pillen to 100% Jim
Pillen. One of our other pork production business entities, PC West, is also owned entirely by Jim Pillen. PC
West was our first farm and the original ownership was 50% Pillen and 50% Mike Wilke. Management fees
have always been paid. Pillen and Wilke split in the late 90's, I believe. The management fee structure did not
change.

I don't know if the law looks at reasonable business practices when holding onto cash to reinvest in the
business when there is no debt - not distributing even a minimum amount of net profit to cover income taxes.
We do know that Pillen could come up with schemes to use cash for the business, if only to squeeze me. Two
of the businesses named in the letter for which cash distributions of net profits will be discontinued, PST Gene
Center and PST Milling, have no debt. Net profits have been distributed for many years, as they have for PST.

From what I have learned a bottom line reasonable offer might have been 4 years EBITDA or even tangible net
value. As you know, this year we are experiencing the most profitable year in our business' history. The
balance sheet values Jim is using for N. Nance, N. Plains and PST Gene Center are old and low. Dr. Griess
was beaten down by the time he left and did not question the balance sheet value he was paid for PST Gene
Center (I was not included in any of these discussions but Jim said there was little discussion). Like me, Dr.
Griess simply wanted out. In negotiating with Bob Gottsch's widow and Brett Gottsch (who is in the midst of a
nasty divorce) on the purchase of GGP, LLC I don't know all of the dynamics that would possess them to use
such a low value. I do know that Bob Gottsch's widow is not a business woman and the death of her husband
was recent. I have also heard that Brett Gottsch was doing whatever he could to minimize the amount he
would have to give his ex-wife.

2

**DR001253.2**

[ 2 ]

I will need your help to respond by April 20th.

Thanks,

Deb Rasby

This message and any attachments are confidential, may contain privileged information, and are intended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery to the named recipient, you are notified that any review, distribution, dissemination or copying is prohibited. If you have received this message in error, you should notify the sender by return email and delete the message from your computer system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

3

**DR001254.2**

## Wells, Roger

| | |
|---|---|
| **From:** | Doug Rasby <ddrasby@frontiernet.net> |
| **Sent:** | Sunday, April 15, 2012 2:04 PM |
| **To:** | Wells, Roger; Hargens, William F. |
| **Subject:** | More questions on Pillen offer |

**Categories:**      Rasby

The following communication is subject to attorney/client confidentiality:

Here are a few more questions – one of which could affect a meeting with Ken Morrison if he will agree to meet:

1)     What if I received a better offer on any or all of the businesses from someone else? Could they purchase any of these business' interests? I plan to call Ken Morrison Monday morning to see if he will meet with me. I would like to ask him if he will purchase my interests but at the least he can be made aware of what Jim is capable. His daughter and granddaughter will have to deal with Jim someday.

2)     With regard to PST's business objectives, I don't know where these are stated.

3)     I am not sure if a signed Buy Sell actually exists for PST – or for PST Gene Center or PST Milling.

4)     Pg 8, Section 13 of the N. Nance, N. Plains and Double D Operating Agreements states that a member shall not sell except as provided in the Buy Sell. Since a Buy Sell doesn't exist for these businesses what is the status of this section?



1

**DR001284.2**

**From:**      Wells, Roger
**To:**        Hargens, William F.
**Sent:**      4/16/2012 8:16:55 PM
**Subject:**   FW: Counter offer possibility?

Give me a call on this in the morning.  thanks

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska  68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773
Home (402) 498-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com

**From:** Doug Rasby [mailto:ddrasby@frontiernet.net]
**Sent:** Monday, April 16, 2012 6:01 PM
**To:** Wells, Roger
**Subject:** Counter offer possibility?

The following is subject to attorney/client confidentiality:
Hi Roger

Gene Arnold agreed that Pillen's offer looks unreasonable and I would guess that Bill Eastwood would be of like mind.  (I emailed Bill the amount offered and the annual EBITDA which I updated based on the 2/29/12 financials. I didn't ask for his opinion and haven't heard from him.) Our concern is that Jim could withdraw his offer, however, he does *badly* want my ownership interests.
Thank you Roger,
Deb



MNMK000480

[ 1 ]

**Wells, Roger**

| | |
|---|---|
| **From:** | Doug Rasby <ddrasby@frontiernet.net> |
| **Sent:** | Wednesday, April 18, 2012 7:40 PM |
| **To:** | Wells, Roger |
| **Subject:** | Letter to Jim Pillen and a question |
| **Attachments:** | Letter to Jim April 19, 2012.docx |

All communications in this email are subject to attorney/client confidentiality.

Hi Roger,

Attached are my thoughts for communication with Jim Pillen. I also need to address the $350,000 note receivable. Could you help me with wording on it?

Thanks,

Deb



**DR001265.2**

[ 1 ]

Jim, you said last week that the majority owner can do whatever he wants. My attorneys, Roger Wells and Bill Hargens with McGrath North, have found case law that supports an actionable case in this situation. It could be a long drawn out affair though. At heart, I think that you are right. If he chooses, a person can get away with whatever he pleases. The gun is at my financial head. With a negative tax basis on the farms the after tax receipt from the sale will be small. I am at your mercy and you can pull the trigger if you wish. My only hope is that the words on your wall, which are from Jesus Christ, are not mere words. "Treat others the way you want to be treated" was a principle on which you founded your business. These words are on your website and on your business cards. If, at the age of 57 and after two decades of placing all of your assets at risk, you would want to accept this offer if you were in my shoes, then I will accept it. If, however, you see that an offer based on 3 years EBITDA and excluding any value for PST, would be more fair, then I am asking you to settle on a price of $4,131,836. This, of course, makes no common sense in human reasoning. This choice on your part would cost you an additional $2,200,807.  Either of these two possible choices for you carries some kind of cost.  My choices have too but they have been done with soul searching and I have felt that I have done the right thing.

**DR001266.2**

[ 2 ]

## Wells, Roger

| | |
|---|---|
| **From:** | Doug Rasby <ddrasby@frontiernet.net> |
| **Sent:** | Thursday, April 19, 2012 11:34 AM |
| **To:** | Wells, Roger; Hargens, William F. |
| **Subject:** | Revised letter to Jim |
| **Attachments:** | Letter to Jim April 19, 2012.docx |
| **Categories:** | Rasby |

This communication is subject to attorney/client confidentiality.

Good morning Roger and Bill,

Jim has the power and seems to be overcome with an appetite for more right now. My one hope in this particular situation is on whether God can work through him. Whether or not mercy is granted, I am not Jim's judge. As my daughter wrote to me "you've always said God works in mysterious ways, maybe this is one of those mysterious ways . . ."

I haven't addressed the $350,000 note receivable – I was thinking of including that in a communication after this part of the decision making is done.

We appreciate all of the talent you both have and the dedicated work that you have done on this case. Although a tough situation, it has been a pleasure to meet you both.

Deb



1

**DR001411.2**

[ 1 ]

Jim,

You said last week that the majority owner can do whatever he wants. My attorneys, Roger Wells and Bill Hargens with McGrath North, have found case law that supports an actionable case in this situation. It could be a long drawn out affair though. At heart, I think that you are right. If he chooses, a majority owner can do whatever works best for him, regardless of hardship to another. The gun is at my financial head. With a negative tax basis on the farms the after tax receipt from the sale will be small. I am at your mercy and you can pull the trigger if you wish.

My only hope is that the words on your wall, which are from Jesus Christ, are not mere words to you. "Treat others the way you want to be treated" was a principle on which you founded your business. These words are on your website and on your business cards. If, after transitioning at the age of 57 to work as an unpaid volunteer because of the necessity of allowing your business partner full authority, and after two decades of placing all of your assets at risk but with a belief in the business and in your business partner's ability and character, you would want to accept this offer under the pressure of a complete and total financial squeeze, then it will have to be done. It will be devastating, which I fully realized from our meeting last Tuesday. If, however, you see that an offer based on 3 years EBITDA which excludes any value for PST, would be more fair, then I am asking you to settle on a price of $4,131,836. This, of course, makes no common sense from a purely materialistic standpoint. This choice would cost you an additional $2,200,807. But either of these two possible choices for you carries some kind of cost. My choice has carried a cost too but it was the right thing to do. I will be grateful and appreciative for goodness and mercy to prevail in your decision making. And, love does continue on.

All the best to you,

Deb

**DR001412.2**

[ 2 ]



**Wells, Roger**

| | |
|---|---|
| **From:** | Wells, Roger |
| **Sent:** | Thursday, April 19, 2012 5:29 PM |
| **To:** | Jim Pillen (jimdp@pstdanbred.com) |
| **Cc:** | Deb Rasby (debrasby@gmail.com); Hargens, William F. |
| **Subject:** | Deb Rasby |
| **Attachments:** | Pillen Letter.pdf |

Dr. Pillen, my apologies for communicating by email without introductions. Deb Rasby has asked us to help her, and I wanted to make sure that we delivered the attached letter to you in time for your deadline tomorrow. Please call me if you have questions or want to discuss. Thanks.

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773

Home (402) 498-0941
rwells@mcgrathnorth.com <mailto:rwells@mcgrathnorth.com> www.mcgrathnorth.com
<http://www.mcgrathnorth.com/>



1

**DR001600.2**



## McGRATH NORTH
### ATTORNEYS AT LAW

ROGER W. WELLS

Phone (402) 341-3070
Fax (402) 952-1853
E-mail rwells@mcgrathnorth.com

April 19, 2012

**VIA EMAIL and OVERNIGHT DELIVERY**
jimdp@pstdanbred.com

Dr. Jim Pillen
Progressive Swine Technologies
3214 25th Street
Columbus, NE 68601

Dear Dr. Pillen:

Deb Rasby has asked McGrath North to assist her in assessing your letter dated April 9, 2012, and the events and circumstances surrounding that letter. In that regard, Mrs. Rasby has asked me to provide an initial response to your letter.

As a preliminary matter, based on your letter and the background that we have been provided, we have questions and concerns about some of the activity that has occurred, and that you have indicated will occur, with respect to the entities in which Mrs. Rasby is a minority shareholder. While that is not Mrs. Rasby's focus, or the purpose of this letter, we would note that Mrs. Rasby is not in agreement with the changes outlined in your letter (liquidating PST; discontinuance of distributions) and would propose that these activities be put on hold pending discussions regarding a sale of Mrs. Rasby's interests to you. If that is not acceptable, please let me know.

Mrs. Rasby is interested in selling her ownership interest in the companies to you. Her only desire is to be treated fairly. Based on what Mrs. Rasby has told me regarding the principles upon which you and your family founded the business, she assumes (hopes) that you also want to be fair.

Your proposal values the businesses using various valuation techniques (i.e., "total cash invested;" "agreed upon fair market value approach;" "standard balance sheet approach;" "price paid to others"). While the number that you proposed based on these valuation methods may be the right number, Mrs. Rasby would like the opportunity to involve a valuation expert to help her evaluate your proposal. I understand that Mrs. Rasby provided you her opinion on value some months ago. We acknowledge that the number was high, but frankly it was based on Mrs. Rasby's desire to remain an investor on a basis consistent with the past. Mrs. Rasby now acknowledges that a fair buy-out is the best option for all parties. Our intent is that a valuation

McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700   1601 Dodge Street   Omaha, NE 68102   www.mcgrathnorth.com

**DR001601.2**

Dr. Jim Pillen
Progressive Swine Technologies
Page 2
April 19, 2012

expert can help Mrs. Rasby feel comfortable with what a fair value is, which will help her respond to your proposal.

Mrs. Rasby understands that you have a business to run and appreciates the complexities that a minor shareholder presents. Mrs. Rasby wants to get out of your way, and sincerely hopes that a buy-out can be completed.

Please let me know if we can have our valuation expert contact you so that he/she can begin work. If you have questions, please feel free to contact me. If you prefer to proceed through written communications as indicated in your letter, then I would appreciate a prompt written response to the questions raised in this letter. In any event, any further communications regarding this matter should be directed to me and not to Mrs. Rasby.

Yours very truly,

ROGER W. WELLS

RWW/jmh

CC:    Deb Rasby
       Bill Hargens

McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700   1601 Dodge Street   Omaha, NE 68102
www.mcgrathnorth.com

**DR001602.2**

[ 3 ]

| From: | Timothy L. Moll |
|---|---|
| To: | Wells, Roger |
| Sent: | 5/13/2012 9:45:27 PM |
| Subject: | Pillen/Rasby |
| Attachments: | Valuation Summary (00488969).PDF |

Roger:

Per our recent telephone conversation, I am attaching the summary valuations prepared for Northern Nance and Northern Plains (combined) and for Double D Family Farms based on Steve Weiss's experience and methodology. Mr. Weiss was retained by the parties to assist in establishing a value for interests purchased by Jim Pillen in two unrelated entities. Jim Pillen was purchasing a controlling interest in both companies. The same methodology was applied to determine the values described in the attachment. The assumptions and underlying asset values are explained in the attachment. If you would like to visit with Steve Weiss directly regarding these valuations, let me know and we can make those arrangements.

As I indicated in our conversation, we understand Ms. Rasby's need to review the terms and basis of the proposed transactions before agreeing to them. Please note, however, that Jim Pillen's letter was not an invitation to go down the road of a battle of valuation experts.

Please note also that PST Milling, Inc., PST Gene Center and PST are entirely different entities so that the valuation approach used by Steve Weiss is not applicable. With regard to PST Gene Center, Jim Pillen is willing to purchase Ms. Rasby's interest on the same basis as he recently purchased the interest of Les Griess, an unrelated party who owned a 10% interest in the company. PST Milling is valued based on the total cash invested in the company as of March 31, 2012. PST is valued based on net assets after liabilities as of March 31, 2012.

When you have reviewed these materials, please contact me so that we can determine how best to proceed. We would like to have a final decision from Ms. Rasby not later than the close of business on May 21, 2012. If she is willing to move forward, then we can prepare the formal agreements for the purchase/sale of her interests. Thank you for your attention to this matter.

**Timothy L. Moll, Attorney**
tmoll@remboltlawfirm.com

**Rembolt Ludtke LLP**
1201 Lincoln Mall, Suite 102
Lincoln, Nebraska 68508
P: (402) 475-5100 ext 125
F: (402) 475-5087
Web: www.remboltlawfirm.com

DISCLOSURE: In accordance with IRS Circular 230, please note the following with regard to any portion of the above message which involves federal tax issues: Unless expressly stated otherwise above, (1) nothing contained in this message is intended or written to be used or relied upon by any taxpayer for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code; and (2) nothing contained in this message may be used to recommend, promote or market any federal tax transaction or matter.

WARNING/CAUTION: This e-mail and any files transmitted with it are strictly confidential and are intended solely for the use of the individual or entity to whom it is addressed. This communication may contain material protected by lawyer-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail and any file attachments is strictly prohibited. If you have received this e-mail in error, please immediately notify us by a collect telephone call to (402) 475-5100 or by reply e-mail to the sender. You must destroy the original transmission and its contents.



MNMK000535

[ 1 ]

## Wells, Roger

| | |
|---|---|
| **From:** | Doug Rasby <ddrasby@frontiernet.net> |
| **Sent:** | Wednesday, May 23, 2012 1:28 PM |
| **To:** | Wells, Roger; Hargens, William F. |
| **Subject:** | Questions |

The following communication is subject to attorney/client confidentiality.

Our questions concerning an appraisal may be moot. Do we have any options other than these?

1) Sell at an extremely low, discounted price that is non-negotiable
2) Stay associated with an oppressive partner
   a. No cash will be distributed to pay taxes- possibly forever, which would use up all of our assets within about 3 years
      i. Is there any action that could be taken with regard to tax liability leniency
         1. Through the IRS?
         2. Through the legal system?
   b. What absolute rights do I have as a minority partner?
      i. Right to ask for a quarterly partner meeting (past practice) – or a meeting at any time I feel is appropriate?
      ii. Objective, accountable reason for holding onto cash when it is harmful to a partner?
      iii. Right to see sales, expense and journal entry detail monthly or quarterly given oppressive action by the majority partner?
3) Appeal to Jim Pillen's values and character – shame him into a selling price that is more fair?
   a. Underlying message of long-term consequence of Jim Pillen's actions on his ability to lead with expectations of good values and character from those he leads (*this had been a cornerstone of our leadership principals throughout our PST history*)
   b. Underlying message of long-term consequence of Jim Pillen's actions on his image in the political spotlight

Thank you for your help in this discouraging process.

Deb



1

**DR001359.2**

## Wells, Roger

| | |
|---|---|
| **From:** | Doug Rasby <ddrasby@frontiernet.net> |
| **Sent:** | Wednesday, May 23, 2012 5:32 PM |
| **To:** | Wells, Roger; Hargens, William F. |
| **Subject:** | The situation as I see it |

**Categories:** Rasby

The following communication is subject to attorney/client confidentiality.



