IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

**EXHIBIT 3**

| | |
|---|---|
| DEBORAH RASBY and | ) |
| DOUGLAS RASBY, husband | ) |
| and wife, | ) CASE NO. 8:15-cv226 |
| | ) |
| Plaintiffs, | ) DEPOSITION TAKEN IN |
| | ) |
| vs. | ) BEHALF OF DEFENDANT |
| | ) |
| JAMES D. PILLEN, an | ) |
| individual, | ) |
| | ) |
| Defendant. | ) |

VIDEOTAPED DEPOSITION OF:  DEBORAH RASBY

DATE:  April 12, 2017

TIME:  8:59 a.m.

PLACE:  260 Regency Parkway Drive, Suite 200,

Omaha, Nebraska

```
 1              A P P E A R A N C E S:

 2   APPEARING FOR THE PLAINTIFFS:

 3           Mr. Robert S. Sherrets
             Attorney at Law
 4           260 Regency Parkway Drive
             Suite 200
 5           Omaha, NE 68114
             law@sherrets.com
 6
     APPEARING FOR THE DEFENDANT:
 7
             Mr. Timothy R. Engler
 8           Ms. Sheila A. Bentzen
             Attorneys at Law
 9           3 Landmark Centre
             1128 Lincoln Mall, Ste. 300
10           Lincoln, NE 68508
             tengler@remboltlawfirm.com
11           sbentzen@remboltlawfirm.com

12   ALSO PRESENT:

13           Kara Barnett; Douglas Rasby; and Roger
             Speakman, Videographer
14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                          Page 3
 1                          I-N-D-E-X

 2
      WITNESS       Direct   Cross    Redirect   Recross
 3
      DEBORAH RASBY  5        230      241        --
 4

 5

 6    EXHIBITS                         Marked  Offered

 7    65. Email String RE: Question
      Concerning Possible Legal
 8    Services                          50      --

 9    66. Plaintiffs' Response to
      Defendant's Requests for Admissions,
10    First Set                        217      --

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1              S-T-I-P-U-L-A-T-I-O-N-S
 2        It is hereby stipulated and agreed by and
 3   between the parties that;
 4        Notice of taking said deposition is
 5   waived; notice of delivery of said deposition
 6   is waived.
 7        Presence of the witness during the
 8   transcription of the stenotype notes is waived.
 9        All objections are reserved until the time
10   of trial except as to form and foundation of
11   the question.
12         The reading of Rule 6-330(8)(a) and
13   6-330(8)(c) having been waived.
14              *         *         *
15                   THE VIDEOGRAPHER:  We are on the
16   video record.  The date is April 12th, 2017.
17   The time is 8:59.  And this is the
18   video-recorded deposition of Deborah --
19                   THE WITNESS:  Rasby.
20                   THE VIDEOGRAPHER:  Rasby.  Thank
21   you.  I forgot to write it down.
22         We may swear in the witness now and
23   proceed.
24
25
```

```
 1                    DEBORAH RASBY,
 2    Of lawful age, being first duly cautioned and
 3     solemnly sworn as hereinafter certified, was
 4            examined and testified as follows:
 5                 DIRECT EXAMINATION
 6   BY MR. ENGLER:
 7   Q.       Good morning.
 8   A.       Good morning.
 9   Q.       For the record, would you state your
10   name and spell your last name?
11   A.       Deborah Rasby, R-A-S-B-Y.
12   Q.       Ms. Rasby, you're the plaintiff in this
13   lawsuit that was filed against Jim Pillen;
14   correct?
15   A.       Yes.
16   Q.       And we met before at another deposition.
17   But I'll introduce myself again.  My name is
18   Tim Engler, and I'm representing Dr. Pillen.
19   Fair enough?
20   A.       Fair enough.
21   Q.       I know you sat through Roger Wells'
22   deposition.  But have you been involved in a
23   deposition before?
24   A.       No.
25   Q.       You may have noticed that in Wells'
```

1         And then what did you do?

2    A.      I was serving on the board of directors

3    for the Prairie Hills Girl Scout Council.  And

4    from that position, they asked me to serve as

5    executive director.  So I became the executive

6    director of Prairie Hills Girl Scout Council

7    serving northeast Nebraska.

8         I did that for about a year and a half.

9    And then I was offered a position back in

10   accounting and finance with Sand Systems, which

11   was a pork production operation.

12   Q.      Okay.

13   A.      And I worked for Sand Systems for

14   approximately two years.

15        And then Jim Pillen and I began

16   Progressive Swine Technologies, officially

17   starting in January of 1994, doing some

18   preliminary work in late of '93.

19   Q.      All right.  What type -- did you work

20   full time at Sand Systems?

21   A.      Yes.

22   Q.      Where were you living at this time?

23   A.      Columbus.

24   Q.      When did you move to Columbus,

25   approximately?

Page 20

```
 1   A.      85,000 is what I recall.

 2   Q.      And Pillen's salary was 110,000?

 3   A.      Correct.

 4   Q.      And he owned 90 percent of the company?

 5   A.      That's right.

 6   Q.      There were no other shareholders?

 7   A.      No.

 8   Q.      He was the only other officer?

 9   A.      That's right.

10   Q.      And the only other director?

11   A.      That's right.

12   Q.      PST --

13   A.      At that time.

14   Q.      At the time.

15   A.      Beginning.

16   Q.      Okay.  Thank you.  Did -- at some point

17   that did change?

18   A.      I can't remember if we brought on

19   another person as a director.

20   Q.      Okay.  Now, when -- when PST was formed,

21   it was formed as a -- as a management company;

22   correct?

23   A.      Correct.

24   Q.      And it was to provide services to

25   customers; correct?
```

Page 21

```
 1   A.       Correct.

 2   Q.       And the services it would provide would

 3   include such things as day-to-day accounting?

 4   A.       Correct.

 5   Q.       Bookkeeping?

 6   A.       Yes.

 7   Q.       Hiring and training employees?

 8   A.       Yes.

 9   Q.       Establishing labor practices, policies

10   and guidelines?

11   A.       Yes.

12   Q.       Analysis of monthly financial and

13   production results?

14   A.       Yes.

15   Q.       Daily cash management?

16   A.       Yes.

17   Q.       Monthly reports for lenders and

18   insurers?

19   A.       Yes.

20   Q.       Maintaining contracts, bills, vouchers

21   and other documentation?

22   A.       Yes.

23   Q.       All right.  Anything else?

24   A.       That was -- those were the -- the

25   services we provided.
```

Page 22

1   Q.      Okay.  And the customers that you had

2   were primarily customers that were owned by

3   people other than Pillen?

4   A.      We began with one customer that was

5   owned by someone other than Jim Pillen, yes.

6   Q.      Do you recall Bartlett Foods?

7   A.      That's right.

8   Q.      Bartlett Foods became a customer in

9   approximately 1995?

10  A.      That's right.

11  Q.      Okay.  Is that Ken Morrison's company?

12  A.      Yes.

13  Q.      And then PC West?

14  A.      That was -- construction was started or

15  finished in 1994, I believe, for PC West.

16  Q.      And Pillen owned 50 percent of it and

17  the other 50 percent was owned by --

18  A.      Mike Wilke.

19  Q.      Mike Wilke.  Correct.  Inland Foods was

20  formed in 1996.  Does that ring a bell?

21  A.      That sounds approximately right.

22  Q.      And Jim was a minority shareholder in

23  that entity?

24  A.      That's right.

25  Q.      Okay.  Furnas Country Farms, 1993?

Page 23

1   A.      Yes.

2   Q.      And Jim was a minority shareholder in

3   that operation?

4   A.      That's right.

5   Q.      Who was the owner involved there, the

6   outside customer?

7   A.      That was Chuck Sand.  I believe there

8   were some other owners also.

9   Q.      Okay.  And then Pheasant Ridge was

10  another customer; correct?

11  A.      That was Jim Pillen 50 percent and Mike

12  Wilke 50 percent.

13  Q.      And so the idea was PST would have

14  management responsibility for these customers,

15  provide the services that we just described?

16  A.      That's right.

17  Q.      And charge a fee?

18  A.      That's right.

19               MR. SHERRETS:  Objection.  Form.

20  You've got to slow down, give me an opportunity

21  to make my objections if necessary.

22               THE WITNESS:  All right.

23               MR. SHERRETS:  And, also, makes

24  sure you allow him to finish his question.

25  Sorry.

Page 24

1                    MR. ENGLER:  No, no, fine.  Your

2    objection was form?

3                    MR. SHERRETS:  Yes, sir.

4                    MR. ENGLER:  Okay.  Thank you.

5    Q.     (BY MR. ENGLER) Oh, and -- and then PST

6    would charge a management fee to the customers;

7    correct?