There is only one aspect in which I see any hope: Pillen wants PST

To clarify what a win would be for us:

1)   Stopping the dissolution of PST

2)   Stopping the manipulation of profits of PST, PST Milling and PST Gene Center that would benefit Jim Pillen disproportionately

a.   Changing the fees

b.   Moving any type of expenses from each of his businesses (including businesses in which he is the sole owner and businesses in which he has other partners) into these businesses that we jointly own

3)   Forcing a reasonable payment of distributions - enough to pay tax liabilities each year from each entity (just the payments of profits from PST, PST Milling and PST Gene Center would have covered this - but these bottom lines can be manipulated to move the profits to the entities in which we have debt - item #2 above)

We would like to cancel the call with the Kansas appraiser tomorrow.  We would use Frankel Zacharia if we proceed with this.  Could we use the time slot for the Kansas call to discuss these thoughts with both of you?

Thank you, both -

Deb



1

**DR001431.2**

**Wells, Roger**

| | |
|---|---|
| **From:** | Wells, Roger |
| **Sent:** | Friday, June 01, 2012 12:48 PM |
| **To:** | Doug and Deb Rasby |
| **Cc:** | Hargens, William F. |
| **Subject:** | Draft response |
| **Attachments:** | Document1.docx |

As discussed, attached is a draft response for you to consider if you decide to reject Pillen's offer.


Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773

Home (402) 498-0941
rwells@mcgrathnorth.com <mailto:rwells@mcgrathnorth.com> www.mcgrathnorth.com
<http://www.mcgrathnorth.com/>



EXHIBIT
42

**DR001363.2**

1

[ 1 ]

Tim, the offer is not acceptable. Deb has retained a valuation expert who has advised Deb that, on a conservative basis, and including a significant minority discount, the fair value of Deb's interest is significantly higher than Mr. Weiss' value. Deb wants to be treated fairly, and Mr. Weiss' value is outside the range of fair. If you want to discuss this, or if you think it would be useful for Mr. Weiss to discuss the valuation with Deb's experts, please let me know.

As I have said before, Deb strongly disagrees with Mr. Pillen's proposed course of action with respect to PST. Admittedly, however, Deb has not been provided sufficient information to understand and evaluate Mr. Pillen's plan. Consequently, we will provide to you early next week a list of information that Deb will need in order to be prepared for the shareholder meeting.

**DR001364.2**

[ 2 ]

**Wells, Roger**

| | |
|---|---|
| **From:** | Wells, Roger |
| **Sent:** | Friday, June 01, 2012 3:51 PM |
| **To:** | Doug and Deb Rasby |
| **Subject:** | Moll message |

Deb and Doug, below is the email message that I will send to Moll unless you have changes. Please let me know. Thanks.

"Tim, Deb is prepared to accept Pillen's offer to buy her out for an aggregate price of $1,881,029, subject to appropriate documentation. Further, this assumes that, contemporaneously with the buyout, (ii) Northern Nance will repay in whole the outstanding loan from Deb (approximately $350,000), and (ii) a tax distribution will be made to Deb in an amount equal to Deb's share of all taxes through buyout date.. Please let me know how you want to proceed."

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773

Home (402) 498-0941
rwells@mcgrathnorth.com <mailto:rwells@mcgrathnorth.com> www.mcgrathnorth.com
<http://www.mcgrathnorth.com/>



1

**DR001365.2**



## Wells, Roger

| | |
|---|---|
| **From:** | Doug Rasby <ddrasby@frontiernet.net> |
| **Sent:** | Friday, June 01, 2012 4:00 PM |
| **To:** | Wells, Roger |
| **Subject:** | RE: Moll message |

This looks fine Roger. We appreciate all that you have done to try to help us.

Deb

From: Wells, Roger [mailto:rwells@mcgrathnorth.com]
Sent: Friday, June 01, 2012 3:51 PM
To: Doug and Deb Rasby
Subject: Moll message

Deb and Doug, below is the email message that I will send to Moll unless you have changes. Please let me know. Thanks.

"Tim, Deb is prepared to accept Pillen's offer to buy her out for an aggregate price of $1,881,029, subject to appropriate documentation. Further, this assumes that, contemporaneously with the buyout, (ii) Northern Nance will repay in whole the outstanding loan from Deb (approximately $350,000), and (ii) a tax distribution will be made to Deb in an amount equal to Deb's share of all taxes through buyout date.. Please let me know how you want to proceed."

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773

Home (402) 498-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com <http://www.mcgrathnorth.com/>



This message and any attachments are confidential, may contain privileged information, and are intended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery

1

**DR001282.2**

[ 1 ]

to the named recipient, you are notified that any review, distribution, dissemination or copying is prohibited. If you have received this message in error, you should notify the sender by return email and delete the message from your computer system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

2

**DR001283.2**



| | |
|---|---|
| From: | Doug Rasby |
| To: | Wells, Roger |
| nt: | 6/8/2012 8:31:04 PM |
| bject: | The written offer - Rasby/Pillen |

The following communication is subject to attorney/client confidentiality.

I do not think that there is a signed Buy/Sell document anywhere to be found. None has materialized and the appraisal process has not followed its guidelines. (I think Sarah Pillen accidentally discarded all of these when the others were revised but were never signed.)

The *unsigned Buy/Sell states* that a written notice of an offer to purchase must include the name of the offeror, the number of shares of Membership Units covered by the offer, the purchase price, the terms of payment, whether cash or credit (and if on credit, the time and interest rate), *any and all other consideration being received or paid in connection with such proposed transaction, and any and all other terms, conditions and details of such offer.*



I believe that we can find a party who would be interested in this.

ink you, Roger.

Deb

**From:** Doug Rasby [mailto:ddrasby@frontiernet.net]
**Sent:** Friday, June 08, 2012 3:52 PM
**To:** 'Wells, Roger'
**Subject:** RE: Rasby/Pillen

The following is subject to attorney/client confidentiality.
We have not heard back from Frankel Zacharia so that is the correct response – it may take some time.  Did you have any luck on the legality of the offer not including the loan?

**From:** Wells, Roger [mailto:rwells@mcgrathnorth.com]
**Sent:** Friday, June 08, 2012 3:29 PM
**To:** Doug and Deb Rasby
**Cc:** Hargens, William F.
**Subject:** FW: Rasby/Pillen

My response to Moll will be that I have not received a response from you.

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska  68102
ne (402) 341-3070



EXHIBIT

47

3-21-17

MNMK000775

1

[ 1 ]

Fax (402) 952-1853
Cell (402) 681-5773
Home (402) 498-0941
ells@mcgrathnorth.com
w.mcgrathnorth.com

From: Timothy L. Moll [mailto:TMoll@remboltlawfirm.com]
Sent: Friday, June 08, 2012 2:57 PM
To: Wells, Roger
Subject: Rasby/Pillen

Roger:

Any response yet from your client regarding my email of a few days ago?  Thanks.
Timothy L. Moll, Attorney
tmoll@remboltlawfirm.com
Rembolt Ludtke LLP
1201 Lincoln Mall, Suite 102
Lincoln, Nebraska 68508
P: (402) 475-5100 ext 125
F: (402) 475-5087
Web: www.remboltlawfirm.com

DISCLOSURE: In accordance with IRS Circular 230, please note the following with regard to any portion of the above message which involves federal tax issues: Unless expressly stated otherwise above, (1) nothing contained in this message is intended or written to be used or relied upon by any taxpayer for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code; and (2) nothing contained in this message may be used to recommend, promote or market any federal tax transaction or matter.
WARNING/CAUTION: This e-mail and any files transmitted with it are strictly confidential and are intended solely for the use of the individual or entity to whom it is addressed. This communication may contain material protected by lawyer-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail and any file attachments is strictly prohibited. If you have received this e-mail in error, please immediately notify us by a collect telephone call to (402) 475-5100 or by reply e-mail to the sender. You must destroy the original transmission and its contents.

This message and any attachments are confidential, may contain privileged information, and are intended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery to the named recipient, you are notified that any review, distribution, dissemination or copying is prohibited. If you have received this message in error, you should notify the sender by return email and delete the message from your computer system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

MNMK000776

2

## Wells, Roger

| | |
|---|---|
| From: | Doug Rasby <ddrasby@frontiernet.net> |
| Sent: | Sunday, June 10, 2012 11:20 PM |
| To: | Wells, Roger |
| Subject: | Feeling that my direction was wrong and a new letter - Rasby/Pillen |
| Attachments: | Dear Jim letter for selling at a fair price.docx |

I don't know how many times I have changed direction but I am getting tired of myself. I can only imagine how you must feel. I woke up this morning and thought '                                                    '. My only defense is desperation. When I take stock of who I might become it is not a pretty site. Attached is yet another letter. I wrote it partly to the Jim with whom I am dealing right now and partly to the Jim I used to know – his highest self who originally came up with our business principals. I want to send it to the 2 kids who are involved in the business, Brock and Sarah, and to his wife – a social acquaintance of mine. The reasons for my inclusion of these three people is to 1) get him to read it and 2) get all of this out into the light of day. The people who thought that the $4.5MM price was a good one were found through my son Greg and through my brother-in-law, Scott (Scott was the one who actually communicated with his contacts). I think that I will mail the letter to Suzanne tomorrow and drop the other 3 copies off at the office on Tuesday when Jim is not there. If you see anything in there that looks harmful could you let me know? I am sure that I will look at it a couple of times again tomorrow before it goes out.

Thank you for your patience,
Deb

**From:** Doug Rasby [mailto:ddrasby@frontiernet.net]
**Sent:** Saturday, June 09, 2012 12:23 PM
**To:** Wells, Roger
**Subject:** A letter - Rasby/Pillen

The following communication is subject to attorney/client confidentiality.

Hello Roger,

Doug does not want to fight this. But I do want to make one final attempt to appeal to the Jim Pillen I once knew. In order to make the most impact, we still need a 3rd party offer and so, we do need to know that a 3rd party would not be liable. With the clause that states that the offer can be revoked by either side prior to closing, it would be truthful. The proposed letter to Jim is attached. It is heartfelt and allows me to honestly express my view of this. It also further removes the 3rd party.

We have already gotten feedback that the $4.5MM price would be an investment that several financially capable people would make if the majority owner was honest. In case Jim would still want to visit with the 3rd party regarding their review of the financial information and website, they would have all of the knowledge needed to respond. Jim knows that it is a good price though. Putting myself in Jim's shoes, and his knowing the real value, I am wondering why he would present himself in any kind of threatening way by doing anything more than calling them to check out their offer. I would prepare them to respond, if asked, that there was a fee offered if Jim matched their offer. (This 5% fee will still be paid if Jim does the upstanding thing and pays $4.5MM.) I am placing Jim in a god-like seat: complete control and me praying for mercy.

Thank you Roger,

Deb

EXHIBIT
48
hm 3-21-19

1

**DR001246.2**

**From:** Doug Rasby [mailto:ddrasby@frontiernet.net]
**Sent:** Friday, June 08, 2012 7:31 PM
**To:** Wells, Roger
**Subject:** The written offer - Rasby/Pillen

The following communication is subject to attorney/client confidentiality.

I do not think that there is a signed Buy/Sell document anywhere to be found. None has materialized and the appraisal process has not followed its guidelines. (I think Sarah Pillen accidentally discarded all of these when the others were revised but were never signed.) Does LLC law address rights or restrictions on transfers of ownership? There is only one paragraph on page 8 of the LLC operating agreements that addresses this and it refers to a nonexistent Buy/Sell. Is it not unconscionable to not allow a member to find another buyer, given a low ball offer and intentions to hold cash hostage?



I believe that we can find a party who would be interested in this.

Thank you, Roger.

Deb

**From:** Doug Rasby [mailto:ddrasby@frontiernet.net]
**Sent:** Friday, June 08, 2012 3:52 PM
**To:** 'Wells, Roger'
**Subject:** RE: Rasby/Pillen

The following is subject to attorney/client confidentiality.
We have not heard back from Frankel Zacharia so that is the correct response – it may take some time.

**From:** Wells, Roger [mailto:rwells@mcgrathnorth.com]
**Sent:** Friday, June 08, 2012 3:29 PM
**To:** Doug and Deb Rasby
**Cc:** Hargens, William F.
**Subject:** FW: Rasby/Pillen

My response to Moll will be that I have not received a response from you.

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska  68102

2

**DR001247.2**

[ 2 ]

Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773
Home (402) 498-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com

**From:** Timothy L. Moll [mailto:TMoll@remboltlawfirm.com]
**Sent:** Friday, June 08, 2012 2:57 PM
**To:** Wells, Roger
**Subject:** Rasby/Pillen

Roger:

Any response yet from your client regarding my email of a few days ago?  Thanks.

**Timothy L. Moll, Attorney**
**tmoll@remboltlawfirm.com**

**Rembolt Ludtke LLP**
**1201 Lincoln Mall, Suite 102**
**Lincoln, Nebraska 68508**
**P: (402) 475-5100 ext 125**
**F: (402) 475-5087**
**Web: www.remboltlawfirm.com**

DISCLOSURE: In accordance with IRS Circular 230, please note the following with regard to any portion of the above message which involves federal tax issues: Unless expressly stated otherwise above, (1) nothing contained in this message is intended or written to be used or relied upon by any taxpayer for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code; and (2) nothing contained in this message may be used to recommend, promote or market any federal tax transaction or matter.

WARNING/CAUTION: This e-mail and any files transmitted with it are strictly confidential and are intended solely for the use of the individual or entity to whom it is addressed. This communication may contain material protected by lawyer-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail and any file attachments is strictly prohibited. If you have received this e-mail in error, please immediately notify us by a collect telephone call to (402) 475-5100 or by reply e-mail to the sender. You must destroy the original transmission and its contents.

---

This message and any attachments are confidential, may contain privileged information, and are intended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery to the named recipient, you are notified that any review, distribution, dissemination or copying is prohibited. If you have received this message in error, you should notify the sender by return email and delete the message from your computer system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

3

**DR001248.2**

Dear Jim,

I am copying Brock and Sarah on this letter as I have heard they are aware of the situation and they are a part of this business. They, too, will have times in their careers in which they will have to make some important decisions that test their core values. That has been the good thing about this process – it has allowed a clarification of what is important and I have continued to have the sense that all will work out well. If we, as Christians and leaders for whom good values are important can't resolve this in a good way, who can? I am also copying Suzanne as I respect her and don't want her to think that I have bad feelings toward her. The aspect of this that makes me feel badly is that this is about money which smacks of greed. At its heart however, it is about fairness – fair play and fair value.

Just to review, for the new eyes included in this communication, because you and I viewed situations differently the last few years, and because your reaction to these differences was so strong (although there were a couple of instances in which my reaction was strong also), I came to the realization that one of us had to go. That person certainly couldn't be you so I retired much earlier than I had planned - and gave up a lot to do it. You said later that you were going to have a conversation with me about it the same day that I gave you my letter of retirement.

My intent was to keep all actions positive and I did this. I wanted to leave with everything in good shape so that you would be fine, our people would be fine, and the business would be fine and I did this. I also wanted to get out of your way, let you run the show with no interference from me and keep my investment as we had agreed on years ago and I did this too. I did not take anything away from you.

After 20 years of putting all that I owned at risk, as well as legal documentation and personal promises from you I took you as a man of your word: that everything would be alright. You have always held up good character and values as integral to our business. I have admired you greatly for doing so, as have many others. Doing what's right and treating others as you want to be treated were values your parents instilled in you. You believed so strongly in them that you put them on the walls of all of the businesses as well as your business cards. It is the first thing that you see on the website. I always believed this to be who you *are* – a truly good man. Bullying someone - especially someone who cares about you – seemed far beneath you. It *is* far beneath you. I still have a belief that you are the Jim Pillen I knew, a good man with whom I have been so thankful and proud over the years to be associated.

You said several things that saddened me when we last spoke in April. When you said that I had an "entitlement" mentality I was speechless. I couldn't find the words at the time but I feel awful - I put everything I had at risk for 20 years, poured my heart into the business, and have a strong belief in it. If I could be involved, I would be. *Fair treatment is the only thing to which I feel entitled.* The second had to do with my emails to you – my intent was only to bring peace and reconciliation to our relationship. I still believe that this should be the goal. So, with that in mind, I am sorry if I sounded preachy. Please bear with me, though, because I will sound preachy again for a minute or two because you have said and done something that is *not* what I have ever wanted to be about:

You said that you were going to dissolve PST, thus eliminating profits to me, and were going to stop paying out the profits from all of the businesses that were debt free, knowing that taxes would need to

**DR001249.2**

[ 4 ]



be paid. When I stated that your plans were unethical, you said that ethics have nothing to do with this. You said that as the majority owner you could do anything that you wanted. Well, you can. We are all given free will. We can kill, steal, commit adultery, lie, etc. Without a sense of right and wrong, without good values, we humans *can* do *anything*. When it comes down to dollars and cents, treating someone the way that you would want to be treated may not *monetarily* serve you best (in the short term) but it serves you best in more important ways. Doing right applies in church, at social gatherings, and certainly at home but in business deals - it can cost you money up front. But that money purchases something of the greatest value – self-respect. John Wooden said that "ability may get you to the top, but character keeps you there."