8    A.     That's correct.

9    Q.     And that was a 5 percent fee?

10   A.     No.

11   Q.     Okay.  What was the fee based upon?

12   A.     The fee was originally based on an

13   amount per weanling pig.

14   Q.     All right.

15   A.     Those first operations were weanling pig

16   operations.

17   Q.     Eventually did it go to a percentage for

18   the customers?

19   A.     It eventually went to a cent and a

20   quarter per pound sold.

21   Q.     All right.  These customers that PST

22   provided its services for were primarily in the

23   swine industry; correct?

24   A.     Correct.

25   Q.     And there's several aspects of these

Page 25

1    farms.  You can have a breeding operation;

2    correct?

3    A.       Correct.

4    Q.       You could have a -- I'm going to get

5    this wrong -- farrowing operation?

6    A.       Correct.

7    Q.       That's when we get a little bigger;

8    correct?

9    A.       Correct.

10   Q.       And then -- that's from birth to certain

11   size.  And then you have a finishing?

12   A.       Correct.

13   Q.       And that's when you get them to the

14   point where they're sold for slaughter;

15   correct?

16   A.       That's right.

17   Q.       And the customers that you were serving

18   had various -- some had all three of those,

19   while others would have one or more; is that

20   right?

21   A.       That's right.

22   Q.       Initially were you the only one in the

23   accounting department?

24   A.       Initially, yes.

25   Q.       And you reported to Pillen?

Page 26

```
1    A.      That's right.

2    Q.      All right.  Did the PST accounting staff

3    grow over time?

4    A.      Yes.

5    Q.      And just so we kind of put an end date

6    on this, I believe you resigned from PST in --

7    you announced your resignation in May of 2011

8    and, actually, last day was, like, July 18th of

9    2011; is that correct?

10   A.      I retired and gave Jim Pillen a

11   retirement letter --

12   Q.      Right.

13   A.      -- in May of 2011.  And my last day was

14   July 13th, 2011.

15   Q.      Okay.  So we've got 17 years there that

16   you're involved with PST?

17   A.      Uh-huh, yes.

18   Q.      Okay.  Were you always responsible for

19   the accounting side of things during that

20   period of time?

21   A.      Yes.

22   Q.      And did the number of staff grow during

23   that 17-year period?

24   A.      Yes.

25   Q.      At the time you left, how large was it?
```

Page 30

1    A.      I don't know.

2    Q.      Okay.  If that were, in fact, the case,

3    that would be on average about $400,000 a year?

4                    MR. SHERRETS:  Form.

5    Q.      (BY MR. ENGLER) Correct?

6    A.      I don't know exactly.

7    Q.      Now, there's a number of entities that

8    were involved in the -- in front of you, you've

9    got the original exhibits from Roger Wells'

10   deposition.  And rather than remark those, I'm

11   going to try and refer to those if possible.

12   A.      All right.

13   Q.      So if you could turn to Exhibit No. 7,

14   which is going --

15                   MR. SHERRETS:  Looks like this.

16   Q.      (BY MR. ENGLER) Yeah, I can help you

17   find it if you want.

18              There you go.

19   A.      There it is.

20   Q.      All right.  I want to talk to you about

21   these various entities in terms of who they

22   were and what they were.

23              You see in the center there -- let me

24   start with, is this a document that you

25   prepared?  Do you recognize it?

1   A.      I did not prepare it.  But someone on

2   our staff prepared it.

3   Q.      It was provided to us from McGrath

4   North.  And we know that because it has the

5   Bates number on the bottom right-hand corner of

6   MNMK 281.

7   A.      Yes.

8   Q.      That tells us that they were the ones

9   that actually produced it.

10          And it's my understanding from Roger

11  Wells that he provided this -- you provided

12  this to him in, I think, the summer of 2011 as

13  background information?

14  A.      Yes.

15  Q.      So at the time, I assume that you would

16  agree with me that the information contained on

17  here is accurate and fair?

18  A.      Yes.

19  Q.      Okay.  And you -- did you participate in

20  reviewing this before it was finalized?

21  A.      Yes.

22  Q.      Okay.  Now, we have five -- I guess six

23  asterisks that show, first of all, the one in

24  the middle is PST, and that's an indication

25  that you had ownership interest in that;

1    correct?

2    A.      Yes.

3    Q.      And then we have Double D.  And there's

4    an asterisk there; correct?

5    A.      Yes.

6    Q.      Do I understand correctly you have a 5

7    percent interest in Double D?

8    A.      Yes.

9    Q.      Now, Double D was formed in 2002;

10   correct?

11   A.      Yes.

12   Q.      You didn't actually have to pay for that

13   5 percent interest, did you?

14   A.      No.  We were able to handle this in a

15   way that allowed us not to put cash in.

16   Q.      Okay.  Double D is in the business of,

17   you know, the swine industry; correct?

18   A.      Yes.

19   Q.      And it also was a customer of PST;

20   correct?

21   A.      Yes.

22   Q.      Should have probably started

23   chronologically.  But it doesn't matter.  Let's

24   go to PST Milling, which was 20 -- 2001 when it

25   was formed; correct?

Page 33

1    A.      Yes.

2    Q.      And this was a milling operation that

3    produced feed for the swine?

4    A.      Yes.

5    Q.      And you had a --

6    A.      10 percent.

7    Q.      -- 10 percent interest in that as well?

8            Again, you didn't actually pay cash for

9    that 10 percent interest, did you?

10   A.      Again, we didn't have to.  We found

11   other ways --

12   Q.      Okay.  All right.

13   A.      -- to handle that.

14   Q.      Northern Nance was formed in 1996?

15   A.      Yes.

16   Q.      Another part of the swine operation;

17   correct?

18   A.      Actually, there may -- I -- Northern

19   Plains was -- was constructed first.

20   Q.      Oh, okay.

21   A.      Then Northern Nance.

22   Q.      So maybe that asterisk, maybe it's the

23   date of 1998 rather than '96?

24   A.      It might be.

25   Q.      Okay.  So Northern Plains farm was built

Page 34

1    in 1997.

2    A.       Yes.

3    Q.       And you have a 10 percent interest in

4    that?

5    A.       Yes.

6    Q.       And then following was Northern Nance?

7    A.       Yes.

8    Q.       Okay.  PST Gene Center was formed in

9    1998; correct?

10   A.       Yes.

11   Q.       And PST Gene Center is a semen

12   production facility?

13   A.       A genetics facility.

14   Q.       Okay.  Genetics.

15   A.       For stud facility.

16   Q.       And you had 10 percent interest in that?

17   A.       Yes.

18   Q.       As to all of these, you didn't have to

19   pay any cash for that; correct?

20   A.       I had to put my personal assets as

21   guaranties.  And I did have money ready to

22   invest in Northern Plains.  But our lenders

23   accepted the value that we provided as general

24   contractors so that we were not -- it was not

25   necessary for us to put that cash in.  But I

Page 35

1   did have that cash ready.

2   Q.      Did you ever sign a personal guaranty

3   for any of these entities?

4   A.      Yes.

5   Q.      When?

6   A.      When Northern Plains was begun, I signed

7   a personal guaranty and guarantied my personal

8   assets, our savings and our home.

9   Q.      Was that -- how long was that personal

10  guaranty in effect?

11  A.      I believe that it continued on through

12  my ownership of that business.

13  Q.      Okay.  Do you know what the level of

14  debt was that you were guarantying?

15  A.      My portion of debt was that -- my 10

16  percent portion of debt was very close to the

17  assets that I guarantied.

18  Q.      So your personal guaranty was limited to

19  the 10 percent that -- of the ownership

20  interest that you had?

21  A.      I believe my personal guaranty was 125

22  percent of my share.

23  Q.      All right.  Any other personal

24  guaranties that you had to provide in

25  connection with your ownership of any of these

Page 36

1    entities?

2    A.      Yes.   Each one of them had personal

3    guaranties.

4    Q.      Truth in lending institutions?

5    A.      Yes.

6    Q.      Do you -- did you safe copies of those?

7    A.      I have the Northern Plains and Northern

8    Nance.

9            I can't recall having the other ones.

10   Q.      Do you think you still have copies?

11   A.      I don't -- I don't think I do.   I

12   believe that we kept them all at the PST

13   office.

14   Q.      All right.   Now, the other entities,

15   there are a number of other entities shown on

16   Exhibit 7.

17   A.      Yes.

18   Q.      Do you contend in this lawsuit that you

19   were entitled to any ownership interest in

20   those entities?

21   A.      I believe I was.

22   Q.      Okay.   Based on what?

23   A.      The Corporate Opportunities Act that I

24   discovered later through Mr. Sherrets.

25   Q.      What is your understanding as to why

1   you -- strike that.

2          Do you believe you personally were

3   entitled to ownership interest in these

4   entities, you, Deborah Rasby?