Well Jim, you have always been about character. You have been tough, but still you have been fair. You haven't been one to bully someone – you have been there to help others. I hope that this is still the real Jim Pillen. I have not shared this situation with any of our friends as I want it to be resolved amicably. There is still an ember of hope alive in me.

I would have liked to have stayed invested in the business - agriculture is the best business there is. If, however, my selling is the only way to have peace then that is what we will do. You have given me a price that is 35.4% of the lowest value calculated by a certified appraiser. He was quick to point out that it was an extremely low ball offer and the true value of what I have lost will be significantly greater. But by the effective elimination of all income (paying out no cash), while continuing to incur the expense to Uncle Sam, the act becomes one of oppression. Fair value no longer holds any meaning, negotiation cannot occur when one's head is held under water. Your price was set by an accountant who used a method that would result in the lowest possible value - old, historic, depreciated costs, with no value given to income flows and verified by an appraiser as acceptable for a dire situation with little or no marketability. But I am forced to either take it, legally fight it - as it constitutes minority shareholder oppression, or live under oppression. There was also a fourth option.

In the past few days I have visited with several parties who have the financial capability to purchase my interests and to wait for cash distributions until the farms are debt free. I shared my 7 year financial history on all of the businesses except PST and the occurrences in our industry in 2008 and 2009. The value for my asking price of $4.5MM was seen immediately as a good one. As we used to say: it was a no brainer. I had also directed them to the website and they liked what they saw. I told a little about your history and expertise and they were impressed. Then I explained that I left the business because we differed on our approaches to a few things but I was in a position to retire early. I said that the cash distributions on the debt free businesses had been discontinued, which I relied on to pay taxes. Just as quickly as they had seen tremendous value, you became the one drawback. No one wanted to associate with the person who would take this action. The person who used to be the most important and valuable asset of this business and its greatest selling point was now the opposite.

You had a personal encounter one weekend with the One who said these words: What good is it for a man to gain the whole world, and yet lose or forfeit his very self. If you are His follower fairness is required. As followers we understand that saying "no" to what is wrong and saying "yes" to what is right are the right choices.

**DR001250.2**

The price you offered for the businesses, excluding PST, is 34% of the $4.5MM value seen by others as an exceptionally good price. It is 35.4% of a certified appraiser's lowest value. Given its financial history and core values it would have a market. The after tax result of the purchase price you offered, due to the negative tax basis, will be very little. The largest part of my 20 year investment will be gone. I have survived the risk of a lawsuit from angry neighbors, the watershed from sustained low prices due to a glut of Canadian pigs and the depressed market due to the misnomer of "swine flu". I never dreamed that the business partner of whom I thought so highly might act against his principals and cause me harm.

But I am counting on you to be true to yourself. I am counting on you to live up to your core values of being honest and fair, "doing what's right" and "treating others as you want to be treated". I am counting on you to be a man of your word, and that your word of a year ago that "everything will be alright" was the truth. I am at your mercy.

Although the $4.5MM price I am asking is low, at least it falls within what could be said is fair. If you were on the other side of this and you were offered this price for 10% of Nance/Plains, 5% of Double D, 10% of PST Milling and 10% of the PST Gene Center, would you agree with the people who thought this was a great price?

If you would like to meet, Brock and Sarah, and Suzanne if she would like, are welcome to join us. An amicable resolution is the best for all of us. As I said at the beginning of this, if we as Christians and respected leaders can't resolve this in a good way, who can? I will give you a call.

Thank you Jim,

Deb


p.s. By the way, I will stand on my 20 year record. I did keep copies of communications that reflect and document many of my contributions about which I feel very good, as well as those things on which we disagreed. They reflect, too, the fun that I had working with you – you could always make me laugh, and my admiration for you. You have been blessed with many gifts and I am thankful to have seen all of the great results from them. I think my communications also reflect my love for working through processes with our teams and seeing them improve on things that I did. Continual improvements on these systems were exciting. If you still have a Deb Rasby file I would be happy to give you copies to remind you of some of the good things. I tried my best and stood by what I believed to be right. I cared about treating people with respect. I enjoyed working in a friendly environment and did the best that I could to maintain one. I loved the people, and still do.

**DR001251.2**

[ 6 ]

**Wells, Roger**

| | |
|---|---|
| **From:** | Hargens, William F. |
| **Sent:** | Thursday, May 24, 2012 10:47 AM |
| **To:** | Doug and Deb Rasby (ddrasby@frontiernet.net) |
| **Subject:** | LLCs |
| | |
| **Categories:** | Rasby |

Deb: The Northern Nance partnership agreement (and I'm assuming the others as well) provide that the net income of the partnership will be paid out to the partners within 90 days after the end of the year. No such provision exists in the Operating Agreement. Was there any discussion at the time the entities were converted to LLCs about the income distributions? Any e-mails or letters to the effect that the distributions would/would not change as in the past? Thanks. Bill

PS: I cancelled today's scheduled call with the Kansas folks. Please give me a call at 3:30.

1



**DR001896.2**

[ 1 ]

## Wells, Roger

| From: | ddrasby@frontiernet.net |
|---|---|
| Sent: | Thursday, May 24, 2012 1:27 PM |
| To: | Hargens, William F. |
| Subject: | Re: LLCs |

| Categories: | Rasby |
|---|---|

No, there was no provision for this in the conversations. FYI, we have given F.Z. the go ahead to start the appraisal process. If the value is significantly higher, would we ask for that amount or something less? If we had to sue, our goal from a lawsuit would be a reasonable buy-out price. Using the facts of Pillen's actions: dissolution of PST - which generated the most cash & for which the 2008 buy-out agreement was changed to allow ownership to continue after retirement, the stmt made by John Meyer that Jim was going to "F---" with me, the 10 fold increase in Jim's salary, the immediate discontinuance of reimbursement to PST of general office expenses from businesses in which Jim is sole owner, Jim's low-ball offer, discontinuance of profit distributions given a 3 - 20 year time frame of high profitability and a history of regular, monthly distributions of profits for businesses with no debt, what are our chances of 1) proving minority oppression and 2) getting a court ordered reasonable buy-out amount given that continued oppression is most likely to occur? Have you and Roger had further communication - are you in agreement on how to proceed? These are the primary questions we would like to discuss at 3:30. Thank you, Bill.
Deb
Sent from my Verizon Wireless BlackBerry _____

From: "Hargens, William F." <whargens@mcgrathnorth.com>
Date: Thu, 24 May 2012 15:47:05 +0000
To: Doug and Deb Rasby (ddrasby@frontiernet.net)<ddrasby@frontiernet.net>
Subject: LLCs

Deb: The Northern Nance partnership agreement (and I'm assuming the others as well) provide that the net income of the partnership will be paid out to the partners within 90 days after the end of the year. No such provision exists in the Operating Agreement. Was there any discussion at the time the entities were converted to LLCs about the income distributions? Any e-mails or letters to the effect that the distributions would/would not change as in the past? Thanks. Bill


PS: I cancelled today's scheduled call with the Kansas folks. Please give me a call at 3:30.

_____

This message and any attachments are confidential, may contain privileged information, and are intended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery to the named recipient, you are notified that any review, distribution, dissemination or copying is prohibited. If you have received this message in error, you should notify the sender by return email and delete the message from your computer system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

1

**DR001897.2**

**Wells, Roger**

| | |
|---|---|
| **From:** | Doug Rasby <ddrasby@frontiernet.net> |
| **Sent:** | Thursday, May 31, 2012 12:54 PM |
| **To:** | Wells, Roger; Hargens, William F. |
| **Subject:** | Questions for our meeting |
| **Attachments:** | Questions for Appraisal-Attorney Meeting.docx |

This communication is subject to attorney/client confidentiality.

Attached are questions that we have. Will we be meeting today?

1

**DR001898.2**

[ 3 ]

**Frankel Zachariah**

What appraisal method did you use and can it be defended in court?  Do the courts favor a particular appraisal method?

Could other methods be used that would be more favorable?

You didn't have all of the information that you needed.  Would it require much more time to fill in those blanks later when the information is available?


**McGrath North**

What can be communicated that would plant some fear and persuade Pillen that to negotiate a sale now would be in his best interests? (Forensic audit, past oppressive actions and statements made by others that would not play well in court or in public.)

Other past actions which might be viewed as oppressive:

1) When Pillen bought out Jim Hemmer's widow in 2008, he did not communicate these actions to the other N. Plains partners – the other partners were not given the option to purchase their pro-rata share of Hemmer's interests, although this option was required in the partnership agreement.

2) With regard to Double D:
   a. The effective transfer price of pigs is significantly under market price, and has been since the virtual consolidation in 2009 with Imperial Foods (a finisher operation own entirely by Pillen).  The revenue per weanling pig sold from Double D dropped from $36 - $53/pig to ~ $27/pig with the consolidation. Pillen refused to give the partners a 12/31/2010 report that reflected this. He became angry with me (witnessed by our chief accountant and Pillen's daughter) when this report was shown to him in preparation for a year end partner meeting.

   b. The Double D partners were not asked for approval of the Imperial Foods purchase, although two of the Double D partners (Deb Rasby and Brett Bonwell) expressed their thoughts against the purchase of this finisher due to the distance from our other operations and its prior performance problems. The other Double D partners were unaware of the purchase and of plans to link Double D with this finisher.

   c. Double D partners were asked to share in the prior losses of Imperial Foods (which has had performance problems – high death loss - since its 2008 purchase) and to operate as a virtual farrow to finish operation.  The partners - Pillen's brothers, a friend and two employee/partners, who together comprised a minority share – did not feel they had a real choice in the decision per later conversations.

**DR001899.2**

[ 4 ]

'If this goes to court, would the request be for a court ordered buy-out due my fear of continued oppression?

Would the new LLC law going into effect on Jan 1, 2013 apply to this case if we filed suit before the November elections but didn't go to court until 2013?

Can we get a court order to prevent Pillen from using PST to fund his legal costs if a forensic audit shows him to be using his daughter, a PST employee, and/or other legal counsel paid for through PST?

Can he/we appeal any court decision?

We have a concern about trying him in Platte County.

Would an attorney recommend to a client who is a majority partner the course of action that Pillen has taken?

Can PST legally be dissolved as a squeeze out tactic? What does no longer meet his business objectives mean?

File: documents/doug/Questions for Appraisal-Attorney Meeting

**DR001900.2**

[ 5 ]

**Wells, Roger**

| | |
|---|---|
| **From:** | Wells, Roger |
| **Sent:** | Wednesday, June 13, 2012 5:09 PM |
| **To:** | Doug and Deb Rasby |
| **Subject:** | draft email to Moll |
| **Attachments:** | email_insert.docx |

I will call you about this.

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska  68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773
Home (402) 498-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com



**DR001603.2**

1

[ 1 ]

Tim,

I appreciate your patience. Pillen's offer is not acceptable. Deb has received advice from the valuation experts at Frankel Zacharia that Pillen's offer is grossly undervalued whether the note is included or not. Further, I have been told that Deb has received information from potential third-party investors indicating a willingness to purchase Deb's interests for $4.5 million, which does not include the value of her note. These investors have the financial capability to own Deb's interests in these businesses, sustaining it over time to capitalize on growth. Deb intends to explore further a sale to one or more of these investors. In the meantime, Deb continues to firmly disagree with any plan to dissolve PST. Although we do not have full information of Pillen's plans, it appears that such a dissolution would result in the misappropriation of PST's assets and opportunities, to the detriment of Deb, a minority shareholder. This is unacceptable. To allow Deb to further assess Pillen's plans, please provide the following information:

•       If PST is liquidated, what will happen to PST assets (e.g., equipment, systems, office space, etc.)?

•       If PST is liquidated, what will happen to PST employees?

•       If PST is liquidated, who will provide administrative services to the entities in which Deb is an owner, and at what cost will these services be provided?

•       PST historically and currently provides services to other Pillen entities and Deb, as a minority owner of PST shared in these earnings. If PST is liquidated, who will provide these services, and who receives the earnings from these services?

[Add other questions]

Further, it appears that other improper actions have been taken by Pillen, including excessive compensation [and other actions]. Obviously, Deb reserves all her rights with respect to these oppressive actions.

If you have any questions, please contact me. You should know that Deb and Doug may discuss these matters directly with Pillen. If this is a problem, please let me know and I will direct them to do otherwise.

**DR001604.2**

[ 2 ]

**Wells, Roger**

| | |
|---|---|
| **From:** | Doug Rasby <ddrasby@frontiernet.net> |
| **Sent:** | Thursday, June 14, 2012 3:31 PM |
| **To:** | Wells, Roger |
| **Subject:** | RE: revised Moll email |
| **Attachments:** | Letter to Jim Pillen, June 14, 2012.docx |

Hi Roger,

From our conversation yesterday I took it that the operating agreement gave me no exit – I couldn't sell my interests even if I found a buyer who would purchase it, which would be unlikely under such a cloud. Doug and I will accept the offer but I did take the attached letter over to Jim's office today to visit with him in a conciliatory way. He was in a meeting but I stuck my head in the door as I could see through the glass that it was a group of people I knew and they all caught site of me as I walked by the conference room. I forgot to change the word opinion to advice in the 4th paragraph but will clarify that with him if we have a conversation.


From: Wells, Roger [mailto:rwells@mcgrathnorth.com]
Sent: Thursday, June 14, 2012 2:34 PM
To: Doug and Deb Rasby
Subject: revised Moll email


Deb, I have made a couple revisions to this. Give me a call. Thanks


Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773

Home (402) 498-0941
rwells@mcgrathnorth.com <mailto:rwells@mcgrathnorth.com> www.mcgrathnorth.com
<http://www.mcgrathnorth.com/>



EXHIBIT
52

This message and any attachments are confidential, may contain privileged information, and are intended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery to the named recipient, you are notified that any review, distribution, dissemination or copying is prohibited. If

1

**DR001415.2**

you have received this message in error, you should notify the sender by return email and delete the message from your computer system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

2

**DR001416.2**

[ 2 ]

June 14, 2012

Dear Jim,

After 20 years of enjoying a partnership with you, we've gotten out of synch. I am not going to appeal for a negotiation and I am not going to reject your offer. I do want to say that maybe I have felt entitled as you said. My word for it was 'expectation'. You have always been fair and a man of your word so I expected that from you.

I put everything that I had at risk for 20 years. We've survived a lot of things – lawsuits, a glut of Canadian pigs, and the 'swine flu'. I wanted to keep this investment – and I showed you what just the next 10 years would potentially bring. I may have misinterpreted this but with the discontinuance in the payout of profits and a dissolution of PST there seemed to be anger toward me. I am not angry with you. I have always been open with you about the way I see things, whether it's been agreement or disagreement with you. Let's talk over whatever needs to be made right between us.

When you sent me your offer I got some 3rd party opinions. These included a certified appraiser and potential investors who could sustain my share of the business. Here is the result:

From the opinion given by a certified appraiser, a base value for my share of the values of N Nance, N Plains and Double D would be $3,625,000. From his quick method for a conservative value for PST Gene, PST Milling and PST the values would be approximately $1,002,750. This totals $4,629,670.

From conversations with the potential investors, giving cash flows for 10% of a 10,000 sow farrow to finish, 5% of a 10,000 sow repro, and 10% of a feed mill and a boar stud, $4.5MM was seen as one they would consider a very good purchase price. I based the cash flow total on the annualized April financials.

Another approach using a 3 year multiple of the cash flows for these businesses from the April financials produces a value of $3,767,132.

A value set by an accountant using old, historic, depreciated costs and leaving out the income flows differed significantly. Dave Dodgen's verification was that the accountant's value would work in a dire situation with very little marketability.

As I said, this isn't an attempt to negotiate or a rejection of your offer. In the spirit of fairness though, would you consider getting another certified appraised value or consider using the low end of one of these values?

In the end, fairness creates the most important value for us – self-respect. It provides a model to our children and the small community in which we are leaders – just as Ken Morrison and Tom Osborne have provided to so many people. Their professional footsteps have always been ones that have inspired me and probably you too.

Can we get together to visit? Thank you Jim.