5   A.     I believe that I was.

6   Q.     So when an entity was formed, at the

7   time the entity was formed, you believe you

8   should have been given -- been granted an

9   opportunity personally to invest in that -- in

10  that entity?

11  A.     I be --

12               MR. SHERRETS:  Object to the

13  form.

14  Q.     (BY MR. ENGLER) Go ahead.

15  A.     I believe so, yes.

16  Q.     So, for example, GGP, all right?

17  A.     Yes.

18  Q.     That's a customer of PST, was formed in

19  1997; correct?

20  A.     Yes.

21  Q.     One-third was owned by Jim Pillen.

22  One-third was owned by Bill Gottsch?

23  A.     Bob Gottsch and --

24  Q.     Bob Gottsch and his brother --

25  A.     -- Brett Gottsch.

Page 38

1   Q.      Bob and Brett.  And your position in

2   this lawsuit is that you should have been given

3   some ownership interest in that as well?

4   A.      I believe so, yes.

5   Q.      And what's that based on?

6   A.      It was a similar business to other

7   businesses that I was involved in and had

8   ownership in.

9   Q.      That corporate opportunity should have

10  been presented to you in 1997; is that correct?

11  A.      Yes.

12                  MR. SHERRETS:  Object to the

13  form.  Calls for a legal conclusion.

14  Q.      (BY MR. ENGLER) I just want to know when

15  you thought it should have been presented to

16  you?

17                  MR. SHERRETS:  Oh, when she

18  thought and what the law says is different

19  so --

20                  MR. ENGLER:  Fair enough.

21  Q.      (BY MR. ENGLER) You may answer.

22  A.      I -- after learning about corporate

23  opportunities, I thought that I should have

24  been offered ownership in that.

25  Q.      During the entire time that you were

Page 39

1    associated with PST, did you ever ask for

2    ownership interest in those entities?

3    A.      I can't remember.

4    Q.      Did you ever discuss it with Dr. Pillen

5    that, hey, why aren't I an owner in some of

6    these other entities?

7    A.      I did not state it like that.

8    Q.      Did you ever make -- make any demands

9    upon him that said, hey, I need -- I need a

10   percentage interest in these entities?

11   A.      No.

12   Q.      How much of an ownership interest do you

13   feel you were entitled to?

14   A.      I would think the same level that I had

15   in Northern Plains, Northern Nance, PST.

16   Q.      Why not 5 percent like you did in Double

17   D?

18   A.      I wasn't aware at the time that Double D

19   was formed that corporate opportunities should

20   be the same level in each of the businesses.

21          It would have provided a balance if I

22   had had ownership in all of the businesses.

23   Q.      And just so I have it clear, you're

24   not -- strike that.

25          Do you believe you were denied an

Page 40

1    opportunity to have ownership interest in all

2    of the entities listed on Exhibit 7?

3    A.       All of them, yes.  And I'm looking at

4    Bartlett Foods, which I found out later Jim

5    purchased an interest in.  At the time Jim

6    Pillen had no interest in Bartlett Foods.  And

7    so I was not entitled at that time to have an

8    interest in Bartlett Foods.

9    Q.       So it's your position that if Jim Pillen

10   acquired an interest in an entity, you should

11   have been given your share of that?

12   A.       Yes.

13   Q.       But if it was an entity that was owned

14   by some other customer, then you didn't -- you

15   weren't entitled to it?

16   A.       That's right.

17   Q.       Okay.  And the opportunity was triggered

18   when Jim Pillen obtained the ownership

19   interest; right?

20   A.       The opportunity should have been

21   triggered then.

22   Q.       All right.  Let's go through these

23   entities.  I want to find out -- let me -- as

24   the accountant for PST being involved in

25   accounting, you would have had knowledge of

Page 41

1   these entities; correct?

2   A.      That's correct.

3   Q.      And you knew they existed from the

4   moment they were formed; correct?

5   A.      That's correct.

6   Q.      And so the services you -- you would

7   have been provided would have been throughout

8   the entire tenure in which PST operated?

9   A.      That's right.

10  Q.      Okay.  Bartlett Foods was originally a

11  partnership and then became a limited liability

12  company in -- do you recall that, converted

13  that after initially --

14  A.      Bart -- excuse me.  Bartlett Foods --

15  Q.      Yeah.

16  A.      -- was owned 100 percent by Ken

17  Morrison.

18  Q.      Okay.  Do you know when Pillen purchased

19  Morrison's interest?

20  A.      I believe he purchased the interest in

21  2012.

22  Q.      Okay.  And Bartlett Foods was engaged in

23  the business of breeding, growing and marketing

24  swine and swine products?

25  A.      That's correct.

1   Q.      All right.  Double D, also a -- a sow

2   facility; correct?

3   A.      That's correct.

4   Q.      And that was formed in 2002?

5   A.      Correct.

6   Q.      There were a number of owners in that.

7   Jim Pillen had 65 percent?

8   A.      That's correct.

9   Q.      Cleave Pillen 10 percent?

10  A.      Yes.

11  Q.      Tom Pillen 10 percent?

12  A.      Yes.

13  Q.      Deb Rasby 5 percent?

14  A.      Yes.

15  Q.      And Brett Bonwell, B-O-N-W-E-L-L, 5

16  percent?

17  A.      Yes.  And Dan O'Connor, 5 percent.

18  Q.      Your interest in that was -- was

19  purchased when you -- when you sold in June of

20  2012; correct?

21  A.      Yes.

22  Q.      GGP Partnership, we talked a little bit

23  about that.  But that was the Pillen, Bob

24  Gottsch and Brett Gottsch; correct?

25  A.      That's correct.

Page 43

1   Q.      Jim was a minority shareholder; right?

2   A.      That's correct.

3   Q.      Would he have had the ability to force

4   the other partners to give you an ownership

5   interest in that entity if they chose not to?

6   A.      I believe he could have owned that

7   through PST.

8   Q.      Okay.  GGP Partnership was engaged in

9   breeding, growing and marketing of swine and

10  swine products also?

11  A.      That's right.

12  Q.      These were things that PST was not

13  doing; right?

14  A.      No.

15  Q.      PST was providing management but not the

16  actual growing operations?

17  A.      That's correct.

18  Q.      So it wasn't a similar business to PST,

19  was it?

20  A.      No.

21  Q.      Is that correct?

22  A.      Correct.

23  Q.      Thank you.  I had double negative in

24  there.

25          Okay.  Inland Foods, that was also

1   primarily a Morrison Enterprises-owned company?

2   A.      That's correct.

3   Q.      And that's Ken Morrison?

4   A.      That's correct.

5   Q.      Also involved in breeding, growing and

6   marketing swine and swine products; correct?

7   A.      Yes.

8   Q.      So not something that PST was doing;

9   correct?

10  A.      Correct.

11  Q.      Northern Nance, we talked about that.

12  That was an entity that Jim Pillen owned 69

13  percent?

14  A.      Eventually.

15  Q.      Okay.  Then eventually you had 10

16  percent?

17  A.      Yes.  Originally Jim Pillen had 70

18  percent.  I had 10 percent.  Dan O'Connor had

19  20 percent.

20          Later I believe PST had 1 percent.

21  Q.      How did it come about that PST got the 1

22  percent, do you know?

23  A.      When the -- when it was changed from a

24  general partnership to a limited liability

25  corporation, LLC.

Page 45

1    Q.      Northern Nance and Northern Plains are
2    kind of a combined operation that provide a
3    farrow-to-finish --
4    A.      That's correct.
5    Q.      -- operation; correct?
6            And your 10 percent was purchased by
7    Pillen in June of 2012?
8    A.      Correct.
9    Q.      Okay.  So we talked about Northern
10   Plains and Northern Nance.
11           O'Neill Finishers, 2003, do you know who
12   was the owner there?
13   A.      O'Neill Finishers was Jim Pillen and
14   Dr. Les Griess.
15   Q.      Okay.  And Dr. Griess was a veterinarian
16   also?
17   A.      That's right.
18   Q.      He worked with PST?
19   A.      He was an employee of PST Vet Services.
20   Q.      Okay.  And he retired before you did;
21   correct?
22   A.      He did not retire.  He resigned.
23   Q.      He resigned.  Okay.
24           And Dr. Pillen bought his interest?
25   A.      Yes.

Page 46

1   Q.      Do you know how that -- the value of

2   Dr. Griess' interest was arrived at as part of

3   the purchase?

4   A.      I wasn't involved in their negotiation.

5   Q.      Fair enough.

6           PC West was one of the first ones that

7   was formed.  And that was a 50/50 owner between

8   Pillen and Wilke?

9   A.      That's right.

10  Q.      And Jim perched Wilke's interest in PC

11  West in the mid 1990s?

12  A.      Yes.

13  Q.      PST Gene Center, this would be the boar

14  farm; correct?