**DR001417.2**

[ 3 ]

| | |
|---|---|
| **From:** | Doug Rasby |
| **To:** | Gene Arnold |
| **CC:** | Wells, Roger |
| **Sent:** | 6/22/2012 11:58:24 AM |
| **Subject:** | FW: Pillen / Rasby |
| **Attachments:** | Unit Purchase Agreement (00499302).PDF |

Hi Gene,

Roger hasn't reviewed this but on page 2, section 4 it states that "The effective date of the transfer of the Purchased Interests shall be January 1, 2012, such that all income generated by the Subject Entities in calendar year 2012 and allocable to the Purchased Interests shall be allocated to Pillen for federal and state income tax reporting purposes." At the end of the paragraph it addresses the cash distributions that I received in 2012, which would be reported on Form 1099 to me and I will pay taxes on those.

Since this is all spelled out in the contract, and the taxes are being paid (by Pillen), I would think that Uncle Sam would be happy. Do you agree?

Thanks,

Deb Rasby


From: Wells, Roger [mailto:rwells@mcgrathnorth.com]
Sent: Friday, June 22, 2012 10:31 AM
To: Doug and Deb Rasby
Subject: FW: Pillen / Rasby


I have not reviewed this yet.


Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773

Home (402) 498-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com


From: Nancy D. Schroeder [mailto:NSchroeder@remboltlawfirm.com]
Sent: Friday, June 22, 2012 10:00 AM
To: Wells, Roger
Cc: Timothy L. Moll
Subject: Pillen / Rasby



Mr. Wells:


Pursuant to Tim Moll's request, attached is a Unit Purchase Agreement for your review. Tim is out of the office today, but will follow up with you on Monday.

MNMK000007

Thank you,

Nancy Schroeder
Legal Executive Assistant
nschroeder@remboltlawfirm.com

REMBOLT LUDTKE LLP
125 South 6th Street
Seward, NE 68434
(402) 643-4770
Fax (402) 643-3969
www.remboltlawfirm.com

WARNING/CAUTION: This e-mail and any files transmitted with it are strictly confidential and
are intended solely for the use of the individual or entity to whom it is addressed. This
communication may contain material protected by lawyer-client privilege. If you are not the
intended recipient or the person responsible for delivering the e-mail to the intended
recipient, be advised that you have received this e-mail in error and that any use,
dissemination, forwarding, printing, or copying of this e-mail and any file attachments is
strictly prohibited. If you have received this e-mail in error, please immediately notify us
by a collect telephone call to (402) 475-5100 or by reply e-mail to the sender. You must
destroy the original transmission and its contents.

---

This message and any attachments are confidential, may contain privileged information, and are
intended solely for the recipient named above. If you are not the intended recipient, or a
person responsible for delivery to the named recipient, you are notified that any review,
distribution, dissemination or copying is prohibited. If you have received this message in
error, you should notify the sender by return email and delete the message from your computer
system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S.
tax advice contained in this communication (including any attachments) is not intended or
written to be used, and cannot be used, for the purpose of avoiding penalties under the
Internal Revenue Code, nor should such advice be used or referred to in the promoting,
marketing or recommending of any entity, investment plan or arrangement.

MNMK000008

## UNIT PURCHASE AGREEMENT

THIS UNIT PURCHASE AGREEMENT (the "Agreement") is made and entered into this ___ day of June, 2012, by and between Deborah R. Rasby ("Rasby") and James D. Pillen ("Pillen"), and relates to the sale of ownership interests in the following entities (herein collectively the "Subject Entities"):

Double D Family Farms, LLC, a Nebraska limited liability company ("Double D");
Northern Nance, LLC, a Nebraska limited liability company ("Northern Nance");
Northern Plains, LLC, a Nebraska limited liability company ("Northern Plains");
PST Milling, Inc., a Nebraska corporation ("Milling")
PST Gene Center, LLC, a Nebraska limited liability company ("Gene Center"); and
Progressive Swine Technologies, Inc., a Nebraska corporation ("PST").

WHEREAS, Rasby owns the following interests in the Subject Entities:

Double D – 5 units out of 100 total outstanding units;
Northern Nance – 10 units out of 100 total outstanding units;
Northern Plains – 10 units out of 100 total outstanding units;
Milling - 100 shares out of 1,000 total outstanding shares;
Gene Center – 10 units of out 100 total outstanding units; and
PST – 10 units out of the 100 total outstanding units.

WHEREAS, Northern Nance is indebted to Rasby in the principal amount of $350,000.00 (the "Subordinated Debt"); and

Rasby desires to sell all of her interests in the Subject Entities (including the Subordinated Debt) and Pillen desires to purchase all of said interests from Rasby on the terms and conditions of this Agreement.

FOR VALUABLE CONSIDERATION, the parties agree as follows:

1.     Price and Terms.  Effective as of Closing, as hereunder defined, Rasby shall transfer to Pillen all of her ownership interests in the Subject Entities, including the Subordinated Debt (herein collectively the "Purchased Interests"). Pillen shall pay to Rasby the sum of Two Million Three Hundred Fifty Thousand Dollars ($2,350,000) in full consideration for the Purchased Interests.  Said funds shall be paid in immediately available funds at Closing. The parties agree that the purchase price shall be allocated among the Purchased Entities as follows:

| | |
|---|---|
| Double D: | $ |
| Northern Nance: | |
| Northern Plains: | |
| Milling: | |
| Gene Center: | |
| PST: | |
| | ------------------- |
| TOTAL | $ 2,350,000.00 |

1

MNMK000009

[ 3 ]

2.    <u>Closing</u>.  The date of the closing (the "Closing") for the Purchased Interests shall be no later than June 29, 2012.

3.    <u>Representations of Rasby</u>.  Rasby represents and warrants to Pillen that the Purchased Interests are conveyed and assigned to Pillen free and clear of all liens and encumbrances and that Rasby has full authority to transfer the Purchased Interests to Pillen without the consent or agreement of any other party.  Rasby further represents and warrants that the Purchased Interests represent any and all interests of Rasby in the Subject Entities.  Rasby further acknowledges and agrees that this Agreement is intended as a complete termination and resolution of the business dealings between Rasby and Pillen, Progressive Swine Technologies, Inc. and the Subject Entities.  In exchange for the consideration to be delivered at Closing and except for Pillen's obligations under this Agreement, Rasby releases Pillen and Progressive Swine Technologies, Inc., and each of the Subject Entities from any and all claims of ownership and from any and claims for compensation, dividends, distributions, property, damages, costs, reimbursements or any other matter related to the employment and/or business dealings between the parties.

4.    <u>Distributions and Allocation of Income</u>.  The parties agree that Rasby shall not be entitled to any dividends or distributions from any of the Subject Entities with regard to the 2012 taxable year of any of the Subject Entities.  The effective date of the transfer of the Purchased Interests shall be January 1, 2012, such that all income generated by the Subject Entities in calendar year 2012 and allocable to the Purchased Interests shall be allocated to Pillen for federal and state income tax reporting purposes.  With regard to 2011 and prior years, the parties shall be liable for the income of the Subject Entities allocable to them based on their respective ownership interests in said years.  With regard to any distributions made to Rasby from the Subject Entities during 2012, the applicable Subject Entity will issue a Form 1099 to Rasby and Rasby will be responsible for reporting and paying income tax associated with said payments.

5.    <u>Deliveries at Closing</u>.  At Closing, Rasby agrees to sign, deliver and release to Pillen such documents as are reasonably necessary to assign and transfer all the Purchased Interests to Pillen or Pillen's nominee and to consent to dissolution of PST.  Pillen agrees to deliver to Rasby the purchase price for the Purchased Interests in immediately available funds by cashier's check or wire transfer.  The parties each, for no additional consideration, agree to execute and deliver such other and further documents as may be necessary to consummate and document the matters described in this Agreement.

6.    <u>Miscellaneous</u>.

a.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Nebraska.

b.    <u>Entire Agreement</u>.  This Agreement contains the understandings and agreement of the parties, and shall supersede all previous negotiations and writings.  This Agreement shall not be released, discharged, abandoned, changed or modified in any manner, except by a written document signed by the parties.

2

MNMK000010

c.  **Severability**.  If any term or provision of this Agreement or corresponding Schedules shall to any extent be invalid or unenforceable, the remainder of this Agreement shall not be affected.

d.  **Further Assurances**.  Each party will, whenever reasonably requested to do so by the other party, promptly execute and deliver any and all further documents and accomplish such acts as may be necessary to effectuate this Agreement.

e.  **Time of the Essence**.  Time is of the essence of this Agreement.

f.  **Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, devisees, personal representatives, successors and assigns.

g.  **Paragraph Titles**.  Any title of a paragraph of this Agreement is inserted for convenience only and shall be disregarded in construing or interpreting the provisions of this Agreement.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date and year first above written.

_____
DEBORAH R. RASBY

_____
JAMES D. PILLEN

3

MNMK000011

[ 5 ]

STATE OF NEBRASKA    )
                           ) ss.
COUNTY OF _____ )

       The foregoing instrument was acknowledged before me this _____ day of June, 2012, by Deborah R. Rasby.

       ( S E A L )

_____
             Notary Public

STATE OF NEBRASKA    )
                           ) ss.
COUNTY OF _____ )

       The foregoing instrument was acknowledged before me this _____ day of June, 2012, by James D. Pillen.

       ( S E A L )

_____
             Notary Public

L:\wdox\clients\30814\000\00499259.DOCX

4

MNMK000012

[ 6 ]

| | |
|---|---|
| **From:** | Wells, Roger |
| **To:** | Timothy L. Moll (tmoll@rembolllawfirm.com) |
| **CC:** | Doug and Deb Rasby |
| **Sent:** | 6/28/2012 11:02:38 AM |
| **Subject:** | Unit Purchase Agreement |
| **Attachments:** | Clean unit_purchase_agreement.docx; Redlined unit purchase agreement.pdf |

Tim, attached is the revised Unit Purchase Agreement.  Please note that Deb has not reviewed these changes.

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska  68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773
Home (402) 498-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com



MNMK000028

[ 1 ]

## UNIT PURCHASE AGREEMENT

THIS UNIT PURCHASE AGREEMENT (the "Agreement") is made and entered into this _____ day of June, 2012, by and between Deborah R. Rasby ("Rasby") and James D. Pillen ("Pillen"), and relates to the sale of ownership interests in the following entities (herein collectively the "Subject Entities"):

Double D Family Farms, LLC, a Nebraska limited liability company ("Double D");
Northern Nance, LLC, a Nebraska limited liability company ("Northern Nance");
Northern Plains, LLC, a Nebraska limited liability company ("Northern Plains");
PST Milling, Inc., a Nebraska corporation ("Milling")
PST Gene Center, LLC, a Nebraska limited liability company ("Gene Center"); and
Progressive Swine Technologies, Inc., a Nebraska corporation ("PST").

WHEREAS, Rasby owns the following interests in the Subject Entities:

Double D - 5 units out of 100 total outstanding units;
Northern Nance - 10 units out of 100 total outstanding units;
Northern Plains - 10 units out of 100 total outstanding units;
Milling - 100 shares out of 1,000 total outstanding shares;
Gene Center - 10 units of out 100 total outstanding units; and
PST - 10 units out of the 100 total outstanding units.

WHEREAS, Northern Nance is indebted to Rasby in the principal amount of $350,000.00 (the "Subordinated Debt"); and

Rasby desires to sell all of her interests in the Subject Entities (including the Subordinated Debt) and Pillen desires to purchase all of said interests from Rasby on the terms and conditions of this Agreement.

FOR VALUABLE CONSIDERATION, the parties agree as follows:

1.     Price and Terms. Effective as of Closing, as hereunder defined, Rasby shall transfer to Pillen all of her ownership interests in the Subject Entities, including the Subordinated Debt (herein collectively the "Purchased Interests"). Pillen shall pay to Rasby the sum of Two Million Three Hundred Fifty Thousand Dollars ($2,350,000) in full consideration for the Purchased Interests. Said funds shall be paid in immediately available funds at Closing. The parties agree that the purchase price shall be allocated among the Purchased Entities and the repayment of the Subordinated Debt as follows:

MNMK000029

[ 2 ]

| | |
|---|---|
| Double D: | $192,601.00 |
| Northern Nance: | $57,373.00 |
| Northern Plains: | $1,090,096.00 |
| Milling: | $380,844.00 |
| Gene Center: | $155,318.00 |
| PST: | $123,768.00 |
| Subordinated Debt Repayment: | $350,000.00 |
| TOTAL | $2,350,000.00 |

2.      Closing. The date of the closing (the "Closing") for the Purchased Interests shall be no later than June 29, 2012.

3.      Representations of Rasby. Rasby represents and warrants to Pillen that the Purchased Interests are conveyed and assigned to Pillen free and clear of all liens and encumbrances and that Rasby has full authority to transfer the Purchased Interests to Pillen without the consent or agreement of any other party. Rasby further represents and warrants that the Purchased Interests represent any and all interests of Rasby in the Subject Entities. Rasby and Pillen each further acknowledges and agrees that this Agreement is intended as a complete termination and resolution of the business dealings between Rasby and Pillen, Progressive Swine Technologies, Inc. and the Subject Entities. In exchange for the consideration to be delivered at Closing and except for Pillen's obligations under this Agreement, Rasby releases Pillen and Progressive Swine Technologies, Inc., and each of the Subject Entities from any and all claims of ownership and from any and claims for compensation, dividends, distributions, property, damages, costs, reimbursements or any other matter related to the employment and/or business dealings between the parties.

4.      Release of Rasby. Except for, and subject to, any obligations set forth in this Agreement, (i) each of Pillen and the Subject Entities, on behalf of it/himself and its/his partners, affiliates, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers (and each of their respective partners, affiliates, subsidiaries, directors, officers, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers) (the "Pillen Parties") hereby unconditionally and fully releases and discharges each of Rasby and her assigns, heirs, agents, employees, representatives and insurers (and each of their respective partners, affiliates, subsidiaries, shareholders, directors, officers, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers) (the "Rasby Released Parties") from any and all obligations, claims, actions, liability, past, present, and future, of every kind or character, known or unknown, and unforeseen injuries and damages, and the consequences which the Pillen Parties have or may have in the future, by reason of, growing out of, arising out of or existing in connection with Rasby's employment by, or ownership of any interest in, the Subject Entities.

5.      Distributions and Allocation of Income. The parties agree that Rasby shall not be entitled to any dividends or distributions from any of the Subject Entities with regard to the 2012 taxable year of any of the Subject Entities; provided, however, that, notwithstanding anything to the contrary in this Agreement, in the event any income of any of the Subject Entities with regard to the 2012 taxable year is allocated to Rasby, each such Subject Entity to which such an allocation relates shall promptly distribute, and Pillen shall cause the Subject Entities to distribute to Rasby, in cash, an amount equal to Rasby's state and federal income tax liability (including any penalties and interest) relating to such

2

MNMK000030

allocation. The effective date of the transfer of the Purchased Interests shall be January 1, 2012, such that all income generated by the Subject Entities in calendar year 2012 and allocable to the Purchased Interests shall be allocated to Pillen for federal and state income tax reporting purposes. With regard to 2011 and prior years, the parties shall be liable for the income of the Subject Entities allocable to them based on their respective ownership interests in said years. With regard to any distributions made to Rasby from the Subject Entities during 2012, the applicable Subject Entity will issue a Form 1099 to Rasby and Rasby will be responsible for reporting and paying income tax associated with said payments.

6.  **Deliveries at Closing.** At Closing, Rasby agrees to sign, deliver and release to Pillen such documents as are reasonably necessary to assign and transfer all the Purchased Interests to Pillen or Pillen's nominee and to consent to dissolution of PST. Pillen agrees to deliver to Rasby the purchase price for the Purchased Interests in immediately available funds by cashier's check or wire transfer. The parties each, for no additional consideration, agree to execute and deliver such other and further documents as may be necessary to consummate and document the matters described in this Agreement.

7.  **Miscellaneous.**

   a.  **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Nebraska.

   b.  **Entire Agreement.** This Agreement contains the understandings and agreement of the parties, and shall supersede all previous negotiations and writings. This Agreement shall not be released, discharged, abandoned, changed or modified in any manner, except by a written document signed by the parties.

   c.  **Severability.** If any term or provision of this Agreement or corresponding Schedules shall to any extent be invalid or unenforceable, the remainder of this Agreement shall not be affected.

   d.  **Further Assurances.** Each party will, whenever reasonably requested to do so by the other party, promptly execute and deliver any and all further documents and accomplish such acts as may be necessary to effectuate this Agreement.

   e.  **Time of the Essence.** Time is of the essence of this Agreement.

   f.  **Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, devisees, personal representatives, successors and assigns.

   g.  **Paragraph Titles.** Any title of a paragraph of this Agreement is inserted for convenience only and shall be disregarded in construing or interpreting the provisions of this Agreement.