15  A.      Yes.

16  Q.      And this is one in which Pillen had 79

17  percent, Rasby 10 percent and Griess 10

18  percent?

19  A.      What were those percentages again?

20  Q.      79, 10, 10 and then PST 1?

21  A.      Yes.

22  Q.      Okay.  PST Milling was a feed milling

23  company which produces, mixes and delivery of

24  feed to some of the production entities; is

25  that correct?

Page 47

1   A.      Yes.

2   Q.      It was formed in 2001?

3   A.      Yes.

4   Q.      Jim Pillen had 70 percent.  You had 10

5   percent.  Brett Bonwell had 20 percent?

6   A.      Yes.

7   Q.      And then we talked about PST.  But you

8   had 10 percent ownership interest in that.  And

9   that was sold in June of 2012, your 10 percent?

10  A.      Yes.

11  Q.      And do you know the current status of

12  PST?

13  A.      I believe that the PST name no longer is

14  in operation.

15  Q.      Do you know if the entity still exists?

16  A.      I believe so, yes.

17  Q.      What's that based upon?

18  A.      Information that I have gained from the

19  website, from people in the community that I

20  know still work there.

21  Q.      Do you know if the legal entity still

22  exists, PST --

23  A.      PST?

24  Q.      -- as an entity, a corporation?

25  A.      I do not know.  I do know the name has

Page 49

1    Q.      Okay.  In this lawsuit, are you asking

2    to have your interest in those entities

3    returned to you?

4    A.      No.

5    Q.      You're asking for the contract to be set

6    aside, aren't you, or rescinded?

7                     MR. SHERRETS:  Object to the

8    form.

9            Go ahead.

10   A.      I am asking for a fair value from the

11   businesses that I sold.

12   Q.      (BY MR. ENGLER) What entitles you, to

13   your knowledge, to receive what you consider to

14   be fair value for these interests?

15   A.      Fair and right business dealings.

16   Q.      Did Dr. Pillen in your mind have an

17   obligation to buy your shares back from you?

18   A.      No.

19   Q.      Did you have an obligation to sell them

20   back to him when he left?

21   A.      No.

22   Q.      You received $2 million plus repayment

23   of a $350,000 loan as part of the contract that

24   was actually finalized; correct?

25   A.      Correct.

Page 59

1    was 2,350,000?

2    A.      Yes.

3    Q.      And you thought that you should have

4    received at least 3.5 million; correct?

5    A.      Yes.  Not including the loan.

6    Q.      Okay.  Not including the loan.  Thank

7    you.

8            Okay.  You said you had options.  All

9    right?

10   A.      Yes.

11   Q.      So let's talk about those options.  We

12   talked about the fact you could have held on as

13   a minority shareholder; right?

14   A.      Yes.

15   Q.      You could have brought a lawsuit

16   alleging minority shareholder suppression or

17   oppression?

18   A.      Yes.

19   Q.      You hired a law firm to assist you in

20   that process?

21   A.      Yes.

22   Q.      You hired a very good law firm; right?

23   A.      Yes.

24   Q.      Did you feel that you got very good

25   service from them, good advice?

1   A.     Yes.

2   Q.     Were you always satisfied with their

3   advice and service?

4   A.     Yes.

5   Q.     Was there ever a time where you felt

6   like they weren't representing your interests

7   as diligently as they could?

8   A.     No.

9   Q.     I think you saw that Roger Wells has

10  handled billions of dollars worth of

11  transactions involving mergers, acquisitions

12  and sales of stock; right?

13  A.     Yes.

14  Q.     You consider him to be pretty

15  experienced; right?

16  A.     Yes.

17  Q.     Pretty good at what he does; right?

18  A.     Yes.

19  Q.     And he was going to be your lawyer;

20  correct?

21  A.     Yes.

22  Q.     Was your husband actively involved in

23  the discussions?  Maybe not with Dr. Pillen

24  directly but did the two of you talk about it?

25  A.     Yes.

Page 61

1   Q.      Did you weigh the pros and cons of the

2   various options that you had?

3   A.      Yes.

4   Q.      Consider the strengths and weaknesses of

5   doing one versus the other?

6   A.      Yes.

7   Q.      Agonized over it, I'm sure?

8   A.      Yes.

9   Q.      Tried to figure out what was going to be

10  the best result for you; right?

11  A.      Yes.

12  Q.      If you thought about litigation, you

13  were going to take into account the strengths

14  of the case?

15  A.      Yes.

16  Q.      The weaknesses of the case?

17  A.      Yes.

18  Q.      The likelihood of a favorable result?

19  A.      Yes.

20  Q.      And the likelihood of an unfavorable

21  result?

22  A.      Yes.

23  Q.      The cost associated with it?

24  A.      Yes.

25  Q.      Ultimately what could you recover?  You

Page 62

1    took that all into consideration; right?

2    A.      Yes.

3    Q.      And you were getting advice from very

4    good lawyers as to what those options were;

5    right?

6    A.      Yes.

7    Q.      And ultimately you chose to sign the

8    contract and accept what had been offered

9    rather than proceed with litigation, didn't

10   you?

11                   MR. SHERRETS:  Objection.  Form.

12   A.      I felt it was the only option, really, I

13   had.

14   Q.      (BY MR. ENGLER) When you considered the

15   strengths and weaknesses and the other

16   alternatives, it was the one that made the most

17   sense; right?

18                   MR. SHERRETS:  Objection.  Form.

19   A.      It didn't make sense.  But I had to do

20   it.

21   Q.      (BY MR. ENGLER) Okay.  You did it

22   voluntarily?

23                   MR. SHERRETS:  Form.

24   A.      Not really.

25   Q.      (BY MR. ENGLER) Did someone force you to

Page 77

1    correct?

2    A.      That's right.

3    Q.      It's a very important part of the

4    operation?

5    A.      Yes.

6    Q.      And if that is breached somehow, you

7    could have a serious outbreak of disease that

8    would wipe out an entire production facility

9    theoretically; right?

10   A.      Theoretically.

11   Q.      Now, there's a -- there's another

12   related company called Imperial Foods.  You're

13   familiar with Imperial Foods; right?

14   A.      Yes.

15   Q.      And that was an entity in which Jim

16   Pillen owned 100 percent; correct?

17   A.      Yes.

18   Q.      And Imperial Foods had a relationship

19   with Double D; correct?

20   A.      Yes.

21   Q.      It was -- and at some point, there was a

22   decision made that Imperial Foods and Double D

23   would have a set price for buying the weanling

24   pigs; right?

25   A.      There had been a set price.

1   Q.      Okay.  And at times, that resulted in

2   Imperial Foods buying weanling pigs for below

3   market value; right?

4   A.      Not originally.  When we had a set

5   price, it was based on a market value

6   calculation.

7   Q.      Right.  And that did change, though, at

8   some point; right?

9   A.      That changed when Jim Pillen wanted the

10  business to become a virtual partnership.

11  Q.      And when did that occur, the virtual

12  partnership?

13  A.      2009.

14  Q.      And you were aware of it in 2009?

15  A.      Yes.

16  Q.      Did you believe the virtual partnership

17  impacted you financially, in a negative way?

18  A.      Yes.

19  Q.      Okay.  And you knew that in 2009?

20  A.      Yes.

21  Q.      Did you challenge Jim on that?

22  A.      At that point, I -- I wouldn't say I

23  challenged him.

24          I think -- let's see.  I think I

25  expressed my concern over the virtual

Page 79

1    partnership and what it was going to do to

2    Double D and to his brothers.

3    Q.     And when did you express that concern,

4    did you?

5    A.     I think I had said something in 2009.

6    Q.     How did Jim respond, if at all?

7    A.     At -- at that point -- at that point, I

8    can't remember.

9    Q.     At some later point, was there -- the

10   discussion come up again?

11   A.     Yes.

12   Q.     When was that?

13   A.     In 2011.

14   Q.     All right.

15   A.     After the 2010 results.  And I was -- I

16   was concerned about the economics.

17   Q.     Okay.  So 2010 fiscal year ends.

18   A.     Uh-huh.

19   Q.     And you are evaluating the financial

20   status of Imperial Foods and Double D?

21   A.     Yes.

22   Q.     Because you have access to that

23   information, obviously?

24   A.     Yes.

25   Q.     And you were concerned about the impact

1   the virtual partnership was having on Double D?

2   A.      Yes.

3   Q.      And did you raise a concern with Jim?

4   A.      Yes.

5   Q.      And that would have been early 2011?

6   A.      Yes.

7   Q.      Did you raise a concern with anyone else

8   other than Jim?