3

MNMK000031

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date and year first above written.

Double D Family Farms, LLC
Northern Nance, LLC
Northern Plains, LLC
PST Milling, Inc.
PST Gene Center, LLC
Progressive Swine Technologies, Inc.

By: _____          _____
     JAMES D. PILLEN, President          DEBORAH R. RASBY

                                              _____
                                              JAMES D. PILLEN

MNMK000032

STATE OF NEBRASKA          )
                          ) ss.
COUNTY OF _____    )

    The foregoing instrument was acknowledged before me this ___ day of June, 2012, by Deborah R. Rasby.

    ( S E A L )

_____
Notary Public

STATE OF NEBRASKA          )
                          ) ss.
COUNTY OF _____    )

    The foregoing instrument was acknowledged before me this ___ day of June, 2012, by James D. Pillen, individually, and as President of the Subject Entities.

    ( S E A L )

_____
Notary Public

5

MNMK000033

[ 6 ]

## UNIT PURCHASE AGREEMENT

THIS UNIT PURCHASE AGREEMENT (the "Agreement") is made and entered into this _____ day of June, 2012, by and between Deborah R. Rasby ("Rasby") and James D. Pillen ("Pillen"), and relates to the sale of ownership interests in the following entities (herein collectively the "Subject Entities"):

Double D Family Farms, LLC, a Nebraska limited liability company ("Double D");
Northern Nance, LLC, a Nebraska limited liability company ("Northern Nance");
Northern Plains, LLC, a Nebraska limited liability company ("Northern Plains");
PST Milling, Inc., a Nebraska corporation ("Milling")
PST Gene Center, LLC, a Nebraska limited liability company ("Gene Center"); and
Progressive Swine Technologies, Inc., a Nebraska corporation ("PST").

WHEREAS, Rasby owns the following interests in the Subject Entities:

Double D - 5 units out of 100 total outstanding units;
Northern Nance - 10 units out of 100 total outstanding units;
Northern Plains - 10 units out of 100 total outstanding units;
Milling - 100 shares out of 1,000 total outstanding shares;
Gene Center - 10 units of out 100 total outstanding units; and
PST - 10 units out of the 100 total outstanding units.

WHEREAS, Northern Nance is indebted to Rasby in the principal amount of $350,000.00 (the "Subordinated Debt"); and

Rasby desires to sell all of her interests in the Subject Entities (including the Subordinated Debt) and Pillen desires to purchase all of said interests from Rasby on the terms and conditions of this Agreement.

FOR VALUABLE CONSIDERATION, the parties agree as follows:

1.    Price and Terms. Effective as of Closing, as hereunder defined, Rasby shall transfer to Pillen all of her ownership interests in the Subject Entities, including the Subordinated Debt (herein collectively the "Purchased Interests"). Pillen shall pay to Rasby the sum of Two Million Three Hundred Fifty Thousand Dollars ($2,350,000) in full consideration for the Purchased Interests. Said funds shall be paid in immediately available funds at Closing. The parties agree that the purchase price shall be allocated among the Purchased Entities and the repayment of the Subordinated Debt as follows:

MNMK000034

[ 7 ]

| | |
|---|---|
| Double D: | $192,601.00 |
| Northern Nance: | $57,373.00 |
| Northern Plains: | $1,090,096.00 |
| Milling: | $380,844.00 |
| Gene Center: | $155,318.00 |
| PST: | $123,768.00 |
| Subordinated Debt Repayment: | $350,000.00 |
| | ------------------------ |
| | --- |
| TOTAL | $2,350,000.00 |

2.      Closing. The date of the closing (the "Closing") for the Purchased Interests shall be no later than June 29, 2012.

3.      Representations of Rasby. Rasby represents and warrants to Pillen that the Purchased Interests are conveyed and assigned to Pillen free and clear of all liens and encumbrances and that Rasby has full authority to transfer the Purchased Interests to Pillen without the consent or agreement of any other party. Rasby further represents and warrants that the Purchased Interests represent any and all interests of Rasby in the Subject Entities. Rasby and Pillen each further acknowledges and agrees that this Agreement is intended as a complete termination and resolution of the business dealings between Rasby and Pillen, Progressive Swine Technologies, Inc. and the Subject Entities. In exchange for the consideration to be delivered at Closing and except for Pillen's obligations under this Agreement, Rasby releases Pillen and Progressive Swine Technologies, Inc., and each of the Subject Entities from any and all claims of ownership and from any and claims for compensation, dividends, distributions, property, damages, costs, reimbursements or any other matter related to the employment and/or business dealings between the parties.

4.      Release of Rasby.  Except for, and subject to, any obligations set forth in this Agreement, (i) each of Pillen and the Subject Entities, on behalf of it/himself and its/his partners, affiliates, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers (and each of their respective partners, affiliates, subsidiaries, directors, officers, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers) (the "Pillen Parties") hereby unconditionally and fully releases and discharges each of Rasby and her assigns, heirs, agents, employees, representatives and insurers (and each of their respective partners, affiliates, subsidiaries, shareholders, directors, officers, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers) (the "Rasby Released Parties") from any and all obligations, claims, actions, liability, past, present, and future, of every kind or character, known or unknown, and unforeseen injuries and damages, and the consequences which the Pillen Parties have or may have in the future, by reason of, growing out of, arising out of or existing in connection with Rasby's employment by, or ownership of any interest in, the Subject Entities.

5.      4 Distributions and Allocation of Income. The parties agree that Rasby shall not be entitled to any dividends or distributions from any of the Subject Entities with regard to the 2012 taxable year of any of the Subject Entities; provided, however, that, notwithstanding anything to the contrary in this Agreement, in the event any income of any of the Subject Entities with regard to the 2012 taxable year is allocated to Rasby, each such Subject Entity to which such an allocation relates shall promptly distribute, and Pillen shall cause the Subject Entities to distribute to Rasby, in cash, an amount equal to Rasby's state and federal income tax liability (including any penalties and interest) relating to such

2

MNMK000035

[ 8 ]

allocation. The effective date of the transfer of the Purchased Interests shall be January 1, 2012, such that all income generated by the Subject Entities in calendar year 2012 and allocable to the Purchased Interests shall be allocated to Pillen for federal and state income tax reporting purposes. With regard to 2011 and prior years, the parties shall be liable for the income of the Subject Entities allocable to them based on their respective ownership interests in said years. With regard to any distributions made to Rasby from the Subject Entities during 2012, the applicable Subject Entity will issue a Form 1099 to Rasby and Rasby will be responsible for reporting and paying income tax associated with said payments.

6.     5. Deliveries at Closing. At Closing, Rasby agrees to sign, deliver and release to Pillen such documents as are reasonably necessary to assign and transfer all the Purchased Interests to Pillen or Pillen's nominee and to consent to dissolution of PST. Pillen agrees to deliver to Rasby the purchase price for the Purchased Interests in immediately available funds by cashier's check or wire transfer. The parties each, for no additional consideration, agree to execute and deliver such other and further documents as may be necessary to consummate and document the matters described in this Agreement.

7.     6. Miscellaneous.

a.     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Nebraska.

b.     Entire Agreement. This Agreement contains the understandings and agreement of the parties, and shall supersede all previous negotiations and writings. This Agreement shall not be released, discharged, abandoned, changed or modified in any manner, except by a written document signed by the parties.

c.     Severability. If any term or provision of this Agreement or corresponding Schedules shall to any extent be invalid or unenforceable, the remainder of this Agreement shall not be affected.

d.     Further Assurances. Each party will, whenever reasonably requested to do so by the other party, promptly execute and deliver any and all further documents and accomplish such acts as may be necessary to effectuate this Agreement.

e.     Time of the Essence. Time is of the essence of this Agreement.

f.     Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, devisees, personal representatives, successors and assigns.

g.     Paragraph Titles. Any title of a paragraph of this Agreement is inserted for convenience only and shall be disregarded in construing or interpreting the provisions of this Agreement.

3

MNMK000036

[ 9 ]

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date and year first above written.

Double D Family Farms, LLC
Northern Nance, LLC
Northern Plains, LLC
PST Milling, Inc.
PST Gene Center, LLC
Progressive Swine Technologies, Inc.

By:

JAMES D. PILLEN, President          DEBORAH R. RASBY

JAMES D. PILLEN

MNMK000037

[10]

STATE OF NEBRASKA       )
                                 ) ss.
COUNTY OF _____  )

     The foregoing instrument was acknowledged before me this ___ day of June, 2012, by Deborah R. Rasby.

     ( S E A L )

Notary Public

STATE OF NEBRASKA       )
                                 ) ss.
COUNTY OF _____  )

     The foregoing instrument was acknowledged before me this ___ day of June, 2012, by James D. Pillen, individually, and as President of the Subject Entities.

     ( S E A L )

Notary Public

5

MNMK000038

[11]

| From: | Doug Rasby |
|---|---|
| To: | Wells, Roger |
| ~~nt:~~ | 6/28/2012 4:31:48 PM |
| ~~.~~ject: | RE: Rasby/Pillen |
| Attachments: | Letter to Jim, Suzanne, Sarah and Brock after closing.docx |

Attached are my thoughts. This sale quite simply feels wrong – in the method used to bring it about and in the value. It is sick. I did not do anything to deserve this treatment. Attached are the thoughts that I would like to convey to those involved. I would not involve myself in any business relationships or make false statements. I hope that someday they make it right.

**From:** Wells, Roger [mailto:rwells@mcgrathnorth.com]
**Sent:** Thursday, June 28, 2012 3:17 PM
**To:** 'Doug Rasby'
**Subject:** RE: Rasby/Pillen

I'm not sure why you would want to do this, but the agreement does not include any kind of mutual "non-disparagement" clause. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773
~~ne~~ (402) 498-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com

**From:** Doug Rasby [mailto:ddrasby@frontiernet.net]
**Sent:** Thursday, June 28, 2012 3:06 PM
**To:** Wells, Roger
**Subject:** RE: Rasby/Pillen

If you are ok with this I am. I do have a question though. After all of this is done, could I express to Jim, Suzanne, Sarah and Brock the pain caused to me by the unilateral decisions that were made? I don't think my soul can rest until I have the freedom from oppression to speak from my heart in a respectful way.

**From:** Wells, Roger [mailto:rwells@mcgrathnorth.com]
**Sent:** Thursday, June 28, 2012 2:50 PM
**To:** Doug and Deb Rasby
**Subject:** FW: Rasby/Pillen

Attached is a revised draft that I received from Moll. Note that he has revised your release of Pillen and the entities. I do not have a problem with this unless you think you have some kind of claim that you would assert in the future. Moll is right...I transposed the Northern numbers. I intend to tell Moll that the changes are fine and that he should correct the transposition...if you disagree, please let me know. Thanks.

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
~~1~~ Dodge Street

EXHIBIT
56
3-22-17

MNMK000812

1

Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
(402) 681-5773
ne (402) 498-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com

**From:** Timothy L. Moll [mailto:TMoll@remboltlawfirm.com]
**Sent:** Thursday, June 28, 2012 1:44 PM
**To:** Wells, Roger
**Subject:** Rasby/Pillen

Roger:

Your proposed changes to the Unit Purchase Agreement are fine in substance.  Please note the following:

1.   I revised the release language to make it consistent for both parties.
2.   I changed the reference to Jim Pillen as President to be "Authorized Signer".  He is president of some and member/manager of others.
3.   The allocation is fine, except we believe the numbers for Northern Nance and Northern Plains are transposed.  I did not make any change pending your review.

A revised version of the agreement is attached for your review.  Please verify the allocation number and confirm that the attached form of the agreement is acceptable.  Once it is, we can make arrangements for signatures and transfer of funds.  Please provide wiring instructions for the account Ms. Rasby desires to receive the proceeds.  I am advised that Ms. Rasby is not holding any original certificates for her ownership interests.  Accordingly, I will forward an "Assignment Separate from Certificate" for the subject entities to be signed as part of the closing.  My hope is that we can have things finalized this afternoon and sign documents and transfer funds tomorrow.  Thank you.



**Timothy L. Moll, Attorney**
tmoll@remboltlawfirm.com

**Rembolt Ludtke LLP**
**1201 Lincoln Mall, Suite 102**
**Lincoln, Nebraska 68508**
P: (402) 475-5100 ext 125
F: (402) 475-5087
Web: www.remboltlawfirm.com

DISCLOSURE: In accordance with IRS Circular 230, please note the following with regard to any portion of the above message which involves federal tax issues: Unless expressly stated otherwise above, (1) nothing contained in this message is intended or written to be used or relied upon by any taxpayer for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code; and (2) nothing contained in this message may be used to recommend, promote or market any federal tax transaction or matter.

WARNING/CAUTION: This e-mail and any files transmitted with it are strictly confidential and are intended solely for the use of the individual or entity to whom it is addressed. This communication may contain material protected by lawyer-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail and any file attachments is strictly prohibited. If you have received this e-mail in error, please immediately notify us by a collect telephone call to (402) 475-5100 or by reply e-mail to the sender. You must destroy the original transmission and its contents.

---

This message and any attachments are confidential, may contain privileged information, and are intended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery to the named recipient, you are notified that any review, distribution, dissemination or copying is prohibited. If you have received this message in error, you should notify the der by return email and delete the message from your computer system.

MNMK000813

2

[ 2 ]

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

This message and any attachments are confidential, may contain privileged information, and are intended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery to the named recipient, you are notified that any review, distribution, dissemination or copying is prohibited. If you have received this message in error, you should notify the sender by return email and delete the message from your computer system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

MNMK000814

3

[ 3 ]

**From:** Timothy L. Moll
**To:** Wells, Roger
**Sent:** 6/29/2012 10:16:59 AM
**Subject:** RE: Rasby Closing

Roger:

Apparently your client called my client and scheduled to meet in person in Columbus at 10:00 a.m. and sign the documents. My client is going to forward me copies of the signed documents. I will forward a set to you when I receive them. Thanks.

**Timothy L. Moll, Attorney**
tmoll@remboltlawfirm.com
**Rembolt Ludtke LLP**
**1201 Lincoln Mall, Suite 102**
**Lincoln, Nebraska 68508**
**P: (402) 475-5100 ext 125**
**F: (402) 475-5087**
**Web:** www.remboltlawfirm.com

DISCLOSURE: In accordance with IRS Circular 230, please note the following with regard to any portion of the above message which involves federal tax issues: Unless expressly stated otherwise above, (1) nothing contained in this message is intended or written to be used or relied upon by any taxpayer for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code; and (2) nothing contained in this message may be used to recommend, promote or market any federal tax transaction or matter.
WARNING/CAUTION: This e-mail and any files transmitted with it are strictly confidential and are intended solely for the use of the individual or entity to whom it is addressed. This communication may contain material protected by lawyer-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail and any file attachments is strictly prohibited. If you have received this e-mail in error, please immediately notify us by a collect telephone call to (402) 475-5100 or by reply e-mail to the sender. You must destroy the original transmission and its contents.

**From:** Wells, Roger [mailto:rwells@mcgrathnorth.com]
**Sent:** Friday, June 29, 2012 8:30 AM
**To:** Timothy L. Moll
**Subject:** RE: Rasby Closing

Yes.

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773
Home (402) 498-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com

**From:** Timothy L. Moll [mailto:TMoll@remboltlawfirm.com]
**Sent:** Friday, June 29, 2012 8:19 AM
**To:** Wells, Roger
**Subject:** Rasby Closing

Roger:

My client is going to sign the Unit Purchase Agreement this morning and will scan and email a copy to me. Would you

EXHIBIT
57
Rm 3-26-17

MNMK000192

[ 1 ]

have Ms. Rasby sign the Unit Purchase Agreement and assignments and get copies to you? Once we both have signed copies in our possession, we can email them to each other and my client will wire the funds to Ms. Rasby's account. We can then each drop the original documents in the mail so that my client will have the signed original assignments and both parties will have a signed original Unit Purchase Agreement. We'd like to get this all done this morning if possible so the wire will be assured to hit Ms. Rasby's account today. Let me know if you see any problems with proceeding in this manner. Thank you.

Timothy L. Moll, Attorney
tmoll@remboltlawfirm.com
Rembolt Ludtke LLP
1201 Lincoln Mall, Suite 102
Lincoln, Nebraska 68508
P: (402) 475-5100 ext 125
F: (402) 475-5087
Web: www.remboltlawfirm.com
DISCLOSURE: In accordance with IRS Circular 230, please note the following with regard to any portion of the above message which involves federal tax issues: Unless expressly stated otherwise above, (1) nothing contained in this message is intended or written to be used or relied upon by any taxpayer for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code; and (2) nothing contained in this message may be used to recommend, promote or market any federal tax transaction or matter.
WARNING/CAUTION: This e-mail and any files transmitted with it are strictly confidential and are intended solely for the use of the individual or entity to whom it is addressed. This communication may contain material protected by lawyer-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail and any file attachments is strictly prohibited. If you have received this e-mail in error, please immediately notify us by a collect telephone call to (402) 475-5100 or by reply e-mail to the sender. You must destroy the original transmission and its contents.