9   A.      Raise a concern?  No.  I wanted to

10  discuss it with Jim.  And I wanted to discuss

11  the health issues that were causing problems.

12  Q.      Health issues with regard to the?

13  A.      Imperial Foods.

14  Q.      And not somebody's personal health

15  issues?

16  A.      No.

17  Q.      All right.  Do you remember that

18  conversation with Jim?

19  A.      Yes.  We didn't get to the health

20  issues.

21  Q.      Okay.  Where was the conversation?

22  A.      In our conference room.

23  Q.      Who else was present?

24  A.      Kara Barnett and Sarah Pillen.

25  Q.      Did you -- can you give me any more of a

Page 99

1   first page is an e-mail from you.  It says Doug

2   Rasby.  But do you recall that being your --

3   A.      I used Doug Rasby's e-mail and -- but it

4   was from me.

5   Q.      I was confused by that initially.  It's

6   an e-mail to -- from you to Roger Wells,

7   providing some background information.  It's

8   dated May 22nd, 2011; correct?

9   A.      Yes.

10  Q.      And it's my understanding that prior to

11  sending this e-mail, you called Roger Wells;

12  right?

13  A.      Yes.

14  Q.      And had a conversation with him about --

15  about trying to set up a meeting with him;

16  right?

17  A.      Yes.

18  Q.      He thought you had gotten his name from

19  Gene Arnold; is that correct?

20  A.      I believe so, yes.

21  Q.      You'd never worked with Roger before?

22  A.      No.

23  Q.      Never worked with McGrath North before?

24  A.      No.

25  Q.      Had you worked with Gene Arnold before?

1   A.      Yes.

2   Q.      Gene is with Frankel --

3   A.      Zacharia.

4   Q.      -- Zacharia.

5   A.      You got that.

6   Q.      Practiced.

7           And after the conversation with Roger

8   Wells where you introduce yourself and tell him

9   what you want, you send him this information in

10  Exhibit No. 3; correct?

11  A.      Yes.

12  Q.      Okay.  I'm assuming you prepared this

13  entire document; right?

14  A.      Yes.

15  Q.      Okay.  And page 2 of Exhibit 3, you're

16  providing Mr. Wells kind of your objective;

17  would that be fair?

18  A.      Yes.

19  Q.      Okay.  And at that time, you had

20  identified three options.  One is selling of

21  all of your interests.  Two is partially

22  selling your interests.  And three, maintaining

23  your interests.  Do you see that?

24  A.      Let's see, are we on the same --

25  Q.      Yeah.  My --

1   A.      "My intent is to establish a fair and

2   equitable agreement with the majority owner,

3   Jim Pillen."

4   Q.      "Whether my ownerships were sold" --

5   A.      Or maintained.

6   Q.      -- "or just sold or maintained."  So --

7   A.      Yes.

8   Q.      -- three different options?

9   A.      That's right.

10  Q.      On this next page of the exhibit,

11  there's kind of a chart and some information

12  about the companies in which are owned by you

13  and other people.  And we've gone through

14  those.

15          But there's one thing I want to ask you

16  about.  And it's the -- it's the asterisk that

17  appears by Imperial Foods.  Can you see that?

18  Do you see Imperial Foods, LLC?  There's a

19  little asterisk there?

20  A.      Yes.

21  Q.      And then at the bottom is the statement,

22  "I've experienced unilateral decisions

23  implemented by Jim to change rates that had

24  been financially detrimental to me."  Do you

25  see that?

1   A.      Uh-huh, yes.

2   Q.      And that's consistent with what we

3   talked about earlier; right?

4   A.      Yes.

5   Q.      Okay.  Then drop down to the second to

6   the last paragraph.

7   A.      Yes.

8   Q.      The second to the last sentence says,

9   "Jim did, however, unilaterally implement a

10  change in management fees which was beneficial

11  to him and detrimental to me."  What is that

12  referring to, do you know?

13  A.      I -- I can't remember for sure.  I think

14  having to do with Imperial Foods.

15  Q.      Okay.

16  A.      And the virtual partnership.

17  Q.      That's what I'm just trying to clarify.

18  And if it is, that's fine.

19  A.      I think.

20  Q.      Okay.  And then the last paragraph,

21  first sentence, "As I have mentioned, Jim has

22  made intimidating comments that the profits

23  will be moved to the farms."  What intimidating

24  comments did he make to you?

25  A.      As I recall, he said that PST would be

1   going away.  Later he said he was going to blow

2   up PST.

3         He said things -- things are going to

4   change.

5   Q.    And -- but I'm talking about in May of

6   2011.

7   A.    May of 2011.

8   Q.    I know later we have some e-mails

9   about -- or some discussions about blowing up

10  PST.  But up until this point in time, I want

11  to know what Jim Pillen comments have been

12  made, if you recall.  If you don't, that's

13  fine.

14  A.    He had just started making a comment or

15  two about the -- the profits of PST would be

16  going away.

17  Q.    And do you remember when those

18  intimidating comments were made?

19  A.    I don't recall.

20  Q.    Was that kind of the reason why you

21  reached out to Roger Wells is you were

22  concerned about that?

23  A.    Yes.

24  Q.    Okay.  Now, your retirement letter is --

25  I call it a letter.  But your retirement

Page 116

1    the profitability of PST going away, I don't

2    know, that might have been a -- viewed as a

3    lie.

4    Q.      Did he ever say something to you during

5    negotiations that you found out later just

6    wasn't true?

7    A.      Well, he said he was going to blow up

8    PST.  And I think the reality was, he just

9    changed the name to Pillen Family Farms.

10   Q.      I --

11   A.      So I would say that was a lie.

12   Q.      That was a statement about what was

13   going to occur in the future; correct?

14   A.      Yes.

15   Q.      All right.  Did you believe that he was

16   going to blow up PST?

17   A.      I -- I believed -- I believed what he

18   said.  I knew he was going to do something that

19   would be advantageous for him.  And as hostile

20   as he was towards me, I -- I knew it wasn't

21   going to be good for me.  So I believed that.

22   Q.      So you believed he was going to do

23   something?

24   A.      That he said he was going to do, yes.

25   Q.      Did he, in fact, not do what he said he

Page 119

1    A.      Again, as long as the best interests of

2    the owners were taken into account --

3    Q.      (BY MR. ENGLER) Right.

4    A.      -- and the owners would not be harmed,

5    then business decisions need to be made.

6    Q.      And if those decisions do harm the

7    minority shareholder or the minority owner, the

8    minority owner has the right to proceed with a

9    lawsuit; correct?

10                  MR. SHERRETS:  Are you talking

11   hypothetically or Deb Rasby?

12                  MR. ENGLER:  Deb Rasby.

13                  MR. SHERRETS:  Object to the

14   form.

15   A.      If I had been financially able to

16   sustain a lawsuit, yes.

17   Q.      (BY MR. ENGLER) The idea of a lawsuit

18   against Jim Pillen was on the table from the

19   moment you met with Roger Wells through June

20   29th, 2012, wasn't it?

21   A.      That was a possibility to be considered.

22   Q.      Along with the possibility of not

23   selling?

24   A.      That was a possibility to be considered,

25   yes.

1   would you agree that this is your e-mail?

2   A.      Yes.

3   Q.      Okay.  And in the -- right before the

4   best regards, it says, "I will continue to work

5   in the direction of a sale if at all possible.

6   I agree with you that this is -- would be the

7   best path."  Do you see that?

8   A.      Yes.

9   Q.      All right.  So at this point in time, at

10  least you're considering several options;

11  correct?

12  A.      Yes.

13  Q.      And -- but at this point, you've

14  identified as probably the best possible path

15  is the sale of the --

16  A.      Yes.

17  Q.      -- of the interest?

18  A.      Uh-huh.

19  Q.      Okay.  That continued to be kind of the

20  preferred choice as you moved throughout the

21  negotiation, didn't it?

22  A.      Yes.

23  Q.      Okay.

24  A.      I -- I will qualify that.  If -- if the

25  businesses could have operated as they had

Page 130

1  background as a way in which you could maybe

2  maximize your -- the possibility of a

3  successful negotiation?

4  A.      I obviously needed legal advice.  I -- I

5  wanted to negotiate in a positive way with Jim

6  Pillen.

7          My ultimate goal was to come out of it

8  with a good relationship, with something fair

9  and right that -- that would keep us on good

10  terms.

11          So I was using legal advice just to kind

12  of help me navigate the waters and what -- what

13  my rights were and just what the best options

14  were.

15                  MR. ENGLER:  I'm thinking about

16  taking a lunch break.

17                  MR. RASBY:  I heard his stomach

18  growling.  Did you?

19                  THE VIDEOGRAPHER:  I'm hearing

20  everybody's stomach growling.

21                  THE WITNESS:  And you've been

22  snacking.