Click here to report this email as spam.

---

This message and any attachments are confidential, may contain privileged information, and are intended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery to the named recipient, you are notified that any review, distribution, dissemination or copying of this message is prohibited. If you have received this message in error, you should notify the sender by return email and delete the message from your computer system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

MNMK000193

[ 2 ]

**Wells, Roger**

| | |
|---|---|
| **From:** | Doug Rasby <ddrasby@frontiernet.net> |
| **Sent:** | Friday, June 29, 2012 12:42 PM |
| **To:** | Wells, Roger |
| **Subject:** | RE: Rasby/Pillen |

Hi Roger, I left my copies of the signed documents at Jim's office – could you have Tim Moll send you a copy (I just can't bring myself to talk to Jim again). The meeting was cordial and I asked once again for just the appraised values for Nance, Plains and DD, nothing for the rest. I told him that the agreement just felt wrong – I looked at it many times and it gave me a stomach ache and a pain in my chest each time – it was just not fair and right, even in the eyes of objective 3rd parties. He told me that I had done a fabulous job enhancing all that he did and that I worked my tail off every day but that these kind of sales just weren't valued at appraised values. I left him by looking him in the eye and saying "Jim, you can do whatever you want, you have all of the power, but this is just not right. What I have suggested to you is beyond fair to you." At that I left and forgot my signed copies. Since Sarah and Brock are involved in this business directly, and Suzanne to a point, I feel that what I have to say is to each of them. It will not make a dent to Jim only. (During our beginning conversation Jim made an interesting comment on his new grandson (his 1st and his namesake) – he said that it just wasn't a "wow" experience for him as he thought it would be. He seems to be without much feeling of any kind.) This is not the way to do business and if they believe it to be ok, other people will suffer in the years to come. Maybe there is hope for them. It has certainly been a lesson to my own family on the value of ethics in every aspect of life.

**From:** Wells, Roger [mailto:rwells@mcgrathnorth.com]
**Sent:** Friday, June 29, 2012 9:22 AM
**To:** 'Doug Rasby'
**Subject:** RE: Rasby/Pillen

If you want to send this to Jim, ok. I would recommend that you not send it to others.

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773
Home (402) 498-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com

**From:** Doug Rasby [mailto:ddrasby@frontiernet.net]
**Sent:** Thursday, June 28, 2012 3:32 PM
**To:** Wells, Roger
**Subject:** RE: Rasby/Pillen

Attached are my thoughts. This sale quite simply feels wrong – in the method used to bring it about and in the value. It is sick. I did not do anything to deserve this treatment. Attached are the thoughts that I would like to convey to those involved. I would not involve myself in any business relationships or make false statements. I hope that someday they make it right.

1

EXHIBIT
58
DR001407.2

[ 1 ]

**From:** Wells, Roger [mailto:rwells@mcgrathnorth.com]
**Sent:** Thursday, June 28, 2012 3:17 PM
**To:** 'Doug Rasby'
**Subject:** RE: Rasby/Pillen

I'm not sure why you would want to do this, but the agreement does not include any kind of mutual "non-disparagement" clause. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773
Home (402) 498-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com

**From:** Doug Rasby [mailto:ddrasby@frontiernet.net]
**Sent:** Thursday, June 28, 2012 3:06 PM
**To:** Wells, Roger
**Subject:** RE: Rasby/Pillen

If you are ok with this I am. I do have a question though. After all of this is done, could I express to Jim, Suzanne, Sarah and Brock the pain caused to me by the unilateral decisions that were made? I don't think my soul can rest until I have the freedom from oppression to speak from my heart in a respectful way.

**From:** Wells, Roger [mailto:rwells@mcgrathnorth.com]
**Sent:** Thursday, June 28, 2012 2:50 PM
**To:** Doug and Deb Rasby
**Subject:** FW: Rasby/Pillen

Attached is a revised draft that I received from Moll. Note that he has revised your release of Pillen and the entities. I do not have a problem with this unless you think you have some kind of claim that you would assert in the future. Moll is right...I transposed the Northern numbers. I intend to tell Moll that the changes are fine and that he should correct the transposition...if you disagree, please let me know. Thanks.

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773
Home (402) 498-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com

**From:** Timothy L. Moll [mailto:TMoll@remboltlawfirm.com]
**Sent:** Thursday, June 28, 2012 1:44 PM

2

**DR001408.2**

[ 2 ]

**To:** Wells, Roger
**Subject:** Rasby/Pillen

Roger:

Your proposed changes to the Unit Purchase Agreement are fine in substance. Please note the following:

1. I revised the release language to make it consistent for both parties.
2. I changed the reference to Jim Pillen as President to be "Authorized Signer". He is president of some and member/manager of others.
3. The allocation is fine, except we believe the numbers for Northern Nance and Northern Plains are transposed. I did not make any change pending your review.

A revised version of the agreement is attached for your review. Please verify the allocation number and confirm that the attached form of the agreement is acceptable. Once it is, we can make arrangements for signatures and transfer of funds. Please provide wiring instructions for the account Ms. Rasby desires to receive the proceeds. I am advised that Ms. Rasby is not holding any original certificates for her ownership interests. Accordingly, I will forward an "Assignment Separate from Certificate" for the subject entities to be signed as part of the closing. My hope is that we can have things finalized this afternoon and sign documents and transfer funds tomorrow. Thank you.

**Timothy L. Moll, Attorney**
tmoll@remboltlawfirm.com

**Rembolt Ludtke LLP**
**1201 Lincoln Mall, Suite 102**
**Lincoln, Nebraska 68508**
**P: (402) 475-5100 ext 125**
**F: (402) 475-5087**
**Web:** www.remboltlawfirm.com

DISCLOSURE: In accordance with IRS Circular 230, please note the following with regard to any portion of the above message which involves federal tax issues: Unless expressly stated otherwise above, (1) nothing contained in this message is intended or written to be used or relied upon by any taxpayer for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code; and (2) nothing contained in this message may be used to recommend, promote or market any federal tax transaction or matter.

WARNING/CAUTION: This e-mail and any files transmitted with it are strictly confidential and are intended solely for the use of the individual or entity to whom it is addressed. This communication may contain material protected by lawyer-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail and any file attachments is strictly prohibited. If you have received this e-mail in error, please immediately notify us by a collect telephone call to (402) 475-5100 or by reply e-mail to the sender. You must destroy the original transmission and its contents.

---

This message and any attachments are confidential, may contain privileged information, and are intended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery to the named recipient, you are notified that any review, distribution, dissemination or copying is prohibited. If you have received this message in error, you should notify the sender by return email and delete the message from your computer system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

---

3

**DR001409.2**

This message and any attachments are confidential, may contain privileged information, and are intended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery to the named recipient, you are notified that any review, distribution, dissemination or copying is prohibited. If you have received this message in error, you should notify the sender by return email and delete the message from your computer system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

This message and any attachments are confidential, may contain privileged information, and are intended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery to the named recipient, you are notified that any review, distribution, dissemination or copying is prohibited. If you have received this message in error, you should notify the sender by return email and delete the message from your computer system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

4

**DR001410.2**

**Wells, Roger**

| | |
|---|---|
| **From:** | Deb Rasby <debrasby@gmail.com> |
| **Sent:** | Friday, June 29, 2012 7:25 PM |
| **To:** | Jim D. Pillen |
| **Cc:** | Wells, Roger |
| **Subject:** | Thank you! |
| **Attachments:** | ATT00001.htm; 20120629103735230.pdf |

Jim, thank you for your change of heart – I just knew you were a fair and good guy! I am truly grateful for your reconsideration of the amount that I thought was fair to both of us. You have no idea how much this means to me. As John Wooden has said: "Ability may get you to the top, but character keeps you there". You are indeed a man of character, a man of your word, a man of integrity. I am appreciative and deeply grateful.

God's blessings,

Deb

**From:** Wells, Roger [mailto:rwells@mcgrathnorth.com]
**Sent:** Friday, June 29, 2012 2:12 PM
**To:** Rasby Doug
**Subject:** Fwd: Rasby/Pillen

FYI

Roger W. Wells

McGrath North Mullin & Kratz

First National Tower, Suite 3700

1601 Dodge Street

Omaha, Nebraska 68102

Phone (402) 341-3070

Fax (402) 952-1853

Cell (402) 681-5773

Home (402) 498-0941

**EXHIBIT**
59
$\omega_{3} - 2674$

1

**DR001204.2**

[ 1 ]

rwells@mcgrathnorth.com

www.mcgrathnorth.com

Begin forwarded message:

> **From:** "Timothy L. Moll" <TMoll@remboltlawfirm.com>
> **Date:** June 29, 2012 1:03:43 PM CDT
> **To:** "Wells, Roger (rwells@mcgrathnorth.com)" <rwells@mcgrathnorth.com>
> **Subject: Rasby/Pillen**

Roger:


For your records and reference, I am attaching a copy of the signed Unit Purchase Agreement and Assignments.  Let me know if you need anything further.  Thank you.


**Timothy L. Moll, Attorney**
**tmoll@remboltlawfirm.com**

**Rembolt Ludtke LLP**

**1201 Lincoln Mall, Suite 102**
**Lincoln, Nebraska 68508**
**P: (402) 475-5100 ext 125**
**F: (402) 475-5087**
**Web: www.remboltlawfirm.com**

DISCLOSURE: In accordance with IRS Circular 230, please note the following with regard to any portion of the above message which involves federal tax issues: Unless expressly stated otherwise above, (1) nothing contained in this message is intended or written to be used or relied upon by any taxpayer for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code; and (2) nothing contained in this message may be used to recommend, promote or market any federal tax transaction or matter.

WARNING/CAUTION: This e-mail and any files transmitted with it are strictly confidential and are intended solely for the use of the individual or entity to whom it is addressed. This communication may contain material protected by lawyer-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail and any file attachments is strictly prohibited. If you have received this e-mail in error, please immediately notify us by a collect telephone call to (402) 475-5100 or by reply e-mail to the sender. You must destroy the original transmission and its contents.

---

This message and any attachments are confidential, may contain privileged information, and are intended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery to the named recipient, you are notified that any review, distribution, dissemination or copying is prohibited. If you have received this message in error, you should notify the sender by return email and delete the message from your computer system.

2

**DR001205.2**

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

3

**DR001206.2**

[ 3 ]

**UNIT PURCHASE AGREEMENT**

THIS UNIT PURCHASE AGREEMENT (the "Agreement") is made and entered into this 29th day of June, 2012, by and between Deborah R. Rasby ("Rasby") and James D. Pillen ("Pillen"), and relates to the sale of ownership interests in the following entities (herein collectively the "Subject Entities"):

Double D Family Farms, LLC, a Nebraska limited liability company ("Double D");
Northern Nance, LLC, a Nebraska limited liability company ("Northern Nance");
Northern Plains, LLC, a Nebraska limited liability company ("Northern Plains");
PST Milling, Inc., a Nebraska corporation ("Milling")
PST Gene Center, LLC, a Nebraska limited liability company ("Gene Center"); and
Progressive Swine Technologies, Inc., a Nebraska corporation ("PST").

WHEREAS, Rasby owns the following interests in the Subject Entities:

Double D - 5 units out of 100 total outstanding units;
Northern Nance - 10 units out of 100 total outstanding units;
Northern Plains - 10 units out of 100 total outstanding units;
Milling - 100 shares out of 1,000 total outstanding shares;
Gene Center - 10 units of out 100 total outstanding units; and
PST - 10 units out of the 100 total outstanding units.

WHEREAS, Northern Nance is indebted to Rasby in the principal amount of $350,000.00 (the "Subordinated Debt"); and

Rasby desires to sell all of her interests in the Subject Entities (including the Subordinated Debt) and Pillen desires to purchase all of said interests from Rasby on the terms and conditions of this Agreement.

FOR VALUABLE CONSIDERATION, the parties agree as follows:

1.      Price and Terms. Effective as of Closing, as hereunder defined, Rasby shall transfer to Pillen all of her ownership interests in the Subject Entities, including the Subordinated Debt (herein collectively the "Purchased Interests"). Pillen shall pay to Rasby the sum of Three Million Nine Hundred Seventyfive Thousand Dollars ($3,975,000) in full consideration for the Purchased Interests. Said funds shall be paid in immediately available funds at Closing. The parties agree that the purchase price shall be allocated among the Purchased Entities and the repayment of the Subordinated Debt as follows:

**DR001207.2**

[ 4 ]

| | |
|---|---|
| Double D: | $349,089.00 |
| Northern Nance: | $1,975,799.00 |
| Northern Plains: | $103,989.00 |
| Milling: | $690,281.00 |
| Gene Center: | $281,513.00 |
| PST: | $224,329.00 |
| Subordinated Debt Repayment: | $350,000.00 |
| TOTAL | $3,975,000.00 |

2.　　Closing. The date of the closing (the "Closing") for the Purchased Interests shall be no later than June 29, 2012.

3.　　Representations of Rasby. Rasby represents and warrants to Pillen that the Purchased Interests are conveyed and assigned to Pillen free and clear of all liens and encumbrances and that Rasby has full authority to transfer the Purchased Interests to Pillen without the consent or agreement of any other party. Rasby further represents and warrants that the Purchased Interests represent any and all interests of Rasby in the Subject Entities.

4.　　Releases. Rasby and Pillen acknowledge and agree that this Agreement is intended as a complete termination and resolution of the business dealings between Rasby and Pillen and the Subject Entities. Except for, and subject to, any obligations set forth in this Agreement, (i) each of Pillen and the Subject Entities, on behalf of it/himself and its/his partners, affiliates, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers (and each of their respective partners, affiliates, subsidiaries, directors, officers, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers) (the "Pillen Parties") hereby unconditionally and fully release and discharge each of Rasby and her assigns, heirs, agents, employees, representatives and insurers (and each of their respective partners, affiliates, subsidiaries, shareholders, directors, officers, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers) (the "Rasby Parties") from any and all obligations, claims, actions, liability, past, present, and future, of every kind or character, known or unknown, and unforeseen injuries and damages, and the consequences which the Pillen Parties have or may have in the future, by reason of, growing out of, arising out of or existing in connection with the business dealings between the parties, including, but not limited to Rasby's employment by, or ownership of any interest in, the Subject Entities. Likewise, the Rasby Parties hereby unconditionally and fully release and discharge the Pillen Parties from any and all obligations, claims, actions, liability, past, present, and future, of every kind or character, known or unknown, and unforeseen injuries and damages, and the consequences which the Rasby Parties have or may have in the future, by reason of, growing out of, arising out of or existing in connection with the business dealings between the parties, including, but not limited to, Rasby's employment by, or ownership of any interest in, the Subject Entities.

5.　　Distributions and Allocation of Income. The parties agree that Rasby shall not be entitled to any dividends or distributions from any of the Subject Entities with regard to the 2012 taxable year of any of the Subject Entities; provided, however, that, notwithstanding anything to the contrary in this Agreement, in the event any income of any of the Subject Entities with regard to the 2012 taxable year is allocated to Rasby, each such Subject Entity to which such an allocation relates shall promptly distribute, and Pillen shall cause the Subject Entities to distribute to Rasby, in cash, an amount equal to Rasby's state and federal income tax liability (including any penalties and interest) relating to such

2

**DR001208.2**

allocation. The effective date of the transfer of the Purchased Interests shall be January 1, 2012, such that all income generated by the Subject Entities in calendar year 2012 and allocable to the Purchased Interests shall be allocated to Pillen for federal and state income tax reporting purposes. With regard to 2011 and prior years, the parties shall be liable for the income of the Subject Entities allocable to them based on their respective ownership interests in said years. With regard to any distributions made to Rasby from the Subject Entities during 2012, the applicable Subject Entity will issue a Form 1099 to Rasby and Rasby will be responsible for reporting and paying income tax associated with said payments.

6.      Deliveries at Closing. At Closing, Rasby agrees to sign, deliver and release to Pillen such documents as are reasonably necessary to assign and transfer all the Purchased Interests to Pillen or Pillen's nominee and to consent to dissolution of PST. Pillen agrees to deliver to Rasby the purchase price for the Purchased Interests in immediately available funds by cashier's check or wire transfer. The parties each, for no additional consideration, agree to execute and deliver such other and further documents as may be necessary to consummate and document the matters described in this Agreement.