23                  THE VIDEOGRAPHER:  Oh, at a

24  break, yeah.

25                  MR. ENGLER:  Okay.  Let's go off

Page 150

1    e-mail string.  So the bottom half of the

2    e-mail is a -- it goes on to the next page, is

3    an e-mail from you to Roger Wells, March 15th,

4    2012, at 1:34.

5    A.      Uh-huh.

6    Q.      And the very top of the e-mail is his

7    response at 5:22.  But that's been redacted.

8    So we don't get to see what his response is.

9    A.      Okay.

10   Q.      So we're going to focus only on your

11   e-mail to him as primarily an update and a

12   question.

13   A.      Okay.

14   Q.      Okay.  And he updates you about some

15   information on the tax distributions.  And then

16   you're referencing the dissolution of PST.

17   A.      Uh-huh.

18   Q.      And then you talk about the regent's

19   race.

20   A.      Yes.

21   Q.      And the fact that he's running for --

22   candidate for the Board of Regents; correct?

23   A.      Yes.

24   Q.      And you wanted to make Roger Wells aware

25   of that?

1   A.      Yes.

2   Q.      And then your opinion was whether you

3   should go forward and send an e-mail to Jim

4   about threatening to go public with some

5   accusations if he -- if this doesn't go well.

6   Would that be fair?

7   A.      Let's see.

8                   MR. SHERRETS:   I'm going to

9   object to the form.   The document speaks for

10  itself.

11  A.      If there were litigation, information

12  could come out in e-mails that would not show

13  him in a good light.   So I would think that he

14  would want to avoid litigation if at all

15  possible.

16  Q.      (BY MR. ENGLER) And you were going to

17  communicate with him to that effect in order to

18  gain leverage in the negotiation, weren't you?

19                  MR. SHERRETS:   Object to the

20  form.

21  A.      I was trying to -- trying to communicate

22  and encourage him to do the right thing, which

23  were words on his wall, by the way, they

24  were -- as part of his business principles.

25  And every action that I took, I reminded him of

Page 152

1    those business principles.

2            And one of them was treat others the way

3    you would want to be treated.  And it comes

4    from Jesus.  And it incorporates all the law in

5    that one sentence.  All the law is contained in

6    that one sentence.

7    Q.      (BY MR. ENGLER) Golden rule; right?

8    A.      So -- it's the golden rule.  And it

9    comes from Jesus Christ.

10           So I would come back and play on that

11   one note that I had all the time.

12           And in this, there were communications

13   that I kept, e-mails that I kept of his that

14   would come out in a legal proceeding.  If I

15   were in his shoes, I wouldn't want those to

16   come to light.

17   Q.      All right.  Couple things.  One, you

18   were asking Roger for his opinion on whether

19   you should communicate to Jim about

20   communications that would be damaging to his

21   image?

22   A.      Yes.

23   Q.      And those are those e-mails you're

24   referencing?

25   A.      Yes.

Page 153

1   Q.      And then you prepared a draft letter to

2   Jim where --

3   A.      Uh-huh.

4   Q.      -- you were going to incorporate that

5   concept; correct?

6   A.      Yes.

7   Q.      Did you ever send an e-mail to Jim to

8   that effect?

9   A.      That I don't know.

10  Q.      Okay.  You make reference that there

11  were actions on his part that would have

12  crossed the line to criminal if they went

13  further.

14  A.      I thought they might.

15  Q.      What are you referring to?

16  A.      It had to do with Imperial Foods and

17  their water supply.

18  Q.      Okay.

19  A.      And actually was more, like, lack of

20  action on Jim Pillen's part when I had heard

21  that there was -- there was salmonella in the

22  pigs' water supply in Imperial Foods.  And we

23  had experienced a very high death loss there.

24  And I -- I expected him to act with urgency to

25  correct that situation.

Page 154

1            I was not getting the impression that

2     that was happening.

3            So -- I'm not a lawyer.  But I think if

4     a water supply is contaminated, particularly

5     with salmonella, to me it's an urgency.  And I

6     don't know what came of that.

7     Q.     Anything else in terms of actions that

8     were crossing the line?

9     A.     That was -- that was really what I was

10    thinking about.

11    Q.     Okay.  And you were trying to get him to

12    do the right thing?

13    A.     Yes.

14    Q.     And you were going to make sure he

15    understood that some of these things could be

16    exposed and be damaging to him in his regent's

17    race?

18                    MR. SHERRETS:  Form.

19    Q.     (BY MR. ENGLER) Isn't that right?

20    A.     That's right.  Exposure of things that

21    don't indicate integrity would not -- would not

22    be good for a regent for the University of

23    Nebraska.

24    Q.     Right.  And the main reason you were

25    going to do that is to gain an advantage in

Page 164

1   A.      Yeah.

2   Q.      And that was pretty much a take-it-or-

3   leave-it offer; right?

4   A.      Yes.

5   Q.      Did you ever come to understand that the

6   basis for Pillen's offer came from calculations

7   done by Steve Weiss?

8   A.      Yes.

9   Q.      And did you come to understand that

10  Weiss used the same approach that he did when

11  Pillen bought out the interests of the

12  Gottsches?

13  A.      Yes.

14  Q.      And the same approach that he used when

15  Pillen bought out Ken Morrison?

16  A.      I don't know about that.

17  Q.      Okay.  You were offered -- extended an

18  opportunity to meet with Steve Weiss to talk

19  about his calculations?

20  A.      Yes.

21  Q.      But you didn't do that, did you?

22  A.      There didn't seem to be a point.  He's

23  not a certified valuation professional.

24  Q.      So you didn't --

25  A.      So I did not respect his calculations.

Page 176

1  A.      I am not sure.

2  Q.      Okay.  I think we can figure that out in

3  a minute.

4          One thing about the e-mail, though, it

5  makes reference, at the bottom, it says, "We

6  appreciate all the talent you both have and the

7  dedicated work that you have done on this

8  case."  Do you see that?

9  A.      Yes.

10  Q.      Were you satisfied with what Roger and

11  Bill were doing on your behalf?

12  A.      I think they were doing all that could

13  be done in this particular situation.  It was a

14  difficult situation.  There didn't seem to be

15  any good avenues for us to take --

16  Q.      But you --

17  A.      -- after examining them.  An attorney

18  can only do so much.

19  Q.      But you felt that you were in the best

20  of legal hands, didn't you?

21  A.      I did think that we were in good legal

22  hands.

23  Q.      Okay.  The reason I don't think you sent

24  the letter is, if you take a look at Exhibit

25  34, which is an e-mail from Roger Wells, also

Page 180

1  Roger Wells dated May 13th, 2012.  Have you

2  ever seen this before?

3  A.    Yes.

4  Q.    Okay.  And it's a cover e-mail which is

5  attaching summary valuations prepared for

6  Northern Nance and Northern Plains combined and

7  for Double D Family Farms based on Steve Weiss'

8  experience and methodology.  Okay?

9  A.    Yes.

10  Q.    And he goes on to say, "Mr. Weiss was

11  retained by the parties to assist in

12  establishing a fair -- I'm sorry, in

13  establishing a value for interests purchased by

14  Jim Pillen and two unrelated entities."  Do you

15  see that?

16  A.    Yes.

17  Q.    Okay.  Did you understand that

18  Mr. Pillen was using the same methodology he

19  had used with two other minority shareholders?

20  A.    Yes.

21  Q.    Do you think that's unconscionable?

22  A.    I think it's wrong.

23  Q.    Do you think it's unfair?

24  A.    I think it's unfair.

25  Q.    Actually, Jim Pillen was purchasing the

Page 181

1    controlling interest from both companies.  Do

2    you know if there's a -- there's a difference

3    when you buy a controlling interest, do you pay

4    a premium for that?

5    A.      I'm not a valuation expert.

6    Q.      He says, "The same methodology was

7    applied to determine if -- the values described

8    in the attachment."  Do you have any reason to

9    doubt that?

10   A.      Can you say that again?  Where do you --

11   where are reading?

12   Q.      I said -- I'm sorry.  It's the fourth

13   line at the end.  "The same methodology was

14   applied to determine the values described in

15   the attachment."  Do you have any reason to

16   doubt that?

17   A.      The same methodology -- I'm not finding

18   that.  Where are you seeing it?

19   Q.      It's on the -- it's in the fourth line

20   at the end.

21   A.      Oh, on the first paragraph?

22   Q.      Yes.  I'm sorry.

23   A.      Yes.

24   Q.      And then he concludes with -- not

25   concludes but he offers to make Steve Weiss

Page 182

1    available to you --

2    A.    Yes.

3    Q.    -- to go through those, and you chose

4    not to; right?