7.      Miscellaneous.

    a.      Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Nebraska.

    b.      Entire Agreement. This Agreement contains the understandings and agreement of the parties, and shall supersede all previous negotiations and writings. This Agreement shall not be released, discharged, abandoned, changed or modified in any manner, except by a written document signed by the parties.

    c.      Severability. If any term or provision of this Agreement or corresponding Schedules shall to any extent be invalid or unenforceable, the remainder of this Agreement shall not be affected.

    d.      Further Assurances. Each party will, whenever reasonably requested to do so by the other party, promptly execute and deliver any and all further documents and accomplish such acts as may be necessary to effectuate this Agreement.

    e.      Time of the Essence. Time is of the essence of this Agreement.

    f.      Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, devisees, personal representatives, successors and assigns.

    g.      Paragraph Titles. Any title of a paragraph of this Agreement is inserted for convenience only and shall be disregarded in construing or interpreting the provisions of this Agreement.

3

**DR001209.2**

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date and year first above written.

Double D Family Farms, LLC
Northern Nance, LLC
Northern Plains, LLC
PST Milling, Inc.
PST Gene Center, LLC
Progressive Swine Technologies, Inc.

By: _____
     JAMES D. PILLEN, Authorized Signer

_____
DEBORAH R. RASBY

_____
JAMES D. PILLEN

**DR001210.2**

[ 7 ]

STATE OF NEBRASKA          )
                           ) ss.
COUNTY OF _P/n#c_____       )

    The foregoing instrument was acknowledged before me this $\underline{29}$ day of June, 2012, by Deborah R. Rasby.

BRENDA A. JAZWICK
MY COMMISSION EXPIRES
October 13, 2013

_____
Notary Public

STATE OF NEBRASKA          )
                           ) ss.
COUNTY OF /a#c_____         )

    The foregoing instrument was acknowledged before me this $\underline{29}$ day of June, 2012, by James D. Pillen, individually, and as an authorized signer of the Subject Entities.

(S E A L)

BRENDA A. JAZWICK
MY COMMISSION EXPIRES
October 13, 2013

_____
Notary Public

5

**DR001211.2**

[ 8 ]

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto JAMES D. PILLEN, Ten (10) units of interest in NORTHERN PLAINS, LLC, a Nebraska limited liability company (the "*Company*"). Said units of interest are represented by Certificate No. 2 standing in the name of the undersigned on the books of said Company. The undersigned represents that the above units are her entire interest in the Company and this Assignment is intended to transfer her entire interest in the Company. The undersigned does hereby irrevocably constitute and appoint the Manager of said Company to transfer the said units of interest on the books of the within named Company, with full power of substitution in the premises.

Dated this 29th day of June, 2012 to be effective as of January 1, 2012.

_____
Deborah Rasby

WITNESS:

_____
Brenda A Gay

3

**DR001212.2**

[ 9 ]

### ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto JAMES D. PILLEN, Ten (10) shares of the common stock of PROGRESSIVE SWINE TECHNOLOGIES, INC., a Nebraska corporation (the "*Company*"). Said shares of stock are represented by a certificate, but the certificate is not in the possession of the undersigned and has apparently been lost or inadvertently destroyed. The undersigned represents that the above shares of stock are her entire interest in the Company and this Assignment is intended to transfer her entire interest in the Company. The undersigned does hereby irrevocably constitute and appoint the Secretary of said Company to transfer the said shares of stock on the books of the within named Company, with full power of substitution in the premises. In the event the original certificate is located, the undersigned agrees to promptly surrender it to the Company.

Dated this 29th day of June, 2012 to be effective as of January 1, 2012.

Deborah Rasby

WITNESS:

Brenda A Gph

6

**DR001213.2**

[10]

### ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto JAMES D. PILLEN, Ten (10) units of interest in PST GENE CENTER, LLC, a Nebraska limited liability company (the "*Company*"). Said units of interest are represented by Certificate No. 2 standing in the name of the undersigned on the books of said Company. The undersigned represents that the above units are her entire interest in the Company and this Assignment is intended to transfer her entire interest in the Company. The undersigned does hereby irrevocably constitute and appoint the Manager of said Company to transfer the said units of interest on the books of the within named Company, with full power of substitution in the premises.

Dated this 29th day of June, 2012 to be effective as of January 1, 2012.

_____
Deborah Rasby

WITNESS:

_____

4

**DR001214.2**

[11]

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto JAMES D. PILLEN, Five (5) units of interest in DOUBLE D FAMILY FARMS, LLC, a Nebraska limited liability company (the "*Company*"). Said units of interest are represented by Certificate No. 5 standing in the name of the undersigned on the books of said Company. The undersigned represents that the above units are her entire interest in the Company and this Assignment is intended to transfer her entire interest in the Company. The undersigned does hereby irrevocably constitute and appoint the Manager of said Company to transfer the said units of interest on the books of the within named Company, with full power of substitution in the premises.

Dated this 29ᵗʰ day of June, 2012 to be effective as of January 1, 2012.

_____
Deborah Rasby

WITNESS:

_____

1

**DR001215.2**

[12]

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto JAMES D. PILLEN, Ten (10) units of interest in NORTHERN NANCE, LLC, a Nebraska limited liability company (the "*Company*"). Said units of interest are represented by Certificate No. 2 standing in the name of the undersigned on the books of said Company. The undersigned also sells, assigns and transfers unto JAMES D. PILLEN all of the undersigned's rights in and to certain subordinated indebtedness owed by the Company to the undersigned in the principal amount of $350,000. The undersigned represents that the above units and indebtedness are her entire interest in the Company and this Assignment is intended to transfer her entire interest in the Company. The undersigned does hereby irrevocably constitute and appoint the Manager of said Company to transfer the said units of interest and the evidence of indebtedness on the books of the within named Company, with full power of substitution in the premises.

Dated this 29th day of June, 2012 to be effective as of January 1, 2012.

_____
Deborah Rasby

WITNESS:

_____

2

**DR001216.2**

[ 13 ]

## Wells, Roger

| | |
|---|---|
| **From:** | Deb Rasby <debrasby@gmail.com> |
| **Sent:** | Saturday, June 30, 2012 7:54 AM |
| **To:** | Wells, Roger |
| **Subject:** | Fwd: confusion |
| **Attachments:** | 20120629211347653.pdf |

---------- Forwarded message ----------
From: **Jim D. Pillen** <jimdp@pillenfamilyfarms.com>
Date: Fri, Jun 29, 2012 at 9:26 PM
Subject: confusion
To: "Deb Rasby (debrasby@gmail.com)" <debrasby@gmail.com>
Cc: "tmoll@remboltludtke.com" <tmoll@remboltludtke.com>

Deb
I did not have a change of heart the deal we agreed on and signed was for 2.35 and final with you taking my
check for 2.35. Evidently several pages you produced that no one else ever saw and we did not agree on were
inadvertently scanned incorrectly into the agreement. Sorry for the confusion the original is attached.
Jim



EXHIBIT
60

DR001173.2

1

[ 1 ]

| | |
|---|---|
| Double D: | $192,601.00 |
| Northern Nance: | $1,090,096.00 |
| Northern Plains: | $57,373.00 |
| Milling: | $380,844.00 |
| Gene Center: | $155,318.00 |
| PST: | $123,768.00 |
| Subordinated Debt Repayment: | $350,000.00 |
| TOTAL | $2,350,000.00 |

2.  Closing. The date of the closing (the "Closing") for the Purchased Interests shall be no later than June 29, 2012.

3.  Representations of Rasby. Rasby represents and warrants to Pillen that the Purchased Interests are conveyed and assigned to Pillen free and clear of all liens and encumbrances and that Rasby has full authority to transfer the Purchased Interests to Pillen without the consent or agreement of any other party. Rasby further represents and warrants that the Purchased Interests represent any and all interests of Rasby in the Subject Entities.

4.  Releases. Rasby and Pillen acknowledge and agree that this Agreement is intended as a complete termination and resolution of the business dealings between Rasby and Pillen and the Subject Entities. Except for, and subject to, any obligations set forth in this Agreement, (i) each of Pillen and the Subject Entities, on behalf of it/himself and its/his partners, affiliates, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers (and each of their respective partners, affiliates, subsidiaries, directors, officers, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers) (the "Pillen Parties") hereby unconditionally and fully release and discharge each of Rasby and her assigns, heirs, agents, employees, representatives and insurers (and each of their respective partners, affiliates, subsidiaries, shareholders, directors, officers, attorneys, successors, assigns, heirs, agents, employees, representatives and insurers) (the "Rasby Parties") from any and all obligations, claims, actions, liability, past, present, and future, of every kind or character, known or unknown, and unforeseen injuries and damages, and the consequences which the Pillen Parties have or may have in the future, by reason of, growing out of, arising out of or existing in connection with the business dealings between the parties, including, but not limited to Rasby's employment by, or ownership of any interest in, the Subject Entities. Likewise, the Rasby Parties hereby unconditionally and fully release and discharge the Pillen Parties from any and all obligations, claims, actions, liability, past, present, and future, of every kind or character, known or unknown, and unforeseen injuries and damages, and the consequences which the Rasby Parties have or may have in the future, by reason of, growing out of, arising out of or existing in connection with the business dealings between the parties, including, but not limited to, Rasby's employment by, or ownership of any interest in, the Subject Entities.

5.  Distributions and Allocation of Income. The parties agree that Rasby shall not be entitled to any dividends or distributions from any of the Subject Entities with regard to the 2012 taxable year of any of the Subject Entities; provided, however, that, notwithstanding anything to the contrary in this Agreement, in the event any income of any of the Subject Entities with regard to the 2012 taxable year is allocated to Rasby, each such Subject Entity to which such an allocation relates shall promptly distribute, and Pillen shall cause the Subject Entities to distribute to Rasby, in cash, an amount equal to Rasby's state and federal income tax liability (including any penalties and interest) relating to such

2

**DR001175.2**

## UNIT PURCHASE AGREEMENT

THIS UNIT PURCHASE AGREEMENT (the "Agreement") is made and entered into this 29th day of June, 2012, by and between Deborah R. Rasby ("Rasby") and James D. Pillen ("Pillen"), and relates to the sale of ownership interests in the following entities (herein collectively the "Subject Entities"):

Double D Family Farms, LLC, a Nebraska limited liability company ("Double D");
Northern Nance, LLC, a Nebraska limited liability company ("Northern Nance");
Northern Plains, LLC, a Nebraska limited liability company ("Northern Plains");
PST Milling, Inc., a Nebraska corporation ("Milling")
PST Gene Center, LLC, a Nebraska limited liability company ("Gene Center"); and
Progressive Swine Technologies, Inc., a Nebraska corporation ("PST").

WHEREAS, Rasby owns the following interests in the Subject Entities:

Double D - 5 units out of 100 total outstanding units;
Northern Nance - 10 units out of 100 total outstanding units;
Northern Plains - 10 units out of 100 total outstanding units;
Milling - 100 shares out of 1,000 total outstanding shares;
Gene Center - 10 units of out 100 total outstanding units; and
PST - 10 units out of the 100 total outstanding units.

WHEREAS, Northern Nance is indebted to Rasby in the principal amount of $350,000.00 (the "Subordinated Debt"); and

Rasby desires to sell all of her interests in the Subject Entities (including the Subordinated Debt) and Pillen desires to purchase all of said interests from Rasby on the terms and conditions of this Agreement.

FOR VALUABLE CONSIDERATION, the parties agree as follows:

1.      Price and Terms. Effective as of Closing, as hereunder defined, Rasby shall transfer to Pillen all of her ownership interests in the Subject Entities, including the Subordinated Debt (herein collectively the "Purchased Interests"). Pillen shall pay to Rasby the sum of Two Million Three Hundred Fifty Thousand Dollars ($2,350,000) in full consideration for the Purchased Interests. Said funds shall be paid in immediately available funds at Closing. The parties agree that the purchase price shall be allocated among the Purchased Entities and the repayment of the Subordinated Debt as follows:

**DR001174.2**

[ 3 ]

allocation. The effective date of the transfer of the Purchased Interests shall be January 1, 2012, such that all income generated by the Subject Entities in calendar year 2012 and allocable to the Purchased Interests shall be allocated to Pillen for federal and state income tax reporting purposes. With regard to 2011 and prior years, the parties shall be liable for the income of the Subject Entities allocable to them based on their respective ownership interests in said years. With regard to any distributions made to Rasby from the Subject Entities during 2012, the applicable Subject Entity will issue a Form 1099 to Rasby and Rasby will be responsible for reporting and paying income tax associated with said payments.

6.      Deliveries at Closing. At Closing, Rasby agrees to sign, deliver and release to Pillen such documents as are reasonably necessary to assign and transfer all the Purchased Interests to Pillen or Pillen's nominee and to consent to dissolution of PST. Pillen agrees to deliver to Rasby the purchase price for the Purchased Interests in immediately available funds by cashier's check or wire transfer. The parties each, for no additional consideration, agree to execute and deliver such other and further documents as may be necessary to consummate and document the matters described in this Agreement.

7.      Miscellaneous.

   a.      Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Nebraska.

   b.      Entire Agreement. This Agreement contains the understandings and agreement of the parties, and shall supersede all previous negotiations and writings. This Agreement shall not be released, discharged, abandoned, changed or modified in any manner, except by a written document signed by the parties.

   c.      Severability. If any term or provision of this Agreement or corresponding Schedules shall to any extent be invalid or unenforceable, the remainder of this Agreement shall not be affected.

   d.      Further Assurances. Each party will, whenever reasonably requested to do so by the other party, promptly execute and deliver any and all further documents and accomplish such acts as may be necessary to effectuate this Agreement.

   e.      Time of the Essence. Time is of the essence of this Agreement.

   f.      Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, devisees, personal representatives, successors and assigns.

   g.      Paragraph Titles. Any title of a paragraph of this Agreement is inserted for convenience only and shall be disregarded in construing or interpreting the provisions of this Agreement.

3

**DR001176.2**

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date and year first above written.

Double D Family Farms, LLC
Northern Nance, LLC
Northern Plains, LLC
PST Milling, Inc.
PST Gene Center, LLC
Progressive Swine Technologies, Inc.

By: _____
JAMES D. PILLEN, Authorized Signer

_____
DEBORAH R. RASBY

_____
JAMES D. PILLEN

**DR001177.2**

[ 5 ]

STATE OF NEBRASKA )
) ss.
COUNTY OF _Platte_ )

The foregoing instrument was acknowledged before me this _29_ day of June, 2012, by Deborah R. Rasby.

(SEAL)

BRENDA A. JAZWICK
MY COMMISSION EXPIRES
October 13, 2013

_____
Notary Public

STATE OF NEBRASKA )
) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this ___ day of June, 2012, by James D. Pillen, individually, and as an authorized signer of the Subject Entities.

(SEAL)

_____
Notary Public

5

DR001178.2

[ 6 ]

STATE OF NEBRASKA )
) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this ___ day of June, 2012, by Deborah R. Rasby.

(SEAL)

_____

Notary Public

STATE OF NEBRASKA )
) ss.
COUNTY OF Platte )

The foregoing instrument was acknowledged before me this 29 day of June, 2012, by James D. Pillen, individually, and as an authorized signer of the Subject Entities.

(SEAL)

Brenda A Gnl
Notary Public

```
BRENDA A. JAZWICK
MY COMMISSION EXPIRES
October 13, 2013
```

5

**DR001179.2**

[ 7 ]

**Wells, Roger**

| | |
|---|---|
| **From:** | ddrasby@frontiernet.net |
| **Sent:** | Wednesday, July 18, 2012 9:47 AM |
| **To:** | Wells, Roger |
| **Subject:** | Re: Pillen/Rasby Closing |

It was mistakenly sent back by Jim. I am currently communicating with him to take this action simply because it is the right action & still beyond fair to him. If he does this I would not retract my support for his campaign - which I supported far before his bad actions began. If he does not take fair action I will retract my support using the documented facts of the case (no name calling).
Deb
Sent from my Verizon Wireless BlackBerry

---

**From:** "Wells, Roger" <rwells@mcgrathnorth.com>
**Date:** Wed, 18 Jul 2012 14:30:17 +0000
**To:** Doug and Deb Rasby<ddrasby@frontiernet.net>
**Subject:** FW: Pillen/Rasby Closing

Doug and Deb, I hope all is well and that you are surviving the sweltering heat. I was wondering...do you know where the document with the incorrect numbers came from?