5    A.    Yes.

6    Q.    Okay.  Go ahead and take a look at

7    Exhibit No. 38.

8    A.    All right.

9    Q.    Okay.

10   A.    Oh, wait.  There's more.  Oh, please --

11   let's see.

12   Q.    The disclosures, disclaimers.

13   A.    Okay.  Okay.

14   Q.    Okay.  So it this e-mail string with

15   some -- May 21st, approximately, starting off

16   with Roger Wells and Tim Moll.

17         And then the one later in the day 4-18.

18   And it's talking about making Steve Weiss

19   available.

20         Then Tim Moll sends an e-mail to Roger,

21   this is primarily on the second page, with the

22   second to the last paragraph saying the

23   deadline of June 1 and indicating that if the

24   terms are not acceptable, Jim will no longer

25   consider a purchase of your interest.

Page 184

1    doing?

2                    MR. RASBY:  I'm better.

3                    MR. SHERRETS:  Need a break?

4                    THE WITNESS:  I'm okay.

5                    MR. ENGLER:  Okay.

6                    MS. BENTZEN:  I'm fine.

7                    MR. ENGLER:  Okay.

8                    THE VIDEOGRAPHER:  Hopefully we

9    can stop in 10 minutes or so to start a new

10   media file.

11                   MR. ENGLER:  Sounds good.  Stop

12   me whenever you want.  Okay?

13   Q.      (BY MR. ENGLER) Okay.  Take a look at

14   Exhibit No. 39.

15   A.      Okay.

16   Q.      Exhibit 39 is an e-mail from you to

17   Roger Wells and Bill Hargens on May 23rd, 2012.

18   And if I'm reading this correctly, you're

19   laying out what you consider to be your options

20   at that point; right?

21   A.      Yes.

22   Q.      Did you consider any other options other

23   than litigation in those three?

24   A.      At that point, those were -- those were

25   the options we thought we had.

Page 187

1    Q.     Okay.

2    A.     So that was May 31st.

3    Q.     Right.  Okay.  Now, the next two

4    exhibits you can take a look at are --

5    A.     And we had been given till June 1.  So

6    if you can put yourself in that position, it is

7    a crunch.

8    Q.     Right.

9    A.     Just a horrendous squeeze crunch.

10   Q.     And it looks to me like, if you look at

11   Exhibits 43 and 44, Roger Wells had prepared

12   for you both a letter accepting -- I said --

13   I'm sorry, 42 and 43.  Okay.  Put together a

14   draft letter rejecting the offer and a draft

15   e-mail accepting the offer.

16   A.     Yes.

17   Q.     Okay.  And ultimately on June 1, you

18   decided to go ahead and accept; correct?

19          Go to Exhibit 44, and that will help

20   you.

21   A.     Okay.  Okay.

22   Q.     Okay.  Now, after accepting the June 1

23   proposal, between June 1 and June 29, we have

24   several things that go on.  Okay?  I'm trying

25   to summarize those, if I can.

Page 188

1              No. 1, there's an issue as to whether
2     the $350,000 loan is included or not; correct?
3     A.      Correct.
4     Q.      And there had to go back and forth
5     between the lawyers and various people about
6     which direction that was going to go.  You'd
7     agree with me that ultimately the 350 was
8     included as part of the proposal; correct?  The
9     repayment of the 350?
10    A.      Two million three fifty included the
11    repayment of the loan.
12    Q.      And there was an issue as to whether it
13    was the -- included originally or not; right?
14    A.      Right.
15    Q.      Okay.  But ultimately that was resolved?
16    A.      Right.
17    Q.      Okay.  Another consideration during this
18    time is whether you want to see if you can
19    trigger any of the buy/sell agreements by
20    finding a third party to make an offer?
21    A.      Yes.
22    Q.      Okay.  And you involved your son down in
23    Kansas City, but ultimately you chose not to go
24    that path because you -- it didn't feel right?
25    A.      That's right.

Page 191

1    A.      Correct.

2    Q.      And then you also go on to talk about

3    that 4.5 million dollar, that -- your son Greg

4    and your brother-in-law Scott.

5    A.      Yes.

6    Q.      I did say your son-in-law.  And I meant

7    to say earlier your brother-in-law.

8    A.      Okay.

9    Q.      So that's the correction there.

10   A.      Okay.

11   Q.      Okay.  Now, my question is, as to the

12   letter, did you, in fact, drop the letter off?

13   A.      Yes.

14   Q.      Okay.  And so that would have been the

15   next day; is that right?

16   A.      I think so.

17   Q.      Okay.  Did you ever get a response from

18   either Sarah, Brock or --

19   A.      No.

20   Q.      -- his wife?

21           Okay.  You talk about the various

22   options that you have; correct?

23   A.      Yes.

24   Q.      And at this point, you're asking for a

25   sale price of 4.5; is that correct?

Page 193

1    acceptable?

2    A.      On the June 13th e-mail to Roger Wells

3    from me --

4    Q.      Uh-huh.

5    A.      -- I said, "From what I see, if I have a

6    buyer who wants to hold this investment for

7    appreciation, I can sell my interest to him."

8            So we're still holding out that little

9    ray of hope that we could possibly find someone

10   that might want to.

11           I think our son was trying to think of

12   someone.  Our brother-in-law was trying to

13   think of someone.  So we were just kind of

14   holding that out there as a -- as a very small

15   hope but a hope, nevertheless.

16   Q.      And so --

17   A.      And then what was your question that I

18   didn't -- just now didn't answer?

19   Q.      Oh, you kind of did.

20           It looks to me like as of 5:09, Wells

21   has prepared a draft letter to Tim Moll where

22   you are rejecting Pillen's offer?

23   A.      He -- Roger Wells drafted that letter.

24   I don't think it was sent.

25   Q.      No, it wasn't.

Page 194

1    A.      No.

2    Q.      But at least you were considering it at

3    that point; correct?

4    A.      I -- we were considering everything

5    still.

6    Q.      Okay.

7    A.      Just with a great deal of anxiety and

8    fear but just still hoping, hoping, hoping that

9    we could find some way out of this corner that

10   we were backed into.

11           And that was a possibility.  But it --

12   it didn't happen.  And the possibility of a

13   buyer didn't happen, obviously.

14   Q.      So ultimately you told Wells to

15   communicate to Moll that you were going to

16   proceed and go forward with it?

17   A.      We had -- we had no choice.

18   Q.      But you sent Jim another letter on June

19   14th?

20   A.      Probably trying to appeal again.

21   Q.      And trying to ask him to consider

22   another appraisal value; is that fair?

23   A.      That's fair.

24   Q.      Does that kind of refresh your

25   recollection that at least as of June 14th, you

Page 197

1    A.      Very conservative.

2    Q.      Now, after you decide to go forward,

3    there are drafts of the Unit Purchase Agreement

4    exchanged between the lawyers; right?

5    A.      Yes.

6    Q.      And you're involved in reviewing those;

7    correct?

8    A.      Yes.

9    Q.      And approving whatever changes are made;

10   correct?

11   A.      Yes.

12   Q.      At Roger Wells' deposition, I think we

13   pointed out and he agreed that the original

14   Unit Purchase Agreement as drafted contained no

15   release for you, nor for Pillen?

16   A.      Okay.

17   Q.      And then at his suggestion, a release of

18   you only was put in the Unit Purchase Agreement

19   draft.  Do you agree with that?

20   A.      I don't recall that.  Those were to me

21   legalities that I -- I didn't have a very clear

22   understanding of.  It wasn't very important to

23   me at that time.

24   Q.      Was it at some point, though, you

25   understood that there would be a mutual

1   release, where you would release Pillen and

2   Pillen would release you?

3   A.      Yes.

4   Q.      And did you review that release?

5   A.      Yes.

6   Q.      Did you consider it to be ambiguous in

7   any way?

8   A.      No.

9   Q.      Did you consider it to be a full and

10  complete release on both sides?

11  A.      I believe so.

12  Q.      Okay.  One quick thing, on Exhibit 54 --

13  A.      Okay.

14  Q.      Okay.  This is a -- an e-mail from you

15  to Roger Wells, June 28th.  It's talking about

16  the changes to the contract, closing tomorrow.

17  And then makes reference to, "Of course, time

18  is of the essence for the transfer of funds."

19  What did you mean by that?

20  A.      I'm a financial person.  When dollars

21  and cents are involved, time is always of the

22  essence.

23  Q.      Okay.  There's some changes that need to

24  be made on the allocation of the purchase

25  price.  And I think they may have transposed

Page 201

1    feel?  You just feel desperate.  You feel like

2    there's -- you have to do it.

3            So I guess with that in mind, I thought

4    this is -- this is it, this is all I can do, I

5    have to sign it and he's -- he can -- he's the

6    majority, I guess he can do anything that he

7    wants to do.

8    Q.    Of course, he wasn't literally holding

9    your head under water?