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773
Home (402) 498-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com

---

**From:** Wells, Roger
**Sent:** Friday, June 29, 2012 10:33 PM
**To:** Rasby Doug
**Subject:** Fwd: Pillen/Rasby Closing

Fyi

Roger W. Wells
McGrath North Mullin & Kratz
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773
Home (402) 498-0941
rwells@mcgrathnorth.com

**EXHIBIT**
161
m 3-21-17
PENGAD 800-531-6989

1

**DR001188.2**



www.mcgrathnorth.com

Begin forwarded message:

**From:** "Timothy L. Moll" <TMoll@remboltlawfirm.com>
**Date:** June 29, 2012 8:48:09 PM MDT
**To:** "'Wells, Roger'" <rwells@mcgrathnorth.com>
**Subject: Pillen/Rasby Closing**

Roger:

The document I forwarded to you earlier today was not a correct copy of the signed agreement. When a document was assembled for scanning from among the signed originals, incorrect pages were inadvertently included which described a purchase price and allocation that the parties had not discussed or agreed to. It is not a document that our office prepared so I presume the pages were among documents brought to closing by Ms. Rasby. Ms. Rasby was provided with a cashier's check for the agreed purchase price of $2.35 million. A correct copy of the signed Unit Purchase Agreement is attached for your records. Thank you.

**Timothy L. Moll, Attorney**
**tmoll@remboltlawfirm.com**

**Rembolt Ludtke LLP**
**1201 Lincoln Mall, Suite 102**
**Lincoln, Nebraska 68508**
**P: (402) 475-5100 ext 125**
**F: (402) 475-5087**
**Web:** www.remboltlawfirm.com

DISCLOSURE: In accordance with IRS Circular 230, please note the following with regard to any portion of the above message which involves federal tax issues: Unless expressly stated otherwise above, (1) nothing contained in this message is intended or written to be used or relied upon by any taxpayer for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code; and (2) nothing contained in this message may be used to recommend, promote or market any federal tax transaction or matter.

WARNING/CAUTION: This e-mail and any files transmitted with it are strictly confidential and are intended solely for the use of the individual or entity to whom it is addressed. This communication may contain material protected by lawyer-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail and any file attachments is strictly prohibited. If you have received this e-mail in error, please immediately notify us by a collect telephone call to (402) 475-5100 or by reply e-mail to the sender. You must destroy the original transmission and its contents.

---

This message and any attachments are confidential, may contain privileged information, and are intended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery to the named recipient, you are notified that any review, distribution, dissemination or copying is prohibited. If you have received this message in error, you should notify the sender by return email and delete the message from your computer system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot

2

**DR001189.2**

be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

3

**DR001190.2**

**Wells, Roger**

| | |
|---|---|
| From: | Doug Rasby <ddrasby@frontiernet.net> |
| Sent: | Thursday, August 23, 2012 11:07 AM |
| To: | Wells, Roger |
| Subject: | RE: Rasby/Pillen |
| Attachments: | Retraction of support of Pillen.docx; Reasons for Jim Pillen to make the final payment.docx; Email to Jim Pillen Aug 21 2012.docx |

Good morning Roger,

The letter that I will share with people, personally and by mail, states only facts for which I have documentation. I have given Pillen the opportunity to erase it by making a fair payment (even the payment I have requested is extremely conservative) or by his withdrawal from the political race for Regent. His actions have been unethical, if not downright unlawful and I will not hide them. I plan to share the information with mutual friends who are helping with his campaign, with his opponent and perhaps a letter to the editor as well as to people that we know. There was no confidentiality agreement signed in this transaction. I believe that we still have freedom of speech in this country, do we not?? If you wish to share this with Tim Moll you have my permission.

Deb

From: Wells, Roger [mailto:rwells@mcgrathnorth.com]
Sent: Thursday, August 23, 2012 10:34 AM
To: Doug and Deb Rasby
Subject: FW: Rasby/Pillen

Please read Moll's email below.

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773

Home (402) 498-0941
rwells@mcgrathnorth.com <mailto:rwells@mcgrathnorth.com> www.mcgrathnorth.com
<http://www.mcgrathnorth.com/>

From: Timothy L. Moll [mailto:TMoll@remboltlawfirm.com]
Sent: Wednesday, August 22, 2012 9:59 AM
To: Wells, Roger
Subject: Rasby/Pillen



**EXHIBIT**

63

1

**DR001400.2**



Roger:

I am writing to make you aware that since the transaction involving Jim Pillen and Deb Rasby was concluded back in July, Ms. Rasby has contacted my client multiple times per week (by phone and email and personal visits to his office) complaining that the price she received for her ownership interests was too low. She is threatening to send a letter to the press "retracting" her support for Jim Pillen as a candidate for Regent at the University of Nebraska unless Mr. Pillen agrees to pay her another $1.75 million. A copy of her proposed retraction letter is attached for your reference.

The transaction is concluded, Ms. Rasby has been paid, and per the agreement of the parties, all claims have been released. Ms. Rasby is free to support or oppose whomever she pleases in the upcoming elections. Mr. Pillen does not wish to discuss this matter further or receive emails, phone calls or correspondence from Ms. Rasby. At your earliest convenience, please advise Ms. Rasby that communication with Jim Pillen or employees of Pillen Family Farms should stop immediately. I do not see a need for Ms. Rasby to pursue this matter further, but if there is some need to contact Mr. Pillen, any such communications from Ms. Rasby should be directed to my office. If you are no longer representing Ms. Rasby, please let me know and I will forward this information to her directly. Thank you for your assistance. If you have any questions, please contact me.

Timothy L. Moll, Attorney
tmoll@remboltlawfirm.com <mailto:tmoll@remboltlawfirm.com>

Rembolt Ludtke LLP

1201 Lincoln Mall, Suite 102
Lincoln, Nebraska 68508
P: (402) 475-5100 ext 125
F: (402) 475-5087
Web: www.remboltlawfirm.com <http://www.remboltlawfirm.com>

DISCLOSURE: In accordance with IRS Circular 230, please note the following with regard to any portion of the above message which involves federal tax issues: Unless expressly stated otherwise above, (1) nothing contained in this message is intended or written to be used or relied upon by any taxpayer for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code; and (2) nothing contained in this message may be used to recommend, promote or market any federal tax transaction or matter.

WARNING/CAUTION: This e-mail and any files transmitted with it are strictly confidential and are intended solely for the use of the individual or entity to whom it is addressed. This communication may contain material protected by lawyer-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail and any file attachments is strictly prohibited. If you have received this e-mail in error, please immediately notify us by a collect telephone call to (402) 475-5100 or by reply e-mail to the sender. You must destroy the original transmission and its contents.

2

**DR001401.2**

---

This message and any attachments are confidential, may contain privileged information, and are intended solely for the recipient named above. If you are not the intended recipient, or a person responsible for delivery to the named recipient, you are notified that any review, distribution, dissemination or copying is prohibited. If you have received this message in error, you should notify the sender by return email and delete the message from your computer system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code, nor should such advice be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement.

3

**DR001402.2**

### RETRACTION OF MY SUPPORT OF JIM PILLEN FOR UNIVERSITY OF NEBRASKA REGENT

The University deserves to have leaders of high integrity, good values and upstanding character. Jim Pillen's actions that I have personally witnessed have not reflected these qualities. After 20 years of association with Jim Pillen I support David Copple for the University of Nebraska Regent position. The following explains why I am urging you *not* to vote for Jim Pillen:

- I have worked with Jim Pillen as a business partner and chief financial officer for 20 years. I retired from our business in a positive way, acknowledged by Jim Pillen in an email communication to all of the people working in our business.

- I wished to keep my minority share business interests in retirement in accordance with contractual agreements and personal promises.

- Jim Pillen wanted to acquire my business interests.

- Jim Pillen ignored our buy-sell agreements.

- Jim Pillen ignored values determined by two certified appraisers.

- Jim Pillen notified me by certified mail that my most profitable business was being liquidated. (In fact, after the forced sale of my 10% interests, only the name was changed - to Pillen Family Farms. The same services continue to be performed in the same location. Jim Pillen has attempted to rationalize that, because his ownership interests have increased in the entities for which these services are performed, the profitablility of our service business - in which I had a 10% share - should be eliminated. I will also note that Jim Pillen's ownership interests had increased in prior years with no change to the profit structure of our service business.)

- Jim Pillen discontinued paying out profits from my other businesses. (Jim Pillen had cash flow from other businesses which would cover his taxes and would give him disposable income, I would have no funds with which to pay income taxes or have disposable income. Also note that profits had always been distributed in the past from these businesses and the businesses are profitable.)

- Jim Pillen gave me a low ball offer (43% of the certified appraised values - these appraised values were also in line with the values accepted by our business' lenders).

- Jim Pillen would not allow a discussion of the values. (No negotiation was allowed – I could either take the low offer or continue ownership under the new policy – which would eventually bankrupt me).

- My retirement finances were decimated.

- The experience was terrifying and revealed characteristics that would not serve the University of Nebraska well.

*If Jim Pillen would do this to acquire money from a 10% minority business partner of 20 years who treated him respectfully, what else is he capable of doing?*

**DR001403.2**

[ 4 ]

The Pillen Family Farms website (which is exactly the same as the former Progressive Swine Technologies website) shows the following values as the principles of Jim Pillen's businesses: "Do the right thing" and "Treat others the way you want to be treated". Although I worked and retired in a respectful and good way, and Jim Pillen acknowledged to me that I did an exceptional job, *I experienced the opposite*. I pleaded numerous times for Jim Pillen to honor his business principles, some of which are documented in emails. My pleas were ignored.

I asked Jim Pillen only for the lowest, most conservative appraised values on the pork production facilities for which I had put all of my personal assets at risk for many years – I would give him my other business interests for no value. This was ignored.

My attorneys said that I could have my day in court, and that Nebraska law against minority shareholder oppression is being strengthened in 2013. Unfortunately, a lawsuit would have taken years and likely more than our family's savings to pursue. I didn't have pockets deep enough to fight this.

I urge you **not** to vote for Jim Pillen for Regent.

Deborah Rasby

**DR001404.2**

What is good about this situation?

1) You have a past business partner of 20 years who wants good for you, not harm.
2) You have the opportunity to correct the situation so that it does not damage you.
3) You have the ability and personal discipline to create a clean closure and move on in a good way.

Why should you make this payment?

1) It is a good purchase price for you
2) It is an investment in your name
3) It sets the stage for a good future
4) It gives you freedom from a past business partner
5) It shows responsibility to your family and your supporters by keeping your name clear

**DR001405.2**

[ 6 ]



**Deb Rasby**                                                    Aug 21 (2
                                                                days ago)

to Jim

*I have left messages for you at work and on your cell phone so you may disregard those by your*
*reply to this. If I hear no reply I will assume this didn't get through on your email and I will send it*
*to you through Sarah:*
Jim,
To reiterate for the record, the value that I am asking in total for my business interests is 74.55%
of a conservative valuation of these business' value. It uses:
- The appraisal for Double D calculated by Jim VanDerWerff, Certified General Appraiser
- The value calculated for N Nance/N Plains by Matt Stadler, CPA, ABV, CFF
- Subtracts the repayment of my subordinated loan from the calculated value
- Includes no value for PST, PST Gene Center or PST Milling (estimated by Matt Stadler at
25.45% of the total)
- The assumption for N Nance/N Plains uses an equivalent of $2,695,000 annual depreciation
for capital improvement expenditures *each year.* This exceeds what we have done in the past
but it does give full benefit of the doubt for upgrades and provides a highly conservative model.
In the final calculation it should *more* than compensate for all of the subordinated debt, as do
the zero values included for PST, PST Gene Center and PST Milling.

The value is calculated with fairness. This goes to the farthest end of the conservative scale
and can stand up to scrutiny.

Most importantly, we will end this transaction on a note of respect for both of us. I feel good
about the value that I have given to you.

When can we meet to close this?

**DR001406.2**

[ 7 ]

| | |
|---|---|
| **From:** | Doug Rasby |
| **To:** | Wells, Roger |
| ~~**t:**~~ | 8/23/2012 12:41:58 PM |
| ~~.ject:~~ | p.s. The additional amount requested is $1.275MM re:Rasby/Pillen |
| **Attachments:** | Email to Jim Pillen Aug 21 2012.docx; Reasons for Jim Pillen to make the final payment.docx; Retraction of support of Pillen.docx |

Note: The additional amount that I am requesting is $1,275,000. All of this information may be given to Jim Pillen's attorney.

From: Doug Rasby [mailto:ddrasby@frontiernet.net]
Sent: Thursday, August 23, 2012 11:07 AM
To: 'Wells, Roger'
Subject: RE: Rasby/Pillen

Good morning Roger,

The letter that I will share with people, personally and by mail, states only facts for which I have documentation. I have given Pillen the opportunity to erase it by making a fair payment (even the payment I have requested is extremely conservative) or by his withdrawal from the political race for Regent. His actions have been unethical, if not downright unlawful and I will not hide them. I plan to share the information with mutual friends who are helping with his campaign, with his opponent and perhaps a letter to the editor as well as to people that we know. There was no confidentiality agreement signed in this transaction. I believe that we still have freedom of speech in this country, do we not?? If you wish to share this with Tim Moll you have my permission.



From: Wells, Roger [mailto:rwells@mcgrathnorth.com]
Sent: Thursday, August 23, 2012 10:34 AM
To: Doug and Deb Rasby
Subject: FW: Rasby/Pillen

Please read Moll's email below. I strongly recommend that you do not send the draft letter that is attached.

Roger W. Wells
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Phone (402) 341-3070
Fax (402) 952-1853
Cell (402) 681-5773

Home (402) 458-0941
rwells@mcgrathnorth.com
www.mcgrathnorth.com

From: Timothy L. Moll [mailto:TMoll@remboltlawfirm.com]
~~:~~ Wednesday, August 22, 2012 9:59 AM
Wells, Roger



MNMK000835

1

Subject: Rasby/Pillen

r:

I am writing to make you aware that since the transaction involving Jim Pillen and Deb Rasby
was concluded back in July, Ms. Rasby has contacted my client multiple times per week (by
phone and email and personal visits to his office) complaining that the price she received for
her ownership interests was too low. She is threatening to send a letter to the press
"retracting" her support for Jim Pillen as a candidate for Regent at the University of
Nebraska unless Mr. Pillen agrees to pay her another $1.75 million. A copy of her proposed
retraction letter is attached for your reference.

The transaction is concluded, Ms. Rasby has been paid, and per the agreement of the parties,
all claims have been released. Ms. Rasby is free to support or oppose whomever she pleases in
the upcoming elections. Mr. Pillen does not wish to discuss this matter further or receive
emails, phone calls or correspondence from Ms. Rasby. At your earliest convenience, please
advise Ms. Rasby that communication with Jim Pillen or employees of Pillen Family Farms should
stop immediately. I do not see a need for Ms. Rasby to pursue this matter further, but if
there is some need to contact Mr. Pillen, any such communications from Ms. Rasby should be
directed to my office. If you are no longer representing Ms. Rasby, please let me know and I
will forward this information to her directly. Thank you for your assistance. If you have any
questions, please contact me.

Timothy L. Moll, Attorney
tmoll@remboltlawfirm.com

_ .oolt Ludtke LLP

1201 Lincoln Mall, Suite 102
Lincoln, Nebraska 68508
P: (402) 475-5100 ext 125
F: (402) 475-5087
Web: www.remboltlawfirm.com

DISCLOSURE: In accordance with IRS Circular 230, please note the following with regard to any
portion of the above message which involves federal tax issues: Unless expressly stated
otherwise above, (1) nothing contained in this message is intended or written to be used or
relied upon by any taxpayer for the purpose of avoiding penalties that may be imposed under
the Internal Revenue Code; and (2) nothing contained in this message may be used to recommend,
promote or market any federal tax transaction or matter.

WARNING/CAUTION: This e-mail and any files transmitted with it are strictly confidential and
are intended solely for the use of the individual or entity to whom it is addressed. This
communication may contain material protected by lawyer-client privilege. If you are not the
intended recipient or the person responsible for delivering the e-mail to the intended
recipient, be advised that you have received this e-mail in error and that any use,
dissemination, forwarding, printing, or copying of this e-mail and any file attachments is
strictly prohibited. If you have received this e-mail in error, please immediately notify us
by a collect telephone call to (402) 475-5100 or by reply e-mail to the sender. You must
destroy the original transmission and its contents.

MNMK000836

2

This message and any attachments are confidential, may contain privileged information, and are
intended solely for the recipient named above. If you are not the intended recipient, or a
person responsible for delivery to the named recipient, you are notified that any review,
distribution, dissemination or copying is prohibited. If you have received this message in
error, you should notify the sender by return email and delete the message from your computer
system.

The following statement is provided pursuant to U.S. Treasury Department Regulations: Any U.S.
tax advice contained in this communication (including any attachments) is not intended or
written to be used, and cannot be used, for the purpose of avoiding penalties under the
Internal Revenue Code, nor should such advice be used or referred to in the promoting,
marketing or recommending of any entity, investment plan or arrangement.

MNMK000837

3

[ 3 ]