10   A.    Not literally.

11   Q.    Sure.

12   A.    But certainly it felt like that in a

13   financial way.

14   Q.    And if you'd gotten $4-1/2 million, you

15   wouldn't have felt that way?

16   A.    No, I would have felt that we had

17   negotiated, that --

18   Q.    Okay.

19   A.    -- he had listened, that he was at least

20   trying to be fair in it.

21   Q.    How about if he'd have paid you $4

22   million?

23   A.    At that point in time, again, if -- I

24   had used a lot of low -- low values.  And if he

25   would have done something to show in character

Page 202

1   that he was willing to somewhat play fair, to

2   listen and to come somewhere middle ground or

3   move a little more off of his -- his firm

4   stance of these old values, at least I would

5   have seen some kind of good character shown

6   through there, some essence of -- of fair play.

7   Q.     If he'd have paid $3 million, would that

8   have been adequate?

9   A.     I --

10              MR. SHERRETS:  Object to the

11  form.

12  A.     I think my final -- I can't remember

13  what my final value was.

14              I felt my -- the lowest value that I

15  gave was giving so much away, how could you not

16  do that.

17              If I had been in his shoes and a

18  business partner of 20 years had said, okay,

19  take -- I won't even incorporate a value for

20  PST or the Gene Center or the mill and I'll

21  look at the very most conservative value and

22  even less than that and I'll accept this as

23  some kind of a negotiated offer, I would have

24  accepted that.

25              And, in fact, when I thought that he

Page 208

1          And then he didn't pay me that.  He paid

2  me the 2,350,000, handed me a check.

3  Q.     Okay.

4  A.     And I was flustered.  And I left without

5  the signed document.

6  Q.     So he signed the one that was 2.3

7  million?

8  A.     No.  He must have signed -- he signed

9  the other one.  He paid me 2.35.  But he signed

10  the other one.

11          And then that one I got by e-mail, the

12  one with the higher figure.  And I thought, oh,

13  my gosh, he had a change of heart.  And I was

14  thrilled.  And I sent him an e-mail thanking

15  him and saying, Jim, I knew you were a guy of

16  good character, you did it, thank you, thank

17  you.

18          And I just expressed my gratitude toward

19  him.  So --

20  Q.     And --

21  A.     -- I thought he had a change of heart.

22  And that is -- that was my response.

23          So in answer to your questions, would

24  you have been satisfied with whatever?  I think

25  that's the answer to the question was my e-mail

1    response to him saying, thank you, I am

2    grateful.

3    Q.    You found out the next day, though, that

4    he hadn't?

5    A.    Then he sent an e-mail back right away

6    saying I did not have a change of heart.

7    Q.    Right.  Do you remember Roger Wells

8    asking you how it came about that there was a

9    contract?

10   A.    Yes.

11   Q.    What did you tell him?

12   A.    I explained to him that I took both

13   contracts in and that I had tried to have him

14   see that this was a very fair offer and that --

15   that low number but it was still higher than

16   the 2 million was fair.  But I told him he

17   didn't -- he didn't do it.

18   Q.    Now, you continued to attempt to get Jim

19   Pillen to pay you additional compensation,

20   didn't you?

21   A.    I continued to -- I continued to

22   correspond with him or communicate with him.

23   Q.    Sure.

24   A.    Because it just felt wrong.

25   Q.    At some point in time, you told him that

Page 210

1    you were going to retract your support of him

2    as a regent if he didn't pay you another 1.2

3    million?

4    A.      I -- I prepared a letter with -- that

5    outlined the actions that he took in this -- in

6    this whole situation.  And I gave those to him.

7           And I gave him two options, either do

8    some action that shows some kind of good

9    character, some kind of ethical behavior, some

10   kind of fair -- fair character, something that

11   reflects the words that you have on your wall

12   that -- treat others the way you want to be

13   treated; if you do that, I'll accept that as

14   fair; but if you don't, I'm going to speak out

15   and say what you did, I'm not going to be quiet

16   about the actions you took because the

17   University of Nebraska -- the University of

18   Nebraska deserves people that are ethical, that

19   have a respect for other people, that have a

20   high character.  They should -- they should be

21   on the highest plain of human behavior.

22          And what I experienced with Jim Pillen

23   was the opposite.  And he even said to me,

24   ethics have nothing to do with this, ethics

25   have nothing to do with this.

Page 225

1    A.      Yes.

2    Q.      -- such as a subchapter S corporation or

3    a limited liability company --

4    A.      Yes.

5    Q.      -- there's no tax paid at the entity

6    level; correct?

7    A.      That's right.

8    Q.      The income is imputed to the individual

9    shareholders or members, depending upon their

10   percentage interest?

11   A.      That's right.

12   Q.      There is not any obligation for the

13   entity to necessarily pay that money out, but

14   the income is still -- they pay it to the

15   shareholder or the member, but the income is

16   still imputed to them; correct?

17   A.      We had a verbal agreement that we would

18   pay tax distributions to the partners in

19   profitable years.

20   Q.      Right.  And what that verbal agreement

21   was that to the extent there was profit, you

22   would get, at a minimum, a distribution that

23   would cover the taxes that you would have to

24   pay on your share of the profit?

25   A.      That's right.

1    Q.      Okay.   In years where there was a loss,

2    in other words, no profit due to a variety of

3    factors, I suspect, but that same loss was

4    imputed to you as a taxpayer; correct?

5    A.      Yes.

6    Q.      And so you would get probably a K-1;

7    right?

8    A.      Yes.

9    Q.      And if the K-1 showed a loss, you could

10   choose to use that loss to offset other income

11   unrelated to the business; correct?

12   A.      Correct.

13   Q.      Which would lower your tax obligation;

14   right?

15   A.      Correct.

16   Q.      So, for example, if you had a tax loss,

17   you could use it to offset your husband's

18   income from work; right?

19   A.      Right.

20   Q.      Or gains on stocks; correct?

21   A.      Correct.

22   Q.      You don't have to use that loss, though,

23   do you?

24   A.      No.   You can carry it forward.

25   Q.      Sure.   Did you -- during the course of

Page 227

1    the time you were affiliated with these

2    entities, did you, in fact, have some years

3    where there was tax losses?

4    A.       There were some.

5    Q.       Did you use those tax losses to offset

6    other income as part of your taxable year?

7    A.       Yes.

8    Q.       To the extent that you are using the tax

9    losses, would that also reduce your basis in

10   the entity, your basis in the -- either the

11   stock or the membership unit?

12   A.       Ask that again.  Can I -- can you repeat

13   that question?

14   Q.       I'll try.  I'm not sure this -- this is

15   getting on the borderline of what I know about

16   taxes as well.

17            If you own stock in a corporation --

18   A.       Uh-huh.

19   Q.       -- you will have a tax basis in that

20   stock; right?

21   A.       Yes.

22   Q.       And when that stock is sold, the tax

23   basis will determine what the gain is?

24   A.       Right.

25   Q.       So in this particular case, when you

Page 228

1   sold your interests in those entities, that was

2   a taxable transaction?

3   A.      Yes.

4   Q.      And that resulted in a gain to you?

5   A.      Yes.

6   Q.      And the gain was based upon what your

7   basis was?

8   A.      Yes.

9   Q.      Was any of that basis affected by the

10  tax losses that had occurred?

11  A.      There were -- there were some.

12  Q.      Had you not used those tax losses,

13  though, you would not have had to worry about

14  that reduced basis; correct?

15  A.      I would still have to worry about it.

16  Taxes are always a concern.

17  Q.      Right.  Now, on a go-forward basis, what

18  you were concerned with is that there may have

19  been income imputed to you for which you would

20  not receive any distribution to pay taxes?

21  A.      Yes.

22  Q.      Okay.  That would depend on

23  profitability?

24  A.      Yes.

25  Q.      That would depend upon management, in

Page 240

1    I was desperate to get out from the -- the no

2    distribution and the -- the tax consequence

3    squeeze.

4            I was desperate at the age that I was at

5    and, with my career being blown up, to get out

6    of the -- just get out from under Jim Pillen.

7    Q.      And the last thing I'll ask about is

8    Mr. Engler was asking if you voluntarily signed

9    the purchase agreement.  And I think Mr. Engler

10   characterized it as he didn't physically take

11   your hand and force your signature on it?

12   A.      Uh-huh.

13   Q.      But do you believe that you voluntarily

14   agreed to the sale of your shares?

15   A.      No, I don't believe I voluntarily

16   agreed.  I felt like there was a gun to my head

17   financially.

18   Q.      And earlier --

19   A.      I had no options.

20   Q.      Earlier I believe you testified to

21   feeling that someone was holding your head

22   under water?

23   A.      Yes.

24                   MR. SHERRETS:  I have nothing

25   further